10 CV 4905

JUDGE WOOD

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JERRY D. GOODWIN, Individually And On Behalf of All Others Similarly Situated, | CIVIL ACTION NO. _____ |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS |
| vs. | |
| ANADARKO PETROLEUM CORPORATION, JAMES T. HACKETT, ROBERT G. GWIN, and M. CATHY DOUGLAS | |
| Defendants | JURY TRIAL DEMANDED |

RECEIVED

JUN 29 2010

U.S.D.C. S.D. N.Y.

## INTRODUCTION

1.      This is a federal class action on behalf of purchasers of the common stock of Anadarko Petroleum Corporation ("Anadarko" or the "Company") between **June 12, 2009 and June 9, 2010**, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  As alleged herein, defendants published a series of materially false and misleading statements that defendants knew and/or recklessly disregarded were materially false and misleading when made, and that omitted to reveal material information necessary to make defendants' statements, in light of such material omissions, not materially false and misleading.

2.      Anadarko engages in the exploration and production of oil and gas properties in the deepwater of the Gulf of Mexico, among other areas.  Following the acquisition of a federal lease to drill the Macondo/Deepwater Horizon well site located in the Gulf of Mexico by BP

Exploration & Production, Inc., a subsidiary of BP, p.l.c. (collectively "BP") in March of 2008, Anadarko entered into a joint venture with BP and MOEX Offshore 2007 LLC ("MOEX") to explore the well site and surrounding area.  Under the terms of the joint venture, BP would operate the well and control a 65 percent interest, with Anadarko and MOEX controlling 25 percent and 10 percent interests, respectively.

3.     Although the well operator determines the planning and execution of the well, and is responsible for its day-to-day activities, Anadarko undertook this joint venture despite the "horrible safety record" of BP.  Indeed, according to an ABC News investigative report, in the period preceding the Class Period, BP had amassed 760 Occupation Safety and Health Administration (OSHA) violations during the same period in which Exxon had just one, and Sunoco and Conoco-Phillips had just eight each.   As a result of these "egregious and willful" safety violations, Anadarko, a 25 percent owner, was on notice of its need to inspect and scrutinize the actions of its business partner in operating the Macondo/Deepwater Horizon well site, which the Company nevertheless had an independent duty to perform.

4.     In connection with the Macondo/Deepwater Horizon joint venture, an Exploration and Oil Spill Response Plan was filed to obtain drilling permits as required by the Oil Pollution Act of 1990.  However, the Macondo/Deepwater Horizon Exploration and Oil Spill Response Plan was a complete sham, and was neither capable nor intended to respond to any significant oil spill.  Among other things, the Oil Spill Response Plan grossly overstated response capacity by representing an ability to respond to a spill of up to 250,000 barrels a day when the plan could not even provide for a spill of 5,000 barrels a day.  In addition, the Oil Spill Response Plan was materially deficient in several other respects, including: listing key emergency personal with incorrect contact information and who were, in one case, deceased; listing emergency provisions

for animals not found in the Gulf of Mexico; failing to account for the Gulf of Mexico's "loop current" capable of carrying oil hundreds of miles around Florida's southern tip; and grossly inflating the effectiveness of chemical dispersants.

5.      Despite defendants' awareness of, and/or reckless disregard for, the Macondo/Deepwater Horizon Exploration and Oil Spill Response Plan's material deficiencies and its potential effect on Anadarko's business, operations, management and the intrinsic value of Anadarko common stock, defendants consistently touted, among other things, the Company's results, commitment to the environment, and risk profile, which defendants claimed had properly reserved for, and insured against, foreseeable drilling related contingencies through the Class Period.  However, defendants statements were materially false and misleading when made because they failed to disclose, among other things: that there was no effective Exploration and Oil Spill Response Plan for Macondo/Deepwater Horizon; that the BP implemented drilling procedures solely to cut costs at the expense of safety; that the Company lacked adequate systems of internal, operational or financial controls to maintain adequate insurance reserves or to meet the known or foreseeable risks associated with its deepwater drilling liabilities; and that defendants lacked any reasonable basis to claim that Anadarko was operating according to plan, or that Anadarko could achieve guidance sponsored and/or endorsed by defendants.

6.      As a result of these materially false and misleading disclosures, defendants' were able to artificially inflate the price of Anadarko common stock throughout the Class Period of June 12, 2009 and June 9, 2010, inclusive, and profit handsomely, through revision of their compensation agreements in November 2009 and through the direct sale of over $65 million in personally held Anadarko common stock during the Class Period; which did not include Company perks, stock options or regular compensation.

3

7.      On April 20, 2010, the Macondo/Deepwater Horizon rig exploded killing 11 platform workers and inuring 17 others.  In the wake of this tragedy, defendants continued to issue materially false and misleading statements representing that the Company would likely incur only approximately $177.5 million in liability for its part in the Macondo/Deepwater Horizon venture.  However, these statements were materially false and misleading when made for the very same reasons outlined above, *supra* at ¶5.

8.      On June 1, 2010, the public began to learn the truth about Anadarko's business, operations, management, and the intrinsic value of Anadarko common stock when it was reported that the Macondo/Deepwater Horizon well could not be capped and investors came to realize there was effectively no plan in place to stop the spill.  That day, shares of Anadarko fell almost $10.00 per share - - or approximately 20% - - falling from a close of $42.10 per share, from a prior day's close of $52.33 per share, on huge volume of over 44.8 million shares traded.  Shortly thereafter, on  June 9, 2010, shares of Anadarko fell another 20% after investors learned of the material deficiencies in the Macondo/Deepwater Horizon Exploration and Oil Spill Response Plan, via the *Huffington Post*, and further learned that the Company would now be responsible for over $1 billion in clean up costs.

9.      On this news, the artificial inflation caused by the defendants' materially false and misleading statements during the Class Period was removed from the price of Anadarko's stock, thereby causing Plaintiff and the Class to suffer significant economic harm.

## JURISDICTION AND VENUE

10.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5.

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  The Company maintains sufficient contracts in this District, and many of the acts and practices complained of herein, including the dissemination of materially false and misleading information, occurred in this District.  The Company's stock is listed and trades on the New York Stock Exchange (NYSE); the Company conducts significant hedging and derivatives trading activities in crude oil and natural gas on the New York Mercantile Exchange (NYMEX); the Company's depositary and information agent, D.F. King & Co., Inc., is located in this District; Company Director John Gordon is currently located in this District and serves as Senior Managing Director of Deltec Asset Management LLC, an investment firm located in New York, New York; Company Director Paula Reynolds was located in this District during the relevant time period, serving as Vice Chairman and Chief Restructuring Officer of American International Group Inc. (AIG), an insurance and financial services company located in New York, New York from October 2008 to September 2009; and a Beneficial Owner of the Company,  BlackRock Inc., currently resides in this District.

13.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## **PARTIES**

14.     Plaintiff JERRY D. GOODWIN, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Anadarko at artificially inflated prices during the Class Period and has been damaged thereby.

15.     Defendant **ANADARKO PETROLEUM CORPORATION** is a corporation organized under the laws of the state of Delaware.  Anadarko maintains its principal place of business at 1201 Lake Robbins Drive, The Woodlands, Texas 77380.  Its common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "APC."  According to the Company's profile listed on *Yahoo.com/finance*, Anadarko engages in the exploration and production of oil and gas properties primarily in the United States, the deepwater of the Gulf of Mexico, and Algeria.  The Company also markets natural gas, crude oil, condensate, and oil and natural gas liquids, in addition to owing and operating natural-gas gathering, processing, treating, and transportation systems.

16.     Defendant **JAMES T. HACKETT** ("Hackett") is, and during the Class Period was, Chief Executive Officer, President, and Chairman of the Board of Directors of the Company.  During the Class Period, defendant Hackett certified the Company's Form(s) 10-Q, and signed and certified the Company's Form 10-K for the fiscal year ending on December 31, 2009.  During the Class Period, defendant Hackett sold $64,710,229 of his personally held Anadarko common shares while in possession of material adverse non-public information about the Company.

17.    Defendant **ROBERT G. GWIN** ("Gwin") is, and during the Class Period was, Chief Financial Officer and Senior Vice President of Finance of the Company.  During the Class Period, defendant Gwin signed and certified the Company's Form(s) 10-Q, and signed the Company's Form 10-K for the fiscal year ending on December 31, 2009.  During the Class Period, defendant Gwin sold $699,959 of his personally held Anadarko common shares while in possession of material adverse non-public information about the Company.

18.    Defendant **M. CATHY DOUGLAS** ("Douglas") is, and during the Class Period was Chief Accounting Officer and Vice President of the Company.  During the Class Period, defendant Douglas signed the Company's Form 10-K for the fiscal year ending on December 31, 2009.  During the Class Period, defendant Douglas sold $71,931 of her personally held Anadarko common shares while in possession of material adverse non-public information about the Company.

19.    The defendants referenced above in ¶¶16-18 are referred to herein as the "Individual Defendants."

20.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or

recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

21.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Anadarko, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

22.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon

truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

23.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements and omissions contained therein and their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with Anadarko, each of the Individual Defendants had access to the adverse undisclosed information about Anadarko's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Anadarko and its business, issued or adopted by the Company, materially false and misleading.

24.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the Company's SEC filings, press releases, and other public statements during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

25.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Anadarko common stock by disseminating materially false and misleading statements and/or concealing material adverse

facts. The scheme: (i) deceived the investing public regarding Anadarko's business, operations, management and the intrinsic value of Anadarko common stock; (ii) enabled defendants to artificially inflate the price of Anadarko shares; (iii) enabled Anadarko insiders, including the Individual Defendants themselves, to sell over $88 million of their privately held Anadarko shares while in possession of material adverse non-public information about the Company; and (iv) caused plaintiff and other members of the Class to purchase Anadarko common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

26.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of Anadarko between **June 12, 2009 and June 9, 2010**, inclusive (the "Class") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

27.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Anadarko common shares were actively traded on the NYSE. As of March 31, 2010, the Company had over 494.74 million shares of common stock issued and outstanding. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Anadarko or its transfer

agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

28.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal securities laws complained of herein.

29.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

30.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        (a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

        (b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Anadarko; and

        (c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

31.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

32.    **The Company.**  Defendant Anadarko describes itself as follows:

Among the largest independent oil and natural gas exploration and production companies in the world, with approximately 2.3 billion barrels of oil equivalent of proved reserves at year-end 2009.  Anadarko's portfolio of assets encompasses premier positions in nearly a dozen major U.S. onshore natural gas resource plays.  ***The company also is the largest independent deepwater producer in the Gulf of Mexico***, and has production and/or exploration in Alaska, Algeria, Brazil, China, Indonesia, East and West Africa.  ***[Anadarko is] committed protecting our environment, public health and our communities, while safely producing the energy we all need***.  Energy is fundamental to physical existence.  It is as important as clean air, water and affordable food.  ***We take our responsibility very seriously to deliver resources to our energy-hungry world, and we hold true to our core values of integrity and trust, servant leadership and open communication in all of our business activities***. [Emphasis added.]

33.    According to the Company's estimates, Anadarko's deepwater operations in the Gulf of Mexico account for approximately 20% of its expected 2010 oil and gas exploration and production segment capital budget.

34.    **Anadarko Owns 25% of Macondo/Deepwater Horizon Well.**  The Macondo/Deepwater Horizon well site is located in the Gulf of Mexico, at the Mississippi Canyon Block 252 (the "MCB 252"), approximately 45 miles off the coast of Louisiana and Mississippi.  BP Exploration & Production, Inc., a subsidiary of BP, p.l.c. (collectively "BP"), acquired the lease to drill the MCB 252 at a federal lease sale in March 2008.  Thereafter, Anadarko entered into a joint venture with BP and MOEX Offshore 2007 LLC ("MOEX") to explore the MCB 252, with BP controlling 65 percent interest, Anadarko controlling 25 percent interest, and MOEX controlling 10 percent interest.

35.    BP started drilling the Macondo well at MCB 252 on October 7, 2009, using the Marianas rig, which was leased to BP and owned and operated by Transocean Ltd. ("Transocean").  This rig was damaged by Hurricane Ida, so it was replaced with the Deepwater

Horizon rig, also owned and operated by Transocean.  Drilling with the Deepwater Horizon began on February 6, 2010.[1]

36.  **Lack of a Spill Plan.**  Under the Oil Pollution Act of 1990, federal offshore lessees must have an approved Exploration and Oil Spill Response Plan in place before the Department of Interior's Mineral Management Service ("MMS") will approve and issue drilling permits.  In order to comply with this requirement, an Exploration and Response Plan for MCB 252 was filed with MMS prior to obtaining permits to drill in MCB 252.

37.  Unbeknownst to investors, however, the Exploration and Spill Response Plan filed in connection with the Macondo/Deepwater Horizon well was ineffective, not designed to actually respond to any significant oil spill and was otherwise severely flawed in a number of material ways:

- The Exploration and Spill Response Plan stated that the well operator "has the capacity to respond, to the maximum extent practicable, to a worst case discharge, or a substantial threat if such a discharge, resulting from the activities proposed in our Exploration Plan" when, in fact, no such response capacity existed.

- The Exploration and Spill Response Plan stated that it had resources already in place to deal with a worst-case scenario leak, which would be a blowout from a well that could spill up to 250,000 barrels a day when, in fact, no Plan existed that could react to a spill of even 5,000 barrels per day.

38.  The Exploration and Spill Response Plan also contained material errors and omissions, including the listing of key emergency response personnel who were dead or unavailable, and the listing of emergency provisions for animals that did not even exist in the

---

[1] BP leased these rigs from Transocean, despite the fact that Transocean had a rising tally of accidents involved in deepwater drilling.  As reported by the *Wall Street Journal* on May 10, 2010:  "Nearly three of every four incidents that triggered federal investigations into safety and other problems on deepwater rigs in the Gulf of Mexico since 2008 have been on rigs operated by Transocean, according to an analysis of federal data. … Since [2008], Transocean has accounted for 24 of the 33 incidents investigated by the MMS, or 73%, despite during that time owning fewer than half of the Gulf of Mexico rigs operated in more than 3,000 feet of water

region.   As examples of material defects in the Exploration and Spill Response Plan included, in

part, the following:

- The Exploration and Spill Response Plan lists Professor Peter Lutz at the University of Miami as a national wildlife expert, but Mr. Lutz had not worked at the University of Miami for almost 20 years and died in 2005, four years before the plan was submitted.

- Under the heading "sensitive biological resources," the Exploration and Spill Response Plan lists marine mammals including walruses, sea otters, sea lions and seals, even though none of these animals are found in the Gulf of Mexico.

- The names and phone numbers of a several Texas A&M University marine life specialists listed in the Exploration and Spill Response Plan are wrong.

- The Exploration and Spill Response Plan lists telephone numbers that are no longer in service for emergency marine mammal stranding network offices in Louisiana and Florida.

- The Exploration and Spill Response Plan fails to mention or account for the Gulf's "loop current," which could have and should have been calculated to carry oil from the Macondo/Deepwater Horizon well, hundreds of miles around Florida's southern tip and up the Atlantic coast in the event of a major oil leak.

- The website listed for one of the firms that the Exploration and Spill Response Plan stated would be relied on for equipment to clean up a spill, the Marine Spill Response Corp., was incorrectly listed and, instead, links to a page written in Japanese.

- The Exploration and Spill Response Plan projects, based on a computer model, that there would only be a 21 percent chance of oil landing on the coast of Louisiana within a month after a spill when, in fact, this oil could and did wash ashore only 9 days after the explosion on the Deepwater Horizon rig.  This Plan also lists a number of areas where oil has washed ashore as being out the way of any danger of oil contamination.

- The Exploration and Spill Response Plan asserts that it could skim, suck up or otherwise remove 491,721 barrels of oil each day from the water when, in fact, only a small fraction of this amount of oil could be successfully recovered.

- The Exploration and Spill Response Plan states that no adverse impacts are expected on birds, sea turtles or endangered marine mammals, even though hundreds of oiled and/or dead birds, sea turtles and dolphins were immediately effected.

- The Exploration and Spill Response Plan claimed that it could disperse approximately 5,500 to 7,600 barrels of oil per day using chemical dispersants based on the assumption that the dispersants would be 90 percent effective when, in fact, the application of dispersants have historically been effective in only 33 percent of the oil treated.

39.    **"Horrible Safety Record."** In addition to the other material problems that existed at the time that the deepwater Horizon well began operations - - including the lack of a legitimate Exploration and Spill Plan for Gulf of Mexico deepwater drilling - - defendants were also aware, or were grossly reckless in disregarding, the abysmal safety record of its operating partner, BP.  By the inception of the Class Period, defendants knew or recklessly disregarded that BP had a "horrible safety record," which should have or did place defendants on notice to inspect and scrutinize the purported deepwater Horizon Spill Plan.  As evidence of the foregoing, an ABC News investigative report has recently uncovered the fact that, prior to the inception of the Class Period, <u>in the time that Exxon/Mobile (BP's leading competitor) received one single OSHA (Occupational Safety and Health Administration) fine, BP had been fined over 760 times!</u>

40.    Following the end of the Class Period, in June 2010, *Business Insider*, an Internet news source, reported on the results of the ABC News investigation, in part, as follows:

BP's Horrible Safety Record: It's Got 760 OSHA Fines, Exxon Has Just 1

Want to hear something scary? BP (BP) has been fined by OSHA (Occupational Safety and Health Administration) 760 times. By contrast, oil giant ExxonMobil (XOM) has been fined only once.

As The Stock Masters say: How is BP even allowed to operate?

Let's take a look back at BP's horrid track record, courtesy of ABC News:

- OSHA statistics show BP ran up 760 "egregious, willful" safety violations, while Sunoco and Conoco-Phillips each had eight, Citgo had two and Exxon had one comparable citation.

*    *    *

15

- Back in 2007, a BP pipeline spilled 200,000 gallons of crude into the Alaskan wilderness. They got hit with $16 million in fines.

- "The Justice Department required the company to pay approximately $353 million as part of an agreement to defer prosecution on charges that the company conspired to manipulate the propane gas market."

- In two separate disasters prior to Deepwater Horizon, 30 BP workers were killed and more than 200 have been seriously injured.

- "According to the Center for Public Integrity, in the last three years, BP refineries in Ohio  and Texas  have accounted for 97 percent of the "egregious, willful" violations handed out by OSHA"

After examining the facts, we're inclined to agree that BP probably shouldn't be operating here in the U.S. considering its horrific safety record.

### Defendants' Materially False and Misleading Statements Made During the Class Period

41.    **Hackett: Safe & Responsible Deepwater Drilling.** On June 12, 2009, the inception of the Class Period, defendant Hackett was featured in an interview published by *Energy Tribune*, an influential energy business trade publication, in which he conditioned the market to believe that Anadarko was, and would continue, to engage in deep water drilling in a safe and environmentally responsible manner.  In this interview, designed to reassure investors in the days and weeks prior to the inception of the BP deepwater Horizon drilling joint venture, defendant Hackett stated, in relevant part, the following:

R[obert]B[ryce]: *Your company is an aggressive driller in the deepwater*. So how deep is "deep?" I ask because it seems that we need to get a better understanding of the changing terminology in the energy business. In 2008, 51% of the natural gas produced in the US was "unconventional." Thus, what used to be unconventional gas is now conventional -- and what used to be deepwater, isn't so deep anymore. So again, what's "deep?"

J[ames]H[ackett]: The industry tends to define deep water as anything over 1,000 feet. In 2007, Anadarko began producing natural gas at Independence Hub, the world's deepest platform in 8,000 feet of water in the Gulf of Mexico. Working in waters this deep was not even possible a few years ago. *One of the amazing things about our industry is, if you give us a challenge, we will generally find a solution. The technology we are using in deep water rivals that of NASA*. The

16

pressures and temperatures that exist up to two miles below the surface of the ocean are incredible and yet, we're producing enough natural gas from this one facility to meet the daily demands of more than 5 million average American homes. The environmental footprint is about the size of an average office building—*alternative fuels like wind and solar can't touch this efficiency of energy delivery per unit of environmental footprint*.

It's technology like this that makes us scratch our heads as to why our government still holds so much of our natural resources off limits. *We've proven we can develop these resources safely while protecting the environment, yet our government is preventing us from developing areas in the eastern Gulf of Mexico, Alaska, and off the East and West Coasts that potentially hold billions of barrels of oil and trillions of cubic feet of natural gas*. Even Norway, which is often held up as one of the most environmentally sensitive nations in the world, develops all of its resources for the good of its people. *We should be doing the same*. [Emphasis added]

42.     Similarly, on July 29, 2009, in the weeks before drilling began at the Macondo/Deepwater Horizon well, defendants also published a release that again served to condition investors to believe that the Company was, and would continue to engage in deepwater oil exploration in the Gulf of Mexico in a safe and environmentally sound manner.  This release stated, in part, the following:

*Anadarko Announces Its Fourth Deepwater Gulf of Mexico Discovery in 2009*

Anadarko Petroleum Corporation (NYSE: APC) today announced a discovery at the Vito exploration well in Mississippi Canyon block 984. The well encountered more than 250 net feet of oil pay in subsalt Miocene sands.

"We are very excited with the initial results encountered at the Vito well," said Bob Daniels, Anadarko Sr. Vice President, Worldwide Exploration. *"The success at Vito continues to demonstrate the tremendous quality of our deepwater portfolio of high-impact prospects*. We expect to drill two additional prospects that are targeting similar subsalt Miocene objective sections along this trend at our Silverado and Haleakala prospects in Mississippi Canyon in 2010. In the meantime*, the partners will continue evaluating the data from Vito and the timing of an appraisal well*." [Emphasis added]

43.     **2Q:09 "Demonstrated Strong" Results Announced**.  On August 3, 2009, defendants published a release announcing purported results for the second quarter of 2009, the

period ended June 30, 2009. Regarding the Company's 2Q:09 results, this release stated, in part, the following:

> Anadarko Announces Second-Quarter Results
>
> Anadarko Petroleum Corporation (NYSE: APC) today announced a second-quarter 2009 net loss from continuing operations attributable to common stockholders of $224 million, or $0.47 per share (diluted). These results include certain items typically excluded by the investment community in published estimates. In total, these items decreased the net loss by approximately $39 million, or $0.09 per share (diluted) on an after-tax basis. Cash flow from continuing operations in the second quarter of 2009 was $1.228 billion, and discretionary cash flow totaled $1.545 billion.
>
> **SECOND-QUARTER 2009 HIGHLIGHTS**
>
> - Achieved 4-percent sequential volume growth over first-quarter 2009
>
> - Reduced lease operating expense per barrel of oil equivalent (BOE) by 12 percent from first-quarter 2009
>
> - Announced a deepwater discovery in the Gulf of Mexico
>
> - Strengthened liquidity by effectively accessing the capital markets

44.    The August 3, 2009 release again quoted defendant Hackett, who continued to condition the market to believe that the Company was operating, and would continue to operate, its deepwater drilling operations in the Gulf of Mexico in a safe and environmentally responsible manner.  As evidence of this, the release stated, in part, the following:

> *"The strength of Anadarko's portfolio was clearly demonstrated during the quarter, as we delivered record sales volumes (from retained properties) and improved lease operating expenses relative to both the prior-year period and the first quarter of 2009*," Anadarko Chairman and CEO Jim Hackett said. "__We are continuing to drive down costs__ to better align them with the current commodity-price environment. *I am also very pleased with the excellent performance of our exploration teams*, which have announced six deepwater discoveries so far this year. Additionally, during the quarter *we continued to prudently manage our balance sheet by accessing the capital markets to substantially strengthen our liquidity position."*

\* \* \*

18

"*Anadarko's exploration success,*" continued Hackett, "coupled with our strong operational performance and the advancement of our three mega projects, including the recent approval of the Jubilee Phase I Plan of Development and Unitization Agreement by the Ghanaian government, *continues to deliver excellent value today and positions the company to continue to do so in the future.*" [Emphasis added.]

45.    **2Q:09 Form 10-Q.**  As shares of Anadarko continued to trade at levels artificially inflated as a result of the publication of defendants' materially false and misleading statements, on August 4, 2009, defendants filed the Company's 2Q:09 Form 10-Q with the SEC, for the quarter ended June 30, 2009, signed by defendant Gwin and certified by defendants Gwin and Hackett.  The 2Q:09 Form 10-Q made substantially similar statements concerning the Company's operations, including expenses, costs and reserve ratios, as had been published previously.  In addition, the 2Q:09 Form 10-Q also stated that the Company had reviewed its accounting principles, including its risk profile, and had properly reserved for, and insured against, foreseeable drilling related contingencies.  In this regard, the 2Q:09 Form 10-Q provided a summary of Anadarko's Significant Accounting Policies, in part, as follows:

**1.  Summary of Significant Accounting Policies**

*The information, as furnished herein, reflects all normal recurring adjustments that are, in the opinion of management, necessary for the fair presentation of the Company's consolidated financial position as of June 30, 2009 and December 31, 2008*, the consolidated statements of income and comprehensive income for the three and six months ended June 30, 2009 and 2008, cash flows for the six months ended June 30, 2009 and 2008, and the consolidated statement of equity for the six months ended June 30, 2009. Certain amounts for prior periods have been reclassified to conform to the current-period presentation.

In preparing financial statements in accordance with accounting principles generally accepted in the United States, management makes informed judgments and estimates that affect both the reported amounts of assets and liabilities as of the date of the financial statements and the reported amounts of revenues and expenses during the periods reported. *Management reviews its estimates periodically, including those related to the carrying value of properties and equipment, proved reserves, goodwill, intangible assets, asset retirement*

*obligations, litigation reserves, environmental liabilities, pension liabilities and costs*, income taxes and fair values…. [Emphasis added.]

46.    **Controls.**   In addition to the foregoing, the 2Q:09 Form 10-Q also contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as follows:

**Item 4.  Controls and Procedures**

Evaluation of Disclosure Controls and Procedures

Anadarko's Chief Executive Officer and Chief Financial Officer performed an evaluation of the Company's disclosure controls and procedures. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to the issuer's management, including its Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures are effective as of June 30, 2009***. [Emphasis added.]

47.    **Certifications.**   The 2Q:09 Form 10-Q also contained certifications by defendants Gwin and Hackett, that attested to the purported accuracy and completeness of the Company's financial and operational reports, as follows:

**CERTIFICATIONS**

1.    I have reviewed this quarterly report on Form 10-Q of Anadarko Petroleum Corporation;

2.    ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

3.    ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;***

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)    *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*;

c)    *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation*; and

d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)    *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information*; and

b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 3, 2009

/s/ **JAMES T. HACKETT**

James T. Hackett
Chairman, President and Chief Executive Officer

*    *    *

Date: August 3, 2009

/s/ **ROBERT G. GWIN**
Robert G. Gwin
Senior Vice President, Finance and Chief Financial Officer

### SECTION 1350 CERTIFICATION OF PERIODIC REPORT

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, James T. Hackett, Chairman, President and Chief Executive Officer of Anadarko Petroleum Corporation (Company) and Robert G. Gwin, Senior Vice President, Finance and Chief Financial Officer of the Company, certify that:

(1)    the Quarterly Report on Form 10-Q of the Company for the period ending June 30, 2009, as filed with the Securities and Exchange Commission on the date hereof (Report), fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    *the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company*.

August 3, 2009                          /s/ **JAMES T. HACKETT**
                                        James T. Hackett
                                        Chairman, President and Chief
                                        Executive Officer


August 3, 2009                          /s/ **ROBERT G. GWIN**
                                        Robert G. Gwin
                                        Senior Vice President, Finance and
                                        Chief Financial Officer

[Emphasis added.]

48.    The statements made by defendants and reported in the June 12, 2009 *Energy Tribune* interview as well as those statements contained in Anadarko's July 29, 2009 and August 3, 2009 press releases, and those statements contained in the Company's 2Q:09 Form 10-Q were each materially false and misleading when made, and were known by defendants to be false at

that time, or were recklessly disregarded as such thereby, for the following reasons, among others:

(a)    At all times during the Class Period, defendants knew or recklessly disregarded that the Spill Plan associated with the Macondo/Deepwater Horizon rig was woefully deficient and a complete sham, such that the Company and its drilling partner, BP, had no effective Spill Plan related to the Deepwater Horizon rig;

(b)    Throughout the Class Period, defendants knew or recklessly disregarded BP's abysmal safety record or the other operational problems which were known to them, as well as the problems related to the planning and operation at the Deepwater Horizon/Macondo well, and of the decisions to take shortcuts and implement riskier drilling processes and procedures, which were implemented solely to reduce the amount of time and money expended on the Macondo/Deepwater Horizon drilling operation;

(c)    Throughout the Class Period, it was also not true that Anadarko contained adequate systems of internal operational or financial controls, such that Anadarko's reported financial statements were true, accurate or reliable, or such that the Company had maintained adequate insurance reserves or to meet the known or foreseeable risks associated with its deepwater drilling liabilities; and

(d)    As a result of the aforementioned adverse conditions and unreserved risks which defendants failed to disclose, throughout the Class Period, defendants lacked any reasonable basis to claim that Anadarko was operating according to plan, or that Anadarko could achieve guidance sponsored and/or endorsed by defendants.

49.    **3Q:09 "Record" Sales and "Strong" Results Announced**.  On November 2, 2009, defendants published a release announcing purported results for the third quarter of 2009,

the period ended September 30, 2009.  Regarding the Company's 3Q:09 results, this release

stated, in part, the following:

> Anadarko Petroleum Corporation (NYSE:APC) today announced third-quarter
> 2009 net income from continuing operations attributable to common stockholders
> totaled $200 million, or $0.40 per share (diluted). These results include certain
> items typically excluded by the investment community in published estimates. In
> total, these items increased net income by approximately $251 million, or $0.51
> per share (diluted) on an after-tax basis. Cash flow from continuing operations in
> the third quarter of 2009 totaled slightly more than $1 billion, and discretionary
> cash flow totaled approximately $1.26 billion.

50.     In addition to the foregoing, the November 2, 2009 release also quoted defendant

Hackett, in part, as follows:

> ***The positive third-quarter results continue to demonstrate the value of
> Anadarko's portfolio, with strong performance from both our producing assets
> and deepwater exploration program, . . . .*** Our exploration, drilling and
> operations teams continued to perform very well in achieving ***record sales
> volumes, lower costs, increased efficiencies and differentiating deepwater
> drilling success.***
>
> *   *   *
>
> ***As a result of both improved operating performance and the absence of severe
> weather in the Gulf of Mexico, we expect our full-year sales volumes to be
> approximately 220 million BOE, up from our original midpoint of 210 million
> BOE at the beginning of the year, without increasing capital spending,*** . . . .
> This equates to a forecasted growth rate of approximately 7 percent over our 2008
> total sales volumes of 206 million BOE, while spending approximately 35 percent
> less capital on near-term projects.  [Emphasis added.]

51.     Shares of the Company rallied following the publication of these positive

statements.  As evidence of this, shares of Anadarko traded from a low of $60.50 per share on

October 30, 2009, prior to the publication of these purported "record" sales and "strong" results,

to a high of over $62.89 per share following publication.

52.    **3Q:09 Form 10-Q.**  As shares of Anadarko continued to trade at artificially inflated levels, the following day, November 3, 2009, defendants filed with the SEC the Company's 3Q:09 Form 10-Q, for the quarter ended September 30, 2009, signed by defendant Gwin and certified by defendants Gwin and Hackett.  The 3Q:09 Form 10-Q made substantially similar statements concerning the Company operations, including expenses, costs and reserve ratios, as had been published previously. In addition to the foregoing, the 3Q:09 Form 10-Q stated that the Company had reviewed its accounting principles, including its risk profile, and had properly reserved for, and insured against, foreseeable drilling related contingencies.  In this regard, the 3Q:09 Form 10-Q provided a summary of Anadarko's Significant Accounting Policies, in part, as follows:

> **Summary of Significant Accounting Policies**
>
> ***The information, as furnished herein, reflects all normal recurring adjustments that are, in the opinion of management, necessary for the fair presentation of the Company's consolidated financial position as of September 30, 2009 and December 31, 2008***, the consolidated statements of income and comprehensive income for the three and nine months ended September 30, 2009 and 2008, cash flows for the nine months ended September 30, 2009 and 2008, and the consolidated statement of equity for the nine months ended September 30, 2009. Certain amounts for prior periods have been reclassified to conform to the current-period presentation.
>
> ***In preparing financial statements in accordance with accounting principles generally accepted in the United States, management makes informed judgments and estimates*** that affect both the reported amounts of assets and liabilities as of the date of the financial statements and the reported amounts of revenues and expenses during the periods reported. ***Management reviews its estimates periodically, including those related to the carrying value of properties and equipment, proved reserves, goodwill, intangible assets, asset retirement obligations, litigation reserves, environmental liabilities, pension liabilities and costs, income taxes and fair values***…. [Emphasis added.]

53.    **Controls.**  The Company's the 3Q:09 Form 10-Q again contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as follows:

Item 4. **Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures*

***Anadarko's Chief Executive Officer and Chief Financial Officer performed an evaluation of the Company's disclosure controls and procedures.*** Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to the issuer's management, including its Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures are effective as of September 30, 2009.*** [Emphasis added.]

54.    **Certifications.**  In addition to the foregoing, the Company's 3Q:09 Form 10-Q also contained certifications by defendants Gwin and Hackett substantially similar to those Certifications filed previously by defendants with the SEC.  In addition, in the 3Q:09 Form 10-Q defendants Hackett and Gwin also signed Sarbanes Oxley statements that attested to the purported accuracy, truthfulness and completeness of the Company's financial and operational reports, as follows:

**SECTION 1350 CERTIFICATION OF PERIODIC REPORT**

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, James T. Hackett, Chairman, President and Chief Executive Officer of Anadarko Petroleum Corporation (Company) and Robert G. Gwin, Senior Vice President, Finance and Chief Financial Officer of the Company, certify that:

(1)    the Quarterly Report on Form 10-Q of the Company for the period ending September 30, 2009, as filed with the Securities and Exchange Commission on the date hereof (Report), fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

    (2)    **the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.**

| | |
|---|---|
| November 2, 2009 | /s/ **JAMES T. HACKETT** |
| | James T. Hackett |
| | Chairman, President and Chief |
| | Executive Officer |
| | |
| November 2, 2009 | /s/ **ROBERT G. GWIN** |
| | Robert G. Gwin |
| | Senior Vice President, Finance and |
| | Chief Financial Officer |

[Emphasis added.]

55.    The statements made by defendants and contained in the Company's October 20, 2009 and November 2, 2009 press releases, and those statements contained in its 3Q:09 Form 10-Q were each materially false and misleading when made, and were known by defendants to be false at that time, or were recklessly disregarded as such thereby, for the reasons stated herein in ¶48, *supra*.

56.    **Revised Code of Ethics Adopted.**  On November 11, 2009, Anadarko announced that it had adopted a revised Code of Business Conduct and Ethics, that was purported to strengthen the Company's already sufficient controls and procedures.  According to the Company's website, "The Code was revised to (1) emphasize a values based approach based upon the Company's core values, (2) enhance readability and practical application, and (3) include frequently asked questions and answers, examples and ethical conduct tips."  The revised Code stated, in part, the following:

> **Anadarko is committed to managing and operating its assets in a manner that protects and conserves the environment and is consistent with all environmental laws and regulations**.  All employees must understand any environmental issues that impact their job…. [Emphasis added.]

57.    Taking further advantage of the significant inflation in the price of Anadarko's shares caused as a result of defendants' publication of materially false and misleading

information, in early November 2009 defendants also caused the Company to substantially increase their compensation and revise their compensation agreements. As evidence of this, on November 13, 2009, Anadarko filed with the SEC pursuant to Form 8-K, a statement that recounted substantial increases in target bonuses to key executives of the Company, whereby they were then eligible for over $5 million per year in performance and bonus related compensation.

58.    **4Q:09 Results Announced**.  On February 1, 2010, defendants published a release announcing results for the fourth quarter and year end 2009, the period ended December 31, 2009.  This release stated, in part, the following:

Anadarko Announces 2009 Fourth-Quarter and Full-Year Results

Anadarko Petroleum Corporation (NYSE: APC) today announced fourth-quarter 2009 net income from continuing operations attributable to common stockholders totaled $229 million, or $0.46 per share (diluted), for the quarter ending Dec. 31, 2009. These results include certain items affecting comparability that are typically excluded by the investment community in published estimates. In total, these items increased net income by approximately $208 million, or $0.42 per share (diluted), on an after-tax basis.(1) Cash flow from continuing operations in the fourth-quarter of 2009 was $1.10 billion, and discretionary cash flow totaled $869 million.(2)

For the year ended Dec. 31, 2009, Anadarko reported a net loss from continuing operations attributable to common stockholders of $135 million, or $0.28 per share (diluted). Full-year 2009 cash flow from continuing operations was $3.93 billion, and discretionary cash flow totaled $4.36 billion.[2]

**2009 HIGHLIGHTS**

- Increased sales volumes by 7 percent year-over-year, while spending 35-percent less on near-term projects

- Reduced lease operating expense (LOE) per unit by more than 20 percent year-over-year

- Added 314 million barrels of oil equivalent (BOE) of proved reserves before price revisions and divestitures, which equates to replacing 140 percent of production

- Achieved a 50-percent success rate in the 2009 global deepwater exploration program

- Discovered nearly 360 million BOE of net resources from 2009 exploration activities

- Advanced three sanctioned mega projects on time and on budget

59.    In addition to the foregoing, the February 1, 2010 release also quoted defendant Hackett in part, as follows:

> **2009 was a very successful year in advancing our strategy and illustrating the high quality of our portfolio. We feel 2009 has set the stage for continuing success in 2010 and beyond**, . . . . The results demonstrated the ability of our operating teams to grow our production and reserve base, prudently manage our capital spending, reduce costs, improve drilling efficiencies and move our sanctioned mega projects closer to first production. In addition, our 2009 worldwide drilling program resulted in nine significant deepwater discoveries and four successful deepwater appraisal wells that de-risked our portfolio and added to a growing list of future mega projects. When combined with the growing success of our U.S. onshore shale plays, **we are confident that future years will see a material increase in production and reserve additions.** [Emphasis added.]

60.    **2009 Form 10-K.**    As shares of Anadarko continued to trade at artificially inflated levels, on February 23, 2010, defendants filed with the SEC the Company's 2009 Form 10-K for the fourth quarter and year ended December 31, 2009, signed by defendants Hackett, Gwin, and Douglas, among others, and certified by defendants Gwin and Hackett.  The 2009 Form 10-K made substantially similar statements concerning the Company operations, including expenses, costs and reserve ratios, as had been published previously. In addition to the foregoing, the 2009 Form 10-K stated that defendants had reviewed the Company's accounting principles, including its risk profile, and had properly reserved for, and insured against, foreseeable drilling related contingencies.  In this regard, the 2009 Form 10-K again purported to provide a basis of Anadarko's presentation and use of estimates, in part, as follows:

> **Basis of Presentation    The consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the**

29

***United States.*** The consolidated financial statements include the accounts of Anadarko and entities in which it holds a controlling financial interest. Undivided interests in oil and gas joint ventures are consolidated on a proportionate basis. All intercompany transactions have been eliminated. Investments in non-controlled entities over which Anadarko exercises significant influence are accounted for under the equity method. Other investments are carried at cost. Certain amounts for prior periods have been reclassified to conform to the current presentation.

\*    \*    \*

**Use of Estimates**    In preparing financial statements in accordance with accounting principles generally accepted in the United States, management makes informed judgments and estimates that affect the reported amounts of assets and liabilities as of the date of the financial statements and the reported amounts of revenues and expenses during the periods reported. ***Management reviews its estimates periodically, including those related to the carrying value of properties and equipment, proved reserves, goodwill, intangible assets, asset retirement obligations, litigation reserves, environmental liabilities, pension assets and liabilities and costs, income taxes, and fair values***… [Emphasis added.]

61.    **Controls and Procedures.**    The Company's 2009 Form 10-K again contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as follows:

Item 9A.    **Controls and Procedures**

Evaluation of Disclosure Controls and Procedures

***Anadarko's Chief Executive Officer and Chief Financial Officer performed an evaluation of the Company's disclosure controls and procedures.*** Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to the issuer's management, including its Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures are effective as of December 31, 2009***. [Emphasis added.]

62.    **Certifications.**  The 2009 Form 10-K again contained certifications by defendants Hackett and Gwin that were similar to, or substantially the same as, those statements filed with the SEC previously.  In addition, the Form 10-K also contained Sarbanes-Oxley statements that again attested to the purported accuracy and completeness of the Company's financial and operational reports, as follows:

### SECTION 1350 CERTIFICATION OF PERIODIC REPORT

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, James T. Hackett, Chairman, President and Chief Executive Officer of Anadarko Petroleum Corporation (Company) and Robert G. Gwin, Senior Vice President, Finance and Chief Financial Officer of the Company, certify that:

(1)    the Annual Report on Form 10-K of the Company for the period ending December 31, 2009, as filed with the Securities and Exchange Commission on the date hereof (Report), fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    *the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company*.

| | |
|---|---|
| February 23, 2010 | /s/ **JAMES T. HACKETT** |
| | James T. Hackett |
| | Chairman, President and Chief |
| | Executive Officer |
| | |
| February 23, 2010 | /s/ **ROBERT G. GWIN** |
| | Robert G. Gwin |
| | Senior Vice President, Finance and |
| | Chief Financial Officer |

[Emphasis added.]

63.    The statements made by defendants and contained in the Company's February 1, 2010 release and in the Company's 2009 Form 10-K were each materially false and misleading when made, and were know by defendants to be false at that time, or were recklessly disregarded as such thereby, for the reasons stated herein in ¶48, *supra*.

64.    By the end of February 2010, shares of Anadarko traded to about $70.00 per share.  Taking full advantage of the artificial inflation in the price of Company shares caused as a result of the publication of defendants materially false and misleading statements, on March 9, 2010, defendants announced that the Company would price at least $750 million of Senior Notes. Days later, on March 22, 2010, in an effort to condition investors to purchase the hundreds of millions of dollars of these notes, the Company published a release that purported to provide an update regarding Anadarko's deepwater drilling operations.   This release stated, in part, the following:

**Anadarko Provides Deepwater Update**

Anadarko Petroleum Corporation (NYSE:APC) today provided an update on its successful deepwater drilling activity in the Gulf of Mexico and Mozambique. The company announced the Shell-operated Vito appraisal well in the Gulf of Mexico encountered more than 600 net feet of high-quality oil pay in thick subsalt Miocene sands. This sidetrack appraisal well, which is located in Mississippi Canyon block 940, is more than one mile from the 2009 Vito discovery well. Anadarko holds a 20-percent working interest in the block and was the initial operator of the Vito discovery. Shell Offshore Inc., operator, holds a 55-percent working interest, and Statoil USA E&P Inc. holds the remaining 25-percent working interest.

"***Our Gulf of Mexico appraisal program is off to a great start in 2010*** with the successful Lucius and Vito appraisal wells each finding more than 600 net feet of oil pay," said Bob Daniels, Anadarko Sr. Vice President, Worldwide Exploration. "The successful Vito appraisal well is an important step in confirming our geologic models of the area and transitioning this field from exploration to a potential stand-alone development. With more than a mile separating the appraisal location and the discovery well, the initial results of the Vito appraisal well substantiate the field's large areal extent and thick, high-quality reservoirs." [Emphasis added.]

These statements were extremely significant, given that it is now known that significant problems related to the Deepwater Horizon drilling operation were made known to defendants in early March 2010.  As investors learned, following the end of the Class Period, problems related to the Deepwater Horizon rig were already being discussed in internal emails at that time.

65.    **Rig Explosion.** On April 20, 2010, a recommended cement "bond log" test was cancelled, presumably by BP, on the Deepwater Horizon drilling rig. According to reports, conducting this safety-related test would have taken 9-12 hours and cost approximately $128,000, however, by canceling the cement test it was reported that almost 90% of this cost was avoided. Later that day, despite being almost 43 days past the date when the rig was supposed to be moved to another location and despite being tens of millions of dollars over-budget on this drilling operation, a celebration was conducted on the Deepwater Horizon rig to celebrate its safety record.[2]  At 9:45 p.m, however, the Deepwater Horizon caught fire and exploded. The explosion killed 11 platform workers and injured 17 others; another 98 people survived without serious physical injury.

66.    At the time, reports indicated that only approximately 5,000 barrels of oil were leaking from the well - - equal to about 275,000 gallons per day. Also, at that time, shares of the Company continued to trade at levels well above the historical average for the Company. In fact, on April 20, 2010, shares of Anadarko closed at almost $74.00 per share, and the following day, shares of the Company continued to trade above $74.00, before closing the days trading above $72.50, on nearly average trading volume of approximately 4.3 million shares.

67.    **1Q:10 "Record" Results Announced**. On May 3, 2010, shares of the Company continued to trade at levels artificially inflated above $65.00 per share. On that day, defendants published a release that announced purported results for the first quarter of 2010, the period ended March 31, 2010.  This release stated, in part, the following:

Anadarko Announces First-Quarter Results

---

[2] The Deepwater Horizon was only supposed to establish the well and then seal it so that actual drilling could be handled by another rig.

Anadarko Petroleum Corporation (NYSE: APC) today announced first-quarter 2010 net income attributable to common stockholders of $716 million, or $1.43 per share (diluted). These results include certain items typically excluded by the investment community in published estimates. In total, these items increased net income by approximately $304 million, or $0.62 per share (diluted) on an after-tax basis.(1) Cash flow from operating activities in the first quarter of 2010 was $1.317 billion, and discretionary cash flow totaled $1.530 billion.(2)

68.    Again, the Company's release quoted defendant Hackett, in part, as follows:

*During the first quarter of 2010, we continued to build upon the success of 2009 and again delivered significant growth* . . . . In the first quarter of this year, our reported sales volumes increased by about 15 percent relative to the first quarter of 2009, and we've further improved our cost-control efforts and the strength of our balance sheet. *With the strong and consistent performance of our producing properties, we are raising our full-year sales volumes guidance to a range of 230 million to 234 million BOE (barrels of oil equivalent) - equivalent to an increase of 3.5 million BOE in the estimated midpoint*. [Emphasis added.]

69.    Regarding the Deepwater Horizon well explosion and the oil continuing to leak into the Gulf of Mexico at that time, the Anadarko release estimated only that the Company would have limited liability exposure to the disaster.  In this regard, the release stated, in part, the following:

About two weeks ago, in the Gulf of Mexico, the BP-operated Macondo exploration well on Mississippi Canyon block 252 discovered an oil accumulation. As reported in the press, an explosion and fire occurred on the Deepwater Horizon drilling rig during operations. The rig subsequently sank, hydrocarbons were released into the Gulf and a large-scale well-control and clean-up effort has ensued. Anadarko is a 25-percent working interest owner in this block, which is operated by BP Exploration & Production, Inc. A full response and investigation is being conducted by the operator of the well, the drilling rig owner and governmental entities. The company maintains insurance policies designed to provide financial protection for such events, for its share of gross covered costs up to an aggregate level of approximately $710 million, less deductibles. *Based on its 25-percent non-operated interest, the company estimates its net insurance coverage will likely total approximately $177.5 million, less deductibles of $15 million.* [Emphasis added.]

70.    Later, on May 4, 2010, defendants filed with the SEC the Company's 1Q:10 Form 10-Q, for the period ended March 31, 2010, signed by defendant Gwin and again certified by

34

defendants Gwin and Hackett.  The 1Q:10 Form 10-Q again contained statements related to the Company's purported Controls and Procedures and Accounting Principles that were the same as or substantially similar to those statements filed with the SEC previously and reproduced herein. The 1Q:10 Form 10-Q also contained Certifications and Sarbanes Oxley statements that were also the same as, or substantially similar to, those statements filed with the SEC previously and reproduced herein.

71.    In addition to the foregoing, the 1Q:10 Form 10-Q also stated the following, regarding Anadarko's liability related to the Deepwater Horizon/Macondo rig explosion and oil leak:

### 13. Subsequent Event

In April 2010, the Macondo exploration well in the Gulf of Mexico, in which Anadarko holds a 25% non-operating interest, discovered hydrocarbon accumulations. An explosion occurred on the deepwater drilling rig during operations on the well, following which the drilling rig sank and hydrocarbons flowed into the Gulf of Mexico. A full response and investigation is being conducted by the operator of the well, the drilling rig owner and governmental entities. The cause of the explosion, the environmental impact and the ultimate costs associated with this event are not yet known. Contractual language between various parties associated with this well provides for indemnification in certain instances; however, any responsibilities under such indemnities are not yet known. The Company carries insurance to protect against potential financial losses occurring as a result of such events for its share of gross covered costs up to a level of approximately $710 million, less up to $60 million of deductibles. ***Based on its 25% non-operated interest in this well, the Company estimates its net insurance coverage will total approximately $178 million, less deductibles of $15 million***. Given its role as a non-operating interest owner and due to the continuing response to the event, the Company is currently unable to estimate its potential liability for costs arising in connection with this event.

\*    \*    \*

In April 2010, the Macondo exploration well in the Gulf of Mexico, in which Anadarko holds a 25% non-operating interest, discovered hydrocarbon accumulations. An explosion occurred on the deepwater drilling rig during operations on the well, following which the drilling rig sank and hydrocarbons

flowed into the Gulf of Mexico. A full response and investigation is being conducted by the operator of the well, the drilling rig owner and governmental entities. The cause of the explosion, the extent of the environmental impact and the ultimate costs associated with this event are not yet known. Efforts to assist in the response and recovery efforts may divert the attention of our senior management, certain key personnel and other resources away from other exploration and development projects.

In response to this event, certain federal agencies and governmental officials have ordered additional inspections of deepwater operations in the Gulf of Mexico. This event and its aftermath could lead to additional governmental regulation of the offshore exploration and production industry, which may result in substantial cost increases or delays in our offshore exploration and development activities, which could materially impact our business, financial condition and results of operations. We cannot predict with any certainty what form any additional regulation or limitations would take.

Contractual language between various parties associated with this well provides for indemnification in certain instances; however, any responsibilities under such indemnities are not yet known. Further, *although we carry insurance to protect against financial losses occurring as a result of such events, as a non-operating interest owner we are currently unable to estimate any potential liability for costs arising in connection with this event, and whether the costs might exceed the coverage limits under our insurance policies*. This event may also make it increasingly difficult to obtain offshore property damage, well control, or related insurance coverage on economic terms, or at all. Further, as the deep waters of the Gulf of Mexico (as well as international deepwater locations) lack the extent of physical and oilfield service infrastructure present in the shallower waters, *it may be difficult for us to quickly or effectively execute on any contingency plans related to similar events.*

*As a 25% non-operating working interest owner in the Macondo well, we may incur liability under currently existing environmental regulations and we may be asked to contribute to the significant and ongoing remediation expenses*. In addition, several legal proceedings have been filed against certain parties involved in this event, and additional proceedings may be filed, some of which currently or in the future may involve us given our non-operating working interest in the Macondo well. These proceedings may involve civil claims for damages or governmental investigative, regulatory or enforcement actions. While we will seek the protection which might be available to us pursuant to existing contractual indemnities as well as our insurance coverage, *the adverse resolution of any proceedings related to these events could subject us to significant monetary damages and other penalties, which could have a negative impact on our business, prospects, results of operations and financial condition*.   [Emphasis added.]

72.    On May 4, 2010, however, defendant Hackett was also quoted in a report by *Reuter's* news service, as stating that the Deepwater Horizon oil spill had *not* changed any of the Company's plans going forward.  As evidence of this, *Reuters* reported, in part, the following:

> "***Anadarko CEO says spill not changing plans***"
>
> Anadarko Petroleum Corp (APC), which owns a 25 percent stake in the ruptured well in the Gulf of Mexico, said on Tuesday the leak has not yet changed its budget or strategic plans.
>
> Massive offshore drilling projects in the U.S Gulf of Mexico, Brazil and West Africa are central to the Houston company's growth plans.
>
> "***We remain focused on managing through this event,*** *" Anadarko CEO Jim Hackett told analysts on a conference call.*
>
> "***Based on what we know today, we are not currently making any interruptions to our capital spending programs or strategic objectives,***" he said.
>
> The executive cautioned it is far too early to calculate what the company's total spill costs might be, but he vowed to protect the interests of Anadarko's shareholders.
>
> ***Anadarko was not involved in the well's design or operating procedures and came in only at the end of planning to approve the project's budget, Hackett said.***
>
> ***The company estimated on Monday its insurance coverage will total about $178 million, less deductibles, which should cover costs for a few months***.  [Emphasis added.]

73.    The statements made by defendants and contained in the Company's May 3, 2010 releases, defendant Hackett's May 4, 2010 comments and those statements contained in the Company's 1Q:10 Form 10-Q were each materially false and misleading when made, and were know by defendants to be false at that time, or were recklessly disregarded as such thereby, for the reasons stated herein in ¶48, *supra*.

## THE TRUE FINANCIAL AND OPERATIONAL CONDITION
## OF ANADARKO IS BELATED DISCLOSED

74.     Despite defendants' reliance upon the Deepwater Horizon Exploration and Spill

Plan, or their claims that the Company's liability related to the Horizon oil spill would be limited

to approximately $175 million - - based on estimates that the spill was dropping approximately

5,000 barrels of oil into the Gulf of Mexico daily - - on June 1, 2010, shares of the Company

declined precipitously after it was reported that the Deepwater Horizon well could not be capped,

and after investors came to realize that there was effectively no plan in place to stop the spill, cap

the well or remediate the problems that the spill was causing, and foreseeable would continue to

cause.  That day, shares of Anadarko fell almost $10.00 per share - - or approximately 20% - -

falling from a close of $42.10 per share, from a prior day's close of $52.33 per share, on huge

volume of over 44.8 million shares traded.

75.     The following day, the *Wall Street Journal* reported that the oil spill liability

related to the Deepwater Horizon disaster would foreseeably reach at least $40 billion - - placing

Anadarko's 25% interest in this liability at approximately $10 billion - - or approximately $9.8

billion *more* than the Company's insurance coverage.  The *Wall Street Journal* reported, in part,

the following:

> ***"Oil spill liability seen up to $40 billion"***
>
> BP Plc and other companies involved face a liability of $35 billion to $40 billion
> for the ongoing spill in the Gulf of Mexico, according to an estimate released
> Wednesday from Houston research firm Tudor Pickering Holt. Analysts said they
> compared the current spill to costs linked to the Exxon Valdez spill, plus timing
> estimates and guess work to provide a likely liability price tag. "***You've got to try
> and put some realistic projections on oil spill liability before you can try to value
> any stock involved***," Tudor Pickering Holt analysts said. Shares of Anadarko
> Petroleum are trading 20% below the value of their proved reserves, after debt,
> analysts noted. Anadarko owns 25% of the ruptured Macondo well that is
> currently leaking in the Gulf of Mexico.  [Emphasis added.]

76.    Realizing the huge liability that now faced Anadarko and the Company's lack of insurance or reserves, on June 4, 2010, Moody's ratings agency reduced its rating on Anadarko's credit to "Outlook Negative."  In connection with this significant ratings downgrade, Moody's issued the following statement:

> *"Anadarko ratings outlook negative on oil spill-Moody's"*
>
> *Moody's Investors Service on Friday revised its ratings outlook on Anadarko Petroleum Corp to negative from stable, indicating <u>the oil company's debt may be cut into junk territory over the coming 18 months</u>.*
>
> Anadarko owns 25 percent of the Gulf of Mexico well that ruptured in the April 20 explosion that sparked the worst oil spill in U.S. history.
>
> *The outlook change reflects "considerable uncertainty" associated with Anadarko's share of cleaning up the spill, and financial liabilities from the April explosion, Moody's said. <u>Moody's rates Anadarko's senior unsecured debt Baa3, the lowest investment grade</u>.*
>
> *"The future quality of the company's credit profile will be in large part dependent on the steps Anadarko's management is willing, and able, to take to maintain financial flexibility and address its share of liabilities stemming from the disaster,"* Moody's said.
>
> Longer term the company's finances could also be affected by drilling restrictions in the Gulf of Mexico or other deepwater regions and regulatory constraints including tougher safety requirements, Moody's said. [Emphasis added.]

77.    On June 6, 2010, documents released by Congress revealed that emails were circulated on March 10, 2010 - - only days before defendant Hackett liquidated an additional $42.7 million of his personally held Anadarko common shares - - that indicated that there were significant problems related to the drilling operation at the Deepwater Horizon well sometime before the April 20, 2010 explosion.  According to documents released that day by leaders of the House Energy and Commerce Committee, which is now investigating the disaster, these emails stated, in part, the following:

"*We are in the midst of a well control situation on MC 252 #001 and have stuck pipe*. We are bringing out equipment to begin operations to sever the drillpipe, plugback the well and bypass," Scherie Douglas, a BP regulatory advisor, told the district engineer for the U.S. Interior Department's Minerals Management Service in a March 10 e-mail.

In a follow-up e-mail to the district engineer, Frank Patton, Douglas reported the company [BP] wanted to get a plug set in the well before testing the blowout preventer, the massive device used to shut down the well in case of an emergency.

"*With the give and take of the well and hole behavior we would feel much more comfortable getting at least one of the two plugs set in order to fully secure the well prior to testing BOPs*," she wrote.

When Patton told BP he could not delay a test any longer than it took to bring the well under control, the company won a postponement from David Trocquet, the MMS district manager in New Orleans, Louisiana, the documents show. Trocquet ordered BP to make sure its cement plug was set up and to verify its placement, according to his reply.  [Emphasis added.]

78.     Thereafter, on June 9, 2010, shares of Anadarko fell another 20% after rumors began to surface that the liability related to the oil spill could be so large that BP could be forced to file bankruptcy - - leaving Anadarko and another small operating partner to stand alone to face more than $40 billion of potential liability for cleaning up the Gulf oil spill.  At that time, rumors also circulated that BP had submitted a bill to Anadarko for the clean up, although this rumor was later disputed.  Regardless of the fact that BP did or did not send Anadarko a clean up bill at that time, because the Company was now liable for over $1 billion in clean up costs, and because by then it was obvious that there was no Spill Plan in place, that day, shares of the Company fell to below $34.50 per share, from the prior day's close of $42.80 per share, on huge volume of over 45.72 million shares traded.

79.     Another cause of the steep share price decline on June 9, 2010 was a report that the Deepwater Horizon rig Oil Spill Recovery plan contained so many glaring errors that the plan was little more than a sham, designed only to satisfy the federal government's filing

requirements and not to provide any meaningful operating plan necessary in the event of a catastrophic oil spill.  That day, the *Huffington Post,* a well respected internet new website, reported the following:

> \*   ***BP's Approved Spill Plan 'Riddled With Omissions And Glaring Errors'***
>
> \*   ***Professor Peter Lutz is listed in BP's 2009 response plan for a Gulf of Mexico oil spill as a national wildlife expert. He died in 2005***.  Lutz, was one of several dozen experts recommended as resources to be contacted in the event of a spill. Lutz is listed as a go-to wildlife specialist at the University of Miami. But Lutz, an eminent sea turtle expert, left Miami almost 20 years ago to chair the marine biology department at Florida Atlantic University in Boca Raton. He ***died four years before the plan was published.***
>
> \*   Under the heading "sensitive biological resources*," **the plan lists marine mammals including walruses, sea otters, sea lions and seals. None lives anywhere near the Gulf.***
>
> \*   ***The names and phone numbers of several Texas A&M University marine life specialists are wrong***. So are the numbers for marine mammal stranding network offices in Louisiana and Florida, which are ***no longer in service.***
>
> \*   The ***website listed for Marine Spill Response Corp.*** - one of two firms relied upon for equipment to clean a spill - ***links to a defunct Japanese-language page.***
>
> \*   ***The Plan falsely stated that "BP Exploration and Production Inc. has the capability to respond, to the maximum extent practicable, to a worst case discharge, or a substantial threat of such a discharge, resulting from the activities proposed in our Exploration Plan***."  [Emphasis added.]

80.    Similarly, according to an *Associate Press* report, published approximately the same time, the Deepwater Horizon and Gulf of Mexico Spill Pan were so "riddled with omissions and glaring errors," that it appears that this Plan had been made up as the disaster itself unfolded. The lengthy plans approved by the federal government last year before drilling began at the ill-fated Deepwater Horizon well vastly understated the dangers posed by an uncontrolled leak and vastly overstated the operator's preparedness to deal with one.   The *AP* report also concluded, in part, the following:

\*      In the spill scenarios detailed in the documents, fish, marine mammals and birds escape serious harm; beaches remain pristine; water quality is only a temporary problem. And those are the projections for a leak about 10 times worse than what has been calculated for the ongoing disaster.[3]

\*      There are other wildly false assumptions. BP's proposed method to calculate spill volume based on the darkness of the oil sheen is way off. The internationally accepted formula would produce estimates 100 times higher.

\*      The Gulf's loop current, which is projected to help eventually send oil hundreds of miles around Florida's southern tip and up the Atlantic coast, isn't mentioned in either plan.

\*      There weren't supposed to be any coastline problems because the site was far offshore. "Due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected," the site plan says.

81.      According to the *Huffington Post*, other examples of why the Deepwater Horizon

Spill Plan was false and misleading included, in part, the following:

\*      Beaches where oil washed up within weeks of a spill were supposed to be safe from contamination because the Plan promised to marshal more than enough boats to scoop up all the oil before any deepwater spill could reach shore - a claim that in retrospect seems absurd.

\*      The Plan asserts that the combined response could skim, suck up or otherwise remove 20 million gallons of oil each day from the water. But that is about how much has leaked in the past six weeks - and the slick now covers about 3,300 square miles, according to Hans Graber, director of the University of Miami's satellite sensing facility. Only a small fraction of the spill has been successfully skimmed. Plus, an undetermined portion of the spill has sunk to the bottom of the Gulf or is suspended somewhere in between.

\*      The Spill Plan purported to use computer modeling to project a 21 percent chance of oil reaching the Louisiana coast within a month of a spill. In reality, an oily sheen reached the Mississippi River delta just nine days after the April 20 explosion. Heavy globs soon followed. Other locales where oil washed up within weeks of the explosion were characterized in the regional Spill Plan as safely out of the way of any oil danger.

---

[3] Billy Nungesser, president of Plaquemines Parish, La., says there are "3,000 acres (of wetlands) where life as we know it is dead, and we continue to lose precious marshland every day."

\*  The Spill Plan stated that there would be "no adverse impact" on birds, sea turtles or endangered marine mammals, had no basis in fact.

82. By June 11, 2010, estimates of the leak rate far eclipsed the original estimate sponsored or endorsed by defendants and BP, of 5,000 barrels per day.   By that time, Flow Rate Technical Group says the leak could be 20,000 to 40,000 barrels (840,000 to 1,700,000 US gallons; 3,200,000 to 6,400,000 liters) of oil a day. Woods Hole Oceanographic Institution estimated it be 50,000 barrels (2,100,000 US gallons; 7,900,000 liters). The University of Texas at Austin estimate was 22,000 to 30,000 barrels (920,000 to 1,300,000 US gallons; 3,500,000 to 4,800,000 liters) a day. Using the 40,000 level reports indicate that the well would have spewed 90,100,000 US gallons (2,150,000 barrels) since the accident. By contrast the Exxon Valdez leaked 30,000 barrels (1,300,000 US gallons; 4,800,000 liters) a day - - making the leak, in 53 days, eight times larger.  Days later, consensus estimates put the size of the leak at 65,000 barrels per day, after attempts to cap the well failed for the third time.

83. While the exact toll on the Gulf's wildlife may never be known, by that time, even a fraction of the empirical effects noted in the press by only a limited number of observers was proving to be devastating.  Examples of this limited observance included, in part, the following:

\*  More than 400 oiled birds have been treated, while dozens have been found dead and covered in crude, mainly in Louisiana but also in Mississippi, Alabama and Florida. On remote islands teeming with birds, a visible patina of oil taints pelicans, gulls, terns and herons, as captured in *AP* photos that depict one of the more gut-wrenching aspects of the spill's impact. Such scenes are no longer unusual despite the fact that the Response Plan anticipates nothing on this scale.

\*  In Louisiana's Barataria Bay, a dead sea turtle caked in reddish-brown oil lay splayed out with dragonflies buzzing by. More than 200 lifeless turtles and several dolphins also have washed ashore. So have countless fish.

84. On June 14, 2010, the House Committee on Energy and the Environment wrote a letter to Tony Hayward, CEO of BP, summarizing its findings in advance of his testifying before

the Committee the following day. In that letter the Committee summarized the material defects in the design and operation of the Deepwater Horizon well, which were known to its owners and operators prior to the rig explosion in early April 2010. This letter stated, in relevant part, the following:

> Mr. Tony Hayward
> Chief Executive Officer
> BPPLC
> I St. James's Square
> London SWI Y 4PD
> United Kingdom
>
> Dear Mr. Hayward:
>
> We are looking forward to your testimony before the Subcommittee on Oversight and Investigations on Thursday, June 17,2010, about the causes of the blowout of the Macondo well and the ongoing oil spill disaster in the Gulf of Mexico. As you prepare for this testimony, we want to share with you some of the results of the Committee's investigation and advise you of issues you should be prepared to address.
>
> The Committee's investigation is raising serious questions about the decisions made by BP in the days and hours before the explosion on the Deepwater Horizon. *On April 15, five days before the explosion, BP's drilling engineer called Macondo a "nightmare well*." In spite of the well's difficulties, BP appears to have made *multiple decisions for economic reasons that increased the danger of a catastrophic well failure. In several instances, these decisions appear to violate industry guidelines and were made despite warnings from BP's own personnel and its contractors. In effect, it appears that BP repeatedly chose risky procedures in order to reduce costs and save time and made minimal efforts to contain the added risk.*
>
> At the time of the blowout, the Macondo well was significantly behind schedule. This appears to have created pressure to take shortcuts to speed finishing the well. In particular, the Committee is focusing on *five crucial decisions made by BP*: (**1**) the decision to use a well design with few barriers to gas flow; (**2**) the failure to use a sufficient number of "centralizers" to prevent channeling during the cement process; (**3**) the failure to run a cement bond log to evaluate the effectiveness of the cement job; (**4**) the failure to circulate potentially gas-bearing drilling muds out of the well; and (**5**) the failure to secure the wellhead with a lockdown sleeve before allowing pressure on the seal from below. The common feature of these five decisions is that they posed a trade-off between cost and well safety.

Well Design. On April 19, one day before the blowout, BP installed the final section of steel tubing in the well. BP had a choice of two primary options: it could lower a full string of "casing" from the top of the wellhead to the bottom of the well, or it could hang a " liner" from the lower end of the casing already in the well and install a "tieback" on top of the liner. *The liner-tieback option would have taken extra time and was more expensive, but it would have been safer because it provided more barriers to the flow of gas up the annular space surrounding these steel tubes*. A BP plan review prepared in mid-April recommended against the full string of casing because it would create "an open annulus to the wellhead" and make the seal assembly at the wellhead the "only barrier" to gas flow if the cement job failed. *Despite this and other warnings, BP chose the more risky casing option, apparently because the liner option would have cost $7 to $10 million more and taken longer*.

Centralizers. When the final string of casing was installed, one key challenge was making sure the casing ran down the center of the well bore. As the American Petroleum Institute's recommended practices explain, *if the casing is not centered, "it is difficult, if not impossible, to displace mud effectively from the narrow side of the annulus," resulting in a failed cement job. Halliburton, the contractor hired by BP to cement the well, warned BP that the well could have a "SEVERE gas flow problem" if BP lowered the final string of casing with only six centralizers instead of the 21 recommended by Halliburton. BP rejected Halliburton's advice to use additional centralizers*. In an e-mail on April 16, a BP official involved in the decision explained: *" it will take 10 hours to install them . .. . I do not like this*." Later that day, another official recognized the risks of proceeding with insufficient centralizers but commented: *"who cares, it's done, end of story, will probably be fine."*

Cement Bond Log. BP's mid-April plan review predicted cement failure, stating *"Cement simulations indicate it is unlikely to be a successful cement job due to formation breakdown." Despite this warning and Halliburton's prediction of severe gas flow problems, BP did not run a 9- to 12-hour procedure called a cement bond log to assess the integrity of the cement seal*. BP had a crew from Schlumberger on the rig on the morning of April 20 for the purpose of running a cement bond log, but they departed after *BP told them their services were not needed*. An independent expert consulted by the Committee called *this decision "horribly negligent."*

Mud Circulation. In exploratory operations like the Macondo well, wells are generally filled with weighted mud during the drilling process. *The American Petroleum Institute (API) recommends that oil companies fully circulate the drilling mud in the well from the bottom to the top before commencing the cementing process*. Circulating the mud in the Macondo well could have taken as long as 12 hours, but it would have allowed workers on the rig to test the mud for gas influxes, to safely remove any pockets of gas, and to eliminate debris and

condition the mud so as to prevent contamination of the cement. ***BP decided to forego this safety step and conduct only a partial circulation of the drilling mud before the cement job.***

<u>Lockdown Sleeve</u>. ***Because BP elected to use just a single string of casing, the Macondo well had just two barriers to gas flow up the annular space around the final string of casing***: the cement at the bottom of the well and the seal at the wellhead on the sea floor. ***The decision to use insufficient centralizers created a significant risk that the cement job would channel and fail***, while the decision not to run a cement bond log denied BP the opportunity to assess the status of the cement job. ***These decisions would appear to make it crucial to ensure the integrity of the seal assembly that was the remaining barrier against an influx of hydrocarbons. Yet, BP did not deploy the casing hanger lockdown sleeve that would have prevented the seal from being blown out from below***. [Emphasis added.]

85.     The House Letter goes on to describe these five questionable decisions by the Deepwater Horizon well operator in more detail.  It points out that its decision to use a well design with few barriers to gas flow occurred the day before the blowout, on April 19th, when it made the decision to use one of two primary options for the final section of the steel tubing in the well and chose the option that would take less time to install (at least 3 days less) and was less expensive (a cost savings of $7 to $10 million) over the option that was safer.  Indeed, an operational plan review prepared in mid-April recommended against the option ultimately selected because of the risks.  Despite the risks, however, the Deepwater Horizon well operator applied for an amended permit to allow it to use the riskier, but cheaper, option on April 15.

86.     Finally, the House Letter elaborated on the Deepwater Horizon well operators failure to secure the wellhead with a lockdown sleeve before allowing pressure on the seal from below, stating that documents from April 16 reveal that it did not install a casing hanger lockdown sleeve over the cemented wellhead, because it was still waiting for approval from MMS to install the final cement plug at a lower depth than previously approved.

87.     On June 15, 2010, Anadarko's credit rating was again downgraded, by Fitch ratings service, based on the Company's exposure to liability for the Gulf oil spill.  Downgrading the Company's credit to Negative, Fitch issued a statement, in part, as follows:

> *"Anadarko outlook now negative on oil spill-Fitch"*
>
> *Fitch Ratings on Tuesday changed its outlook on Anadarko Petroleum Corp to negative, from stable, citing increasing estimates of damages the company is likely to need to pay as a result of the oil spill in the Gulf of Mexico.*
>
> *A negative outlook indicates the company is more likely to be cut from BBB-minus, the lowest investment grade, over the next one-to-two years.* Downgrades into junk territory can significantly increase a company's borrowing costs.
>
> Anadarko owns 25 percent of the oil well that exploded in the Gulf of Mexico in April, causing a massive spill that BP Plc, the largest owner, has struggled to stop.
>
> "Fitch believes that Anadarko will not have to pay punitive damages since it is a non-operating partner; however, it may have to pay its 25 percent share of containment and cleanup costs as well as compensatory economic damages depending on a number of factors," the rating agency said.
>
> ***Anadarko is expected to have adequate liquidity to fund payments for the spill, which analysts estimate could cost the company around $6 billion***, Fitch said. This assumes that punitive damages for BP could rise to around $40 billion.
>
> However, *"the negative outlook reflects the potential for containment and cleanup costs as well as compensatory economic damages to greatly exceed these estimates,"* Fitch said.  [Emphasis added.]

88.     **The Walrus Plan.**  The Deepwater Horizon Spill Response Plan was so much of a farce that it quickly became referred to in the press and upon Capital Hill during impromptu hearings as the "Walrus Plan," making reference to the walruses that the plan was supposed to protect - - animals that have not inhabited the Gulf of Mexico for a reported 2 million years!  It was not only the press or the members of Congress that instantly realized that there was never a valid response plan for the Deepwater Horizon rig, nor was the rig operated properly.  During the Congressional hearings on June 16, 2010, the CEO of Exxon/Mobile, Rex Tillerson, also

criticized the operation of the Deepwater Horizon rig, stating that his company would *never* have operated the Deepwater Horizon well in such a manner.  During his testimony, Tillerson stated unequivocally*, "we would not have drilled the well the way they did*."  Similarly, Chevron Chief Executive John Watson also stated *that "it's not a well we would have drilled"* and told a House Energy and Commerce Committee panel that an independent investigation will show that "*this tragedy was preventable."*

89.     In addition to the foregoing, Rex Tillerson's statements before the House of Representatives Energy and Environment Subcommittee also included, in part, the following:

> Based on the industry's extensive experience, what we do know is that when you properly design wells for the range of risk anticipated… follow established procedures… build in layers of redundancy… properly inspect and maintain equipment… train operators… conduct tests and drills… and focus on safe operations and risk management, *tragic incidents like the one in the Gulf of Mexico today should not occur.*

> *        *        *

> *"This incident represents a dramatic departure from the industry norm in deepwater drilling."*  [Emphasis added.]

90.     Defendant Hackett was requested to appear before the Senate sub committee but refused, citing a "scheduling conflict."  It was soon reported that while Hackett would not attend these important Congressional Committee hearings, he was not too busy to attend an event in Houston, scheduled at or about the same time, where he accepted the "Oil and Gas Investor's Executive of the Year" award.

91.     While defendant Hackett refused to appear and testify before the Congressional sub Committee, that did not stop Anadarko from publishing a statement on June 16, 2010, that effectively admitted their complicity for and liability in the Deepwater Horizon oil disaster.  That day, defendants published a release that attempted to blame BP for the disaster, but which really

48

admitted their own recklessness and their own complicity for the disaster.  This release stated, in part, the following:

Anadarko Issues Statement

HOUSTON--(BUSINESS WIRE)--Following this week's hearings in Washington regarding the Deepwater Horizon tragedy, Anadarko Petroleum Corporation (NYSE: APC - News) issued the following statement:

\* \* \*

***The mounting evidence clearly demonstrates that this tragedy was preventable and the direct result of BP's reckless decisions and actions***. Frankly, we are shocked by the publicly available information that has been disclosed in recent investigations and during this week's testimony that, among other things, ***indicates BP operated unsafely and failed to monitor and react to several critical warning signs during the drilling of the Macondo well. BP's behavior and actions likely represent gross negligence or willful misconduct*** and thus affect the obligations of the parties under the operating agreement.

\* \* \*

The operator of a well determines the detailed planning and execution of the well, and is responsible for the day-to-day activities of, and decisions executed by, personnel on the rig. Consistent with standard industry practice around the world, non-operating investors rely upon the operator to make the appropriate decisions on the rig.  [Emphasis added.]

.

## CAUSATION AND ECONOMIC LOSS

92.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated Anadarko's stock price and operated as a fraud or deceit on Class Period purchasers of Anadarko's stock by misrepresenting the Company's risk exposure, foreseeable liability related to the Deepwater Horizon well operations, its financial results, and the validity and viability of the Deepwater Horizon Oil Spill Response Plan.  Over a period of approximately twelve months, defendants improperly inflated the Company's financial results and understated its risk exposure and insurance costs. Ultimately, however, when defendants' prior misrepresentations and fraudulent conduct came to

be revealed, shares of Anadarko declined precipitously - - evidence that the prior artificial inflation in the price of Anadarko's shares was eradicated. As a result of their purchases of Anadarko stock during the Class Period, plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

93. By improperly characterizing the Company's financial results and misrepresenting its risk exposure and prospects, the defendants presented a misleading image of Anadarko's business and future growth prospects. During the Class Period, defendants repeatedly emphasized the ability of the Company to monitor and control its operations and expenses, and consistently reported expenses and expense ratios and risk exposure and insurance requirements, well within expectations, and within the range for which the Company was adequately reserved and insured. These claims caused and maintained the artificial inflation in Anadarko's stock price throughout the Class Period, until the truth about the Company was ultimately revealed to investors.

94. Defendants' false and materially misleading statements had the intended effect of causing Anadarko's shares to trade at artificially inflated levels throughout the Class Period - - reaching a Class Period high of over $75.75 per share on April 15, 2010.

95. On June 9, 2010, however, as investors learned the truth about the Company: that defendants had invested in the Deepwater Horizon well despite the fact that there was no emergency Spill Response Plan in place - - or that the Plan that was in place was a sham or a technical filing that lacked any substance so as to make it wholly deficient and unreliable; that the lack of any substantive Response Plan subjected the Company to billions of dollars in liability; and that defendants had materially understated the risk of investing in Anadarko

Defendants' belated disclosures had an immediate, adverse impact on the price of Anadarko shares, causing their collapse.

96.    These belated revelations also evidenced defendants' prior falsification of Anadarko's statements concerning the Company's business prospects and risk exposure.  As investors and the market ultimately learned, the Company's prior business prospects had been overstated as were the Company's results of operations and its risks and liabilities were understated.  As this adverse information became known to investors, the prior artificial inflation began to be eliminated from Anadarko's share price and were damaged as a result of the related share price decline.

97.    As a direct result of investors learning the truth about the Company on June 1 and June 9, 2010, Anadarko's stock price collapsed almost 35%, from a close of $52.33 per share on May 28, 2010 (the last trading day prior to June 1, 2010) to approximately $34.50 per share on June 9, 2010 - - on very high trading volume of approximately 44 million shares traded on each of those days.  This dramatic share price decline, eradicated much of the artificial inflation from Anadarko's share price, causing real economic loss to investors who purchased this stock during the Class Period.

98.    The decline in Anadarko's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud being revealed to investors and to the market. The timing and magnitude of Anadarko's stock price decline negates any inference that the losses suffered by plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to defendants' fraudulent conduct.  During the same period in which Anadarko's share price fell

over 40% as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities

index was relatively unchanged.

99.    The economic loss, *i.e.* damages suffered by plaintiff and other members of the

Class, was a direct result of defendants' fraudulent scheme to artificially inflate the price of

Anadarko's stock and the subsequent significant decline in the value of the Company's shares

when defendants' prior misstatements and other fraudulent conduct was revealed.   The dramatic

decline in the price of Company shares immediately following investors learning that there was

no legitimate Spill Plan and that Anadarko's liability exceeded its insurance limits or reported

risk profile, is evidenced, in part, by the chart below:



## ADDITIONAL SCIENTER ALLEGATIONS

100.    As alleged herein, defendants acted with scienter in that each defendant knew

and/or recklessly disregarded that the public documents and statements issued or disseminated in

the name of the Company were materially false and misleading; knew and/or recklessly

disregarded that such statements or documents would be issued or disseminated to the investing

public; and knowingly and/or recklessly participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Anadarko, their control over, and/or receipt and/or modification of Anadarko's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Anadarko, participated in the fraudulent scheme alleged herein.

101.    Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because: (i) it deceived the investing public regarding Anadarko's business, operations, risk profile and sufficiency of insurance, and the intrinsic value of Anadarko common stock; (ii) it enabled defendants to artificially inflate the price of Anadarko shares; (iii) it enabled Anadarko insiders to sell millions over $88 million worth of their privately held Anadarko shares while in possession of material adverse non-public information about the Company; and (iv) it caused plaintiff and other members of the Class to purchase Anadarko common stock at artificially inflated prices.

102.    Sales of Company shares by Insiders, including the Individual Defendants, that occurred during the Class Period include, in part, the following:

### INSIDER TRANSACTIONS REPORTED DURING CLASS PERIOD

| Date | Insider | Shares | Sale / Disposition | Value |
|---|---|---|---|---|
| 31-Mar-10 | **HACKETT JAMES T** | 584,534 | $73.11 per share. | $42,735,280 |
|  | Officer |  |  |  |
| 25-Mar-10 | DANIELS ROBERT P | 32,000 | $70 per share. | $2,240,000 |
|  | Officer |  |  |  |
| 17-Mar-10 | EBERHART PAULETT | 12,500 | $72.25 per share. | $903,125 |
|  | Director |  |  |  |
| 13-Mar-10 | **DOUGLAS M. CATHY** | 308 | $72.05 per share. | $22,191 |
|  | Officer |  |  |  |

| 4-Mar-10 | BUTLER JOHN R JR | 12,000 | $70.04 per share. | $840,480 |
|---|---|---|---|---|
| | Director | | | |
| 4-Mar-10 | WALKER R A | 28,813 | $70.11 per share. | $2,020,079 |
| | Officer | | | |
| 4-Mar-10 | REEVES ROBERT K | 170,000 | $70.14 per share. | $11,923,800 |
| | Officer | | | |
| 1-Mar-10 | **GWIN ROBERT G** | 3,632 | $70.41 per share. | $255,729 |
| | Officer | | | |
| 15-Feb-10 | MELOY CHARLES A | 4,933 | $65.32 per share. | $322,223 |
| | Officer | | | |
| 15-Feb-10 | **GWIN ROBERT G** | 2,662 | $65.32 per share. | $173,881 |
| | Officer | | | |
| 15-Feb-10 | DANIELS ROBERT P | 7,690 | $65.32 per share. | $502,310 |
| | Officer | | | |
| 15-Feb-10 | WALKER R A | 10,998 | $65.32 per share. | $718,389 |
| | Officer | | | |
| 15-Feb-10 | **HACKETT JAMES T** | 30,795 | $65.32 per share. | $2,011,529 |
| | Officer | | | |
| 15-Feb-10 | REEVES ROBERT K | 8,126 | $65.32 per share. | $530,790 |
| | Officer | | | |
| 16-Jan-10 | **GWIN ROBERT G** | 1,201 | $65.89 per share. | $79,133 |
| | Officer | | | |
| 10-Jan-10 | DANIELS ROBERT P | 633 | $67.06 per share. | $42,448 |
| | Officer | | | |
| 17-Dec-09 | BUTLER JOHN R JR | 10,000 | $62.97 per share. | $629,700 |
| | Director | | | |
| 16-Dec-09 | EBERHART PAULETT | 5,000 | $63 per share. | $315,000 |
| | Director | | | |
| 15-Dec-09 | EBERHART PAULETT | 5,000 | $61 per share. | $305,000 |
| | Director | | | |
| 14-Dec-09 | EBERHART PAULETT | 5,000 | $59.94 per share. | $299,700 |
| | Director | | | |
| 4-Dec-09 | MELOY CHARLES A | 1,433 | $60.25 per share. | $86,338 |
| | Officer | | | |
| 4-Dec-09 | **GWIN ROBERT G** | 716 | $60.25 per share. | $43,139 |
| | Officer | | | |
| 4-Dec-09 | DANIELS ROBERT P | 1,373 | $60.25 per share. | $82,723 |
| | Officer | | | |
| 4-Dec-09 | **HACKETT JAMES T** | 7,107 | $60.25 per share. | $428,196 |
| | Officer | | | |
| 4-Dec-09 | REEVES ROBERT K | 1,324 | $60.25 per share. | $79,771 |
| | Officer | | | |
| 4-Dec-09 | WALKER R A | 1,737 | $60.25 per share. | $104,654 |
| | Officer | | | |
| 3-Dec-09 | MELOY CHARLES A | 1,397 | $59.90 per share. | $83,680 |
| | Officer | | | |
| 3-Dec-09 | **GWIN ROBERT G** | 874 | $59.90 per share. | $52,352 |
| | Officer | | | |
| 3-Dec-09 | DANIELS ROBERT P | 1,555 | $59.90 per share. | $93,144 |
| | Officer | | | |
| 3-Dec-09 | **HACKETT JAMES T** | 10,011 | $59.90 per share. | $599,658 |
| | Officer | | | |
| 3-Dec-09 | REEVES ROBERT K | 2,041 | $59.90 per share. | $122,255 |

| | Officer | | | |
|---|---|---|---|---|
| 3-Dec-09 | WALKER R A | 2,503 | $59.90 per share. | $149,929 |
| | Officer | | | |
| 1-Dec-09 | **DOUGLAS M. CATHY** | 808 | $61.56 per share. | $49,740 |
| | Officer | | | |
| 1-Dec-09 | **GWIN ROBERT G** | 1,555 | $61.56 per share. | $95,725 |
| | Officer | | | |
| 1-Dec-09 | DANIELS ROBERT P | 1,366 | $61.56 per share. | $84,090 |
| | Officer | | | |
| 1-Dec-09 | **HACKETT JAMES T** | 11,299 | $61.56 per share. | $695,566 |
| | Officer | | | |
| 1-Dec-09 | MELOY CHARLES A | 1,474 | $61.56 per share. | $90,739 |
| | Officer | | | |
| 1-Dec-09 | REEVES ROBERT K | 1,946 | $61.56 per share. | $119,795 |
| | Officer | | | |
| 16-Nov-09 | BUTLER JOHN R JR | 1,000 | $64.07 per share. | $64,069 |
| | Director | | | |
| 18-Sep-09 | **HACKETT JAMES T** | 287,000 | $62.49 - $64.62 per share. | $18,240,000 |
| | Officer | | | |
| 21-Aug-09 | BUTLER JOHN R JR | 1,000 | $53.56 per share. | $53,560 |
| | Director | | | |
| 13-Aug-09 | BUTLER JOHN R JR | 1,000 | $45.00 per share. | $45,000 |
| | Director | | | |
| | **TOTAL All INSIDERS** | **1,276,344** | | **$88,334,910** |

### Applicability Of Presumption Of Reliance: Fraud-On-The-Market Doctrine

103.     At all relevant times, the market for Anadarko's common stock was an efficient market for the following reasons, among others:

(a)     Anadarko's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Anadarko filed periodic public reports with the SEC and the NYSE;

(c)     Anadarko regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public

55

disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Anadarko was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

104.    As a result of the foregoing, the market for Anadarko securities promptly digested current information regarding Anadarko from all publicly available sources and reflected such information in Anadarko's stock price. Under these circumstances, all purchasers of Anadarko common stock during the Class Period suffered similar injury through their purchase of Anadarko common stock at artificially inflated prices and the presumption of reliance applies.

## NO SAFE HARBOR

105.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are nevertheless because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false or lacked a reasonable basis, and/or the forward-looking statement was authorized and/or approved

by an executive officer of Anadarko who knew and/or recklessly disregarded that those statements were false when made.

## BASIS OF ALLEGATIONS

106.    Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of SEC filings by Anadarko, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

107.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

108.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Anadarko's business, operations, risk profile and foreseeable liability exposure, and the intrinsic value of Anadarko common stock; (ii) enable defendants to artificially inflate the price of Anadarko shares; (iii) enable Anadarko insiders to sell over $1.2 million of their privately held Anadarko shares while in possession of material adverse non-public information; and (iv) cause plaintiff and other members of the Class to purchase Anadarko common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them) took the actions set forth herein.

109.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Anadarko's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

110.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Anadarko as specified herein.

111.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Anadarko's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Anadarko and its business operations and future prospects in the light of the circumstances under which they were made, not misleading and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Anadarko common stock during the Class Period.

112.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives

and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

113.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in failing to ascertain and to disclose such facts.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly for the purpose and effect of concealing Anadarko's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by defendants' overstatements and misstatements of the Company's business, operations risk profile and foreseeable insurance liability, and cost, expenses and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by refraining from taking steps necessary to discover whether those statements were false or misleading.

114.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Anadarko common

stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Anadarko's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Anadarko common stock during the Class Period at artificially high prices and were damaged thereby.

115.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known the truth regarding the Company's true foreseeable risks and exposure to the oil leak at the Deepwater Horizon well that Anadarko was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Anadarko common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

116.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

117.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against Individual Defendants

118.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

119.    The Individual Defendants acted as controlling persons of Anadarko within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

120.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

121.    As set forth above, Anadarko and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of

the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 23, 2010          KAHN SWICK & FOTI, LLC

_Michael A. McGuane_

Kim E. Miller (a member of the bar of this Court)
Michael A. McGuane (a member of the bar of this Court)
Melissa Ryan Clark (a member of the bar of this Court)
500 5th Ave., Suite 1810
New York, NY 10110
Tel: (212) 696-3730
Fax: (504) 455-1498

kim.miller@ksfcounsel.com
michael.mcguane@ksfcounsel.com
melissa.clark@ksfcounsel.com

- and -

Lewis S. Kahn
Neil Rothstein
206 Covington Street
Madisonville, LA 70447
Tel: (504) 455-1400
Fax: (504) 455-1498
lewis.kahn@ksfcounsel.com

**Attorneys for Plaintiff**