UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re ANADARKO PETROLEUM
CORP. CLASS ACTION LITIGATION

Lead Case No. 10 Civ. 4905 (PGG)

JURY TRIAL DEMANDED

## CONSOLIDATED CLASS ACTION COMPLAINT

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

John C. Browne (JB-0391)
Jeremy P. Robinson
Laurence J. Hasson (LH-5834)
Brett Van Benthysen
1285 Avenue of the Americas
New York, NY 10019
Telephone:   (212) 554-1400
Facsimile:   (212) 554-1444

*Attorneys for Lead Plaintiffs*

**TABLE OF CONTENTS**

PAGES

I.    NATURE OF THE ACTION ...................................................................... 1

II.   JURISDICTION AND VENUE .................................................................. 7

III.  PARTIES .................................................................................................... 8

      A.   Lead Plaintiffs ............................................................................... 8

      B.   Defendants ...................................................................................... 9

           1.   Anadarko .............................................................................. 9

           2.   The Individual Defendants ................................................... 9

      C.   Relevant Non-Parties .................................................................... 10

IV.   BACKGROUND ........................................................................................ 11

      A.   Anadarko Touts Itself As The "Premier Deepwater Producer In The Gulf
           Of Mexico" And Assures Investors That A "Safety First Culture Is A
           Way Of Life At Anadarko" ............................................................ 11

      B.   Anadarko And BP Become Co-Owners Of The Macondo Oil Well And
           Anadarko Is Provided With Detailed Information Regarding The Well ............ 13

V.    DRILLING THE MACONDO OIL WELL ................................................ 21

      A.   Overview Of The Deepwater Drilling Process And The Initial Plan For
           The Macondo Well ......................................................................... 21

      B.   Anadarko And BP Start Drilling The Macondo Well And Immediately
           Encounter Significant Delays And Additional Costs ...................... 22

           1.   Anadarko Approved The Use Of A Less Safe Well Casing Design
                That Saved Time And Money ................................................ 26

           2.   Anadarko Approved The Use Of A Dangerously Small Number Of
                Well Casing Centralizers In Order To Save Time: "Who Cares,
                It's Done, End Of Story, [It] Will Probably Be Fine" ........... 32

           3.   Anadarko Approved The Failure To Conduct Proper Cement
                Circulation Or Properly Test The Cement Job ...................... 36

VI.   THE DEEPWATER HORIZON RIG EXPLODES AND THE MACONDO CO-
      OWNERS ARE UNABLE TO STEM THE FLOOD OF OIL GUSHING INTO
      THE GULF OF MEXICO ........................................................................... 39

      A.   The Explosion And Fire On The *Deepwater Horizon* ........................... 39

      B.   The Macondo Co-Owners Are Unable To Contain The Spill For Months ........... 40

      C.   The Woefully Deficient Macondo Oil Spill Response Plan ................................. 42

VII.  ADDITIONAL ALLEGATIONS CONFIRMING ANADARKO'S
      RECKLESSNESS OR WILLFUL MISCONDUCT ......................................... 46

      A.   Defendant Hackett Admits That Recklessness Or Willful Misconduct
           Caused The Macondo Disaster ................................................................. 46

      B.   Anadarko Willfully Or Recklessly Ignored BP's Abysmal Safety Record ......... 46

      C.   Anadarko Is Sued By The U.S. Government For Its Role In The Disaster ......... 49

      D.   Numerous Investigations Confirm That The Spill Was  Preventable And
           Resulted From Reckless Decisions  Made To Save Time And Money ............... 51

VIII. THE TRUTH IS REVEALED .................................................................... 54

IX.   ADDITIONAL SCIENTER ALLEGATIONS ............................................. 61

X.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
      DURING THE CLASS PERIOD ................................................................ 63

      A.   Defendants' Materially False And Misleading Statements Published On
           Anadarko's Website Throughout The Class Period ................................. 63

      B.   Defendants' Materially False And Misleading Statements  Made During
           The Second Quarter Of 2009 .................................................................. 67

      C.   Defendants' Materially False And Misleading Statements  Made During
           The Third Quarter Of 2009 ..................................................................... 67

      D.   Defendants' Materially False And Misleading Statements  Made During
           The Fourth Quarter Of 2009 ................................................................... 70

      E.   Defendants' Materially False And Misleading Statements  Made During
           The First Quarter Of 2010 ...................................................................... 73

XI.   LOSS CAUSATION .................................................................................. 79

XII.  CLASS ACTION ALLEGATIONS ............................................................ 81

XIII.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ................................... 84

XIV.  PRESUMPTION OF RELIANCE .................................................................... 84

XV.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT............................................ 85

COUNT ONE  FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT
         AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL
         DEFENDANTS ................................................................................... 85

COUNT TWO  FOR VIOLATIONS OF SECTION 20(a) OF  THE EXCHANGE ACT
         AGAINST INDIVIDUAL DEFENDANTS .................................................... 88

Court-appointed Lead Plaintiffs, the Pension Trust Fund for Operating Engineers and the Employees' Retirement System of the Government of the Virgin Islands (collectively, "Lead Plaintiffs") bring this consolidated class action alleging violations of the federal securities laws on behalf of themselves and all other persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired the publicly-traded securities of Anadarko Petroleum Corporation (together with its affiliates, including Anadarko E&P Company, LP, "Anadarko" or the "Company") between June 12, 2009 and June 9, 2010 (the "Class Period) and were injured thereby.

## I.   <u>NATURE OF THE ACTION</u>

1.      This securities class action arises out of one of the largest environmental catastrophes in United States history.  The April 20, 2010 explosion and fire on board the *Deepwater Horizon* oil rig, located forty-nine miles off the Louisiana coast in the Gulf of Mexico, killed eleven people and injured dozens more.  The resulting spill from the ruptured "Macondo" oil well lasted 84 days and poured approximately 205 million gallons of crude oil into the Gulf of Mexico, polluting hundreds of miles of beaches, killing untold numbers of fish, birds and other wildlife, and inexorably damaging millions of acres of delicate wetlands.  While the economic and environmental impacts of this disaster will not be fully appreciated for years, the President has deemed it the "worst environmental disaster the United States has ever faced."

2.      Defendant Anadarko – one of the world's largest independent oil and gas production companies – has a 25% ownership interest in the Macondo well, in which BP p.l.c. (defined in ¶ 25 as "BP") owns a majority 65% interest.  As alleged below, in partnering with BP on the Macondo well, Anadarko expressly approved and funded a series of extremely risky decisions made in connection with drilling the well.  These decisions, which contributed directly

to the disaster, departed from industry standards and deliberately sacrificed safety in favor of saving time and money.

3.     Anadarko was formed in 1985 and initially focused on drilling for oil in Texas and Oklahoma.  As oil and gas prices skyrocketed to unprecedented levels starting in 2005, Anadarko began investing in expensive and risky – but potentially lucrative – deepwater oil exploration and drilling in the Gulf of Mexico.  By 2009, Defendants were telling investors that the Company was "[o]ne of the most successful explorers in the Gulf of Mexico" and had a "competitive advantage within the Gulf of Mexico."  As Anadarko's Chief Executive Officer, Defendant James Hackett ("Hackett"), told investors in May 2009, deepwater exploration in the Gulf of Mexico is "a phenomenal growth area for us in terms of organic growth."

4.     At the same time Defendants were telling investors that Anadarko was developing an expertise in drilling in the Gulf of Mexico, they repeatedly assured the market that the Company had the highest possible regard for safety and environmental compliance.  As Defendants knew, drilling for oil in the deepwater of the Gulf of Mexico exposed the Company to potentially massive liability in the event of an environmental mishap.  In order to assuage investor concerns, Defendants stressed the Company's supposedly stringent safety and environmental compliance practices.  Defendants emphasized, for instance, that "a safety-first culture is a way of life at Anadarko."  Indeed, Anadarko told its investors that the Company's "Gulf of Mexico operations team views safety as a top priority,"[1] and that the Company "is one of the industry's safest and most successful deepwater explorers," that has "proven we can develop these [oil] resources safely while protecting the environment."

---

[1] Unless otherwise noted, all emphasis herein has been added.

5.      Defendants similarly assured investors that the Company closely monitored its drilling projects and conducted extensive due diligence before undertaking new projects.  For instance, Defendants stated that "whenever we undertake a new project, we work to understand the environmental issues . . . [and] create a balanced plan that couples new energy development with oftentimes innovate techniques to protect the locations in which we operate."  In addition, Defendants stated that Anadarko had a purportedly "rigorous" approach to managing risk and was "positioned for continued success in the deepwater Gulf of Mexico" because it was "disciplined in its risking methodology."  Defendants also stated that the Company had a "separate risk assessment team that interacts with each of our exploration teams . . . the bottom line is that we have a consistent process.  It is rigorous and it's applied throughout the world to each of the prospects we drill."

6.      On October 1, 2009, Anadarko formally agreed to partner with BP on the Macondo oil well, purchasing a 25 percent ownership interest in return for an initial payment of approximately $24 million.  Prior to making this multi-million dollar investment, Anadarko was provided various key documents concerning the well, including the well design plan, an "oil response plan" (discussed in more detail below), and BP's estimates of the cost and timeline for drilling the Macondo well.  The project was originally budgeted for $96.2 million and estimated to take 51 working days.

7.      BP was designated as the operator of the Macondo well and took the lead in drilling operations.  In order to protect its multi-million dollar investment, however, Anadarko was granted broad rights to monitor and approve activities on the Macondo well pursuant to a comprehensive operating agreement between the co-owners (discussed below at ¶¶ 35-47).  Among other things, Anadarko was given immediate and continuous access to detailed

3

information concerning all operations on the *Deepwater Horizon* oil rig, including daily drilling reports, copies of well test results and 24/7 access to "real time" drilling data detailing current and prospective activities at the well.  The operating agreement also required Anadarko's express approval for key operations on the well.  Indeed, a June 29, 2010 article in the <u>Financial Times</u> reported that "Anadarko was kept abreast of what was going on each morning when BP sent a report of what had happened at the rig in the previous 24 hours, both companies said."

8.      Contrary to its assurances to investors, Anadarko performed virtually no due diligence before agreeing to partner with BP on the Macondo oil well.  Among other things, Anadarko approved BP's facially absurd oil spill response plan (discussed below at ¶¶ 110-121), which supposedly details the actions the co-owners would take in the event of an oil spill.  The Macondo oil spill response plan was riddled with errors and outright falsifications.  The Congressional Committee on Energy and Commerce (the "Congressional Energy Committee") investigating the Macondo disaster referred to the plan as "tragically flawed" and "embarrassing."  Anadarko also willfully or recklessly disregarded BP's abysmal safety record, which was notorious within the oil and gas industry.  For instance, between June 2007 and February 2010, BP received <u>760 citations for "egregious willful" safety violations</u> – an astonishing <u>ninety-seven percent</u> of all egregious willful violations issued to all oil producers during that time.  This shocking safety record put Anadarko on notice of a heightened need to closely monitor BP's operations in order to protect Anadarko's investment and ensure that the Company would not be exposed to huge liabilities in the event of an accident.

9.      True to past form, BP made a number of reckless decisions on the *Deepwater Horizon* rig.  Almost from the outset, the Macondo well earned a reputation as a "nightmare well," and encountered numerous difficulties.  As the project fell significantly behind schedule

and became tens of millions of dollars over-budget, BP and Anadarko made a series of increasingly reckless decisions that deliberately sacrificed safety in favor of saving time and money. As discussed below at ¶¶ 51-98, Anadarko knowingly and expressly approved BP's riskiest cost-cutting and time saving proposals. These decisions were contrary to the initial plans on the well and were made despite open acknowledgement of the safety risks they imposed. For instance, when BP and Anadarko agreed to depart from the original plans and use only six "centralizers" to secure the well (described in more detail below at ¶¶ 80-88), as opposed to the sixteen that the original plans called for, an internal email among BP personnel noted the risks but declared "who cares, it's done, end of story, it will probably be fine."

10. On April 20, 2010, Anadarko's and BP's recklessness materialized when gas leaked into the well and caused an explosion on the *Deepwater Horizon* rig that left eleven people dead, many injured and the rig critically damaged. Two days later, the *Deepwater Horizon* sank, causing a massive oil spill. Lacking an adequate oil spill response plan, Anadarko and BP failed to contain the spill for nearly five months while millions of barrels of oil were discharged into the Gulf of Mexico.

11. Various government investigations followed. To date, the evidence and conclusions from these investigations (which are still ongoing) establish that not only was this tragedy preventable, but it was caused by a series of dangerous decisions made in drilling the well (most of which were expressly approved by Anadarko). In the words of the *Report To The President* prepared by the National Commission on the BP *Deepwater Horizon* Oil Spill and Offshore Drilling (the "Presidential Commission"), these decisions reveal "systematic failures in risk management."

12.     Anadarko has attempted to defend itself by pointing the finger solely at its partner, BP.  On June 18, 2010, Defendant Hackett, Anadarko's Chief Executive Officer and Chairman of the Board stated in a press release that "[t]he mounting evidence clearly demonstrates that this tragedy was preventable and the direct result of BP's reckless decisions and actions. […]  BP's behavior and actions likely represent … willful misconduct."  Incredibly, Hackett fails to acknowledge that each of the "reckless decisions and actions" taken by BP were expressly approved by Anadarko.

13.     Indeed, as alleged below, during the Class Period, Hackett had instilled a corporate culture at Anadarko that was focused on cutting costs and bringing projects in on time and under budget.  These aggressive cost-cutting efforts – which Defendants falsely assured investors did not compromise safety – resulted in a steep rise in the Company's stock price.  Defendant Hackett reaped enormous personal benefits from this by selling off more than $61 million in stock in just seven months during the Class Period, despite not having sold any of his stock holdings in the two years prior to the Class Period.  Moreover, an astonishing $42.7 million worth of Defendant Hackett's sales – approximately sixty-nine percent of his holdings – occurred on March 31, 2010, after the Macondo project had suffered significant delays and just three weeks before the Macondo well disaster.

14.     The Company, by contrast, now faces billions of dollars in potential liability for its role in the disaster.  Indeed, on December 15, 2010, Anadarko was named as a defendant in a lawsuit brought by the United States Government, *United States of America v. BP Exploration & Production, Inc. et al.*, 10-cv-04536-CJB-SS (E.D. La.), seeking damages under the Clean Water Act and the Oil Pollution Act of 1990, and alleging that Anadarko recklessly or with "willful misconduct" failed to follow proper safety protocols in the period leading up the *Deepwater*

*Horizon* explosion.   As discussed below, the dangerous choices approved by Anadarko recklessly placed human lives, the environment, and the financial well being of the Company itself directly at risk.   When Anadarko's role in the explosion and subsequent oil spill was revealed, the price of the Company's publicly traded stock dropped by more than 38%, causing nearly $9 billion in market losses to the Company's investors.   Investors are entitled to recover for the losses they suffered.[2]

## II.    JURISDICTION AND VENUE

15.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

16.    Venue is permitted in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).   The better venue for this action, however, is the Southern District of Texas because, among other things: (i) Anadarko is headquartered near Houston, Texas and conducts substantial operations there; (ii) Anadarko's investor relations department is located near Houston, Texas; (iii) all of the Defendants and critical third-party witnesses reside in Texas or in

---

[2] Lead Plaintiffs' investigation has included a review and analysis of public filings by Anadarko, filings made in publicly available legal actions involving Anadarko and BP, including the civil action brought by the United States government against Anadarko and others captioned *United States of America v. BP Exploration & Production, Inc. et al.*, 10-cv-04536-CJB-SS (E.D. La.) and the BP Securities Action captioned *In re: BP p.l.c. Securities Litigation*, 10-md-02185 (S.D. Tex.), as well as other public documents and transcripts of testimony obtained from various government and other investigations into the events described herein.  Lead Plaintiffs' investigation is still ongoing, as are most of the relevant government and other investigations into the events at issue.  Although Lead Plaintiffs have obtained some documents that have been released publicly in connection with other investigations, the vast majority of relevant documents have not yet been made publicly available.  Lead Plaintiffs believe that additional evidentiary support will exist for their allegations after a reasonable opportunity for discovery.

the Gulf region closer to Texas; (iv) the misstatements alleged herein were issued from Anadarko's corporate headquarters in Houston, Texas; (v) the overwhelming majority of documents and other evidence is located in or close to Texas; and (vi) the locus of operative facts in this action is closer to Texas.  In addition, because the factually and legally related securities class action against BP is proceeding in the Southern District of Texas (*i.e.*, *In re: BP p.l.c. Securities Litigation*, 10-md-02185 (S.D. Tex.), trial efficiency and judicial economy strongly favor transfer of this action to the Southern District of Texas.

17.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.   PARTIES

### A.     Lead Plaintiffs

18.     Lead Plaintiff The Pension Trust Fund for Operating Engineers ("Operating Engineers") is a non-profit corporation that administers the employee benefit programs for over 35,000 participants of the International Union of Operating Engineers, Local 12, and their dependents and beneficiaries.  Operating Engineers purchased common stock and bonds issued by Anadarko during the Class Period, and suffered damages as a result of the violations of the federal securities laws pled herein.

19.     Lead Plaintiff Employees' Retirement System of the Government of the Virgin Islands ("Virgin Islands") is a public pension fund for officials and employees of the Government of the Virgin Islands.  As of September 30, 2009, Virgin Islands had more than $1.33 billion in net assets maintained for the benefit of active and retired government employees and elected public officials.  Virgin Islands purchased common stock and bonds issued by

Anadarko during the Class Period, and suffered damages as a result of the violations of the federal securities laws pled herein.

**B.      Defendants**

      **1.      Anadarko**

20.      Defendant Anadarko Petroleum Corporation (together with its affiliates, including, Anadarko E&P Company, LP, "Anadarko" or the "Company") is a corporation organized under the laws of the state of Delaware.  Anadarko engages in the exploration and production of oil and gas properties in the United States and internationally.  Anadarko has its principal place of business located at 1201 Lake Robbins Drive, The Woodlands, Texas 77380, where its investor relations department is also located and from where the Company issues its public statements.  The Company's annual meetings of stockholders are held in The Woodlands, Texas and Anadarko maintains substantial operations in Texas.

      **2.      The Individual Defendants**

21.      Defendant James T. Hackett ("Hackett") resides in Houston, Texas and was at all relevant times Anadarko's Chief Executive Officer and Chairman of the Board of Directors. Hackett also served as President of Anadarko from 2003 to February 2010.  Defendant Hackett signed and certified the accuracy of Anadarko's Form 10-K for the fiscal year ended 2009, and also certified the accuracy of the Company's Forms 10-Q for the periods ended June 30, 2009, September 30, 2009 and March 31, 2010.  Defendant Hackett frequently spoke to investors throughout the Class Period.  During the Class Period, Defendant Hackett sold over $61 million worth of Anadarko common stock.  Hackett is also a director of Halliburton Company, which is also headquartered in Texas.

22.      Defendant Robert G. Gwin ("Gwin") resides in Houston, Texas and was at all relevant times Anadarko's Chief Financial Officer ("CFO") and Senior Vice President of

Finance of the Company.   During the Class Period, defendant Gwin signed and certified the accuracy of the Company's Form 10-K for the fiscal year ended December 31, 2009, and signed and certified the Company's Forms 10-Q for the periods ended June 30, 2009, September 30, 2009 and March 31, 2010.

23.     Defendant Robert P. Daniels ("Daniels") resides in Spring, Texas (near Houston) and was at all relevant times Anadarko's Senior Vice President, Worldwide Exploration.   During the Class Period, Defendant Daniels spoke on behalf of the Company during conference calls and at conferences, including the Bank of America Energy Conference on November 18, 2009 and the Credit Suisse Energy Summit on February 3, 2010 and Anadarko's 2010 Annual Investor Conference on March 2, 2010.

24.     Defendants Hackett, Gwin and Daniels are collectively referred to herein as the "Individual Defendants."   Together with Defendant Anadarko, the Individual Defendants are collectively referred to herein as "Defendants."

### C.     Relevant Non-Parties

25.     Relevant non-party BP p.l.c. (together with its affiliates, "BP"), a global oil and gas company, is incorporated under the laws of the state of Delaware.   BP America's Chairman and President resides in Texas, and BP maintains substantial operations in Texas, including oil and gas exploration and production operations.   According to BP's corporate website, "the Houston [Texas] area has one of the largest gatherings of BP employees in the world," with "nearly 4,000 employees at our Houston (Westlake HQ), and almost 2,000 more at the Texas City refinery just to the south."

26.     BP is also a defendant in a multi-district securities class action, *In re: BP p.l.c. Securities Litigation*, 10-md-02185 (S.D. Tex.), currently proceeding in the Southern District of Texas.   As set forth herein, BP was a co-owner with Anadarko of the Macondo well, having a

65% ownership interest.  Pursuant to the terms of a comprehensive Joint Operating Agreement (defined below), BP and Anadarko partnered with respect to the oil exploration activities undertaken at the Macondo well, sharing in the potential rewards, as well as the costs, risks and liabilities associated with the project.

## IV.   BACKGROUND

### A.   Anadarko Touts Itself As The "Premier Deepwater Producer In The Gulf Of Mexico" And Assures Investors That A "Safety First Culture Is A Way Of Life At Anadarko"

27.    Anadarko is one of the world's largest independent oil and gas exploration and production companies.  When Anadarko was initially formed in 1985, its primary focus was drilling for oil in Texas and the Oklahoma panhandle.  As oil and gas prices skyrocketed to unprecedented levels starting in 2005, Anadarko began to invest heavily in expensive – but potentially lucrative – deepwater oil exploration and drilling in the Gulf of Mexico.  By 2009, Anadarko boasted of having "one of the industry's largest deepwater drilling programs," and Defendants told investors that deepwater drilling in the Gulf of Mexico would be the primary driver of the Company's future growth.  For instance, at an energy-related investor conference held on May 28, 2009, Defendant Hackett told investors that "deepwater exploration … is still a phenomenal growth area for us in terms of organic growth.  I think we are in the top four acreage holders in the Gulf of Mexico, including major oil companies."

28.    Defendants also told investors that the Company was the "premier deepwater [oil] producer in the Gulf of Mexico," "[o]ne of the most successful explorers in the Gulf of Mexico," and "among the largest independent leaseholders and producers in the deepwater Gulf of Mexico."  During an investor conference held on August 13, 2009, Defendant Hackett stated that "[with] the production history that we have and the wells that are being produced . . . [Anadarko has] a very good competitive advantage within the Gulf of Mexico."  During that same

conference, Anadarko executives emphasized the strength of the Company's burgeoning Gulf of Mexico operations and told investors that "it's a great time to invest in Anadarko . . . it's got a strong growth vehicle for a combination of both low-risk and high-end exploration opportunities."

29.     At the same time Defendants were telling investors that Anadarko was developing an expertise in deepwater drilling operations in the Gulf of Mexico, they were also assuring the market that the Company had the highest possible regard for safety and environmental compliance – even going so far as to call Anadarko a "steward of the environment."  Defendants emphasized, for instance, the Company's supposed "industry-proven track record of project execution and development," and stressed that "a safety-first culture is a way of life at Anadarko."  In keeping with this theme, on the Company's website, Anadarko portrayed its oil exploration and production operations to investors as follows:  "At Anadarko, we are committed to safely producing the energy we all need in a manner that protects the environment, public health and supports our communities."   Anadarko's corporate website also praises the Company's safety practices, including specifically in the Gulf of Mexico.  For example, on a webpage titled "Deepwater Exploration," Anadarko states:

> Anadarko's expertise and focused pursuit of material exploration targets in the Gulf of Mexico have made us one of the industry's safest and most successful deepwater explorers.

30.     Anadarko also stressed the extensive due diligence that it supposedly undertakes to ensure that each of its new business ventures adheres to the Company's purportedly rigorous "Environment, Health & Safety" standards:

> [W]henever we undertake a new project, we work to understand the environmental issues and cultural considerations of an area.  Then we create a balanced plan that couples new energy development with oftentimes innovate techniques to protect the locations in which we operate.  Fundamental to our

12

operating philosophy is a commitment to adhere to the stricter of two standards: our own policies and principles or an individual country's regulations.

31.    Further, the Company's "Gulf of Mexico Fact Sheet," which is published on Anadarko's corporate website (www.anadarko.com), stresses Anadarko's disciplined and rigorous approach to managing risk, stating that Anadarko is:

> Positioned for continued success in the deepwater Gulf of Mexico and <u>disciplined in its risking methodology. This methodology incorporates a rigorous technical and commercial evaluation, risked economics for comparability and continuous high grading with commercial focus.</u>

In touting its "risking methodology," Anadarko specifically points to its "[p]roven exploration track record," and "industry-leading project-management skills."

32.    Based on these and other representations (which, as discussed below, were materially false and misleading when made), the price of Anadarko's publicly-traded securities was artificially inflated during the Class Period – with the Company's common stock rising from $41.66 on July 7, 2009 to a Class Period high of $74.74 on April 5, 2010.  Anadarko took advantage of this rising stock price to raise hundreds of millions of dollars from public investors. Indeed, just one month before the Macondo disaster, pursuant to a shelf registration statement effective on or about March 9, 2010, Anadarko sold $750,000,000 6.200% Senior Notes due 2040 to the investing public.

**B.     Anadarko And BP Become Co-Owners Of The Macondo Oil Well And Anadarko Is Provided With Detailed Information Regarding The Well**

33.    In March 2008, BP paid approximately $34 million to the Minerals Management Service ("MMS") (now the Bureau of Ocean Energy Management, Regulation and Enforcement) for an exclusive lease to drill for oil in a nine-square-mile plot in the Gulf of Mexico known as Mississippi Canyon Block 252.  Block 252 is located approximately 49 miles off the coast of Louisiana in the deepwater of the Gulf of Mexico.  Based on available geological data, BP had

good reason to believe that this area would yield an oil well that could generate a large profit. BP, however, would be the first company to drill an oil well in the Block 252 area – an expensive operation that had no guarantee of success.

34.     BP sought to partner with other oil and gas companies in order to share the costs and risks involved in drilling the first exploratory deepwater oil well within the Block 252 area. During the Class Period, Anadarko agreed to become co-owners with BP in what came to be named the "Macondo" oil well.  In exchange for an initial payment to BP of approximately $24 million, Anadarko purchased a 25% ownership interest in the oil well.  According to an article published in Bloomberg on July 22, 2010, during an interview at Houston's River Oaks Country Club, Defendant Hackett told a reporter that he personally made the decision to "…to buy a 25 per cent share of BP Plc's Macondo well."

35.     Anadarko and BP entered into several agreements that formalized their status as co-owners of the Macondo well and partners on the oil exploration activities to be carried out on the well.  These agreements gave Anadarko significant control over the project.  Pursuant to a lease agreement (referred to as a "Lease Exchange Agreement"), effective as of October 1, 2009, Anadarko became a co-lessee of the oil well.  A separate but related joint operating agreement entitled "Ratification and Joinder of Operating Agreement Macondo Prospect" (the "Joint Operating Agreement") gave Anadarko the rights to participate with BP in the exploratory drilling at the Macondo well site as well as sweeping rights to supervise and approve material operation decisions on the well.  As a result of these contractual arrangements, Anadarko owned a 25% interest in the lease of the Macondo well and BP held a 65% interest.  A third partner, MOEX Offshore 2007 LLC ("MOEX"), owned the remaining 10% interest.

36.     Even prior to entering into these agreements, Anadarko was provided with detailed information concerning the design of the Macondo well.  For instance, in connection with an investigation into the oil spill being conducted jointly by the U.S. Coast Guard and the Bureau of Ocean Energy Management (the "Joint Marine Board"), Michael Beirne ("Beirne"), who was BP's Offshore Land Negotiator and the primary contact between BP and Anadarko concerning the Macondo well, gave sworn testimony that Anadarko was provided with detailed information concerning BP's plans for the Macondo well as early as the summer of 2009, including the well design plan, well permit applications and other filings with the U.S. Government, the estimated costs of the well and other key documents.

37.     Under the Lease Exchange Agreement and the Joint Operating Agreement, BP was designated as the operator of the Macondo oil well and Anadarko was given the right to oversee and approve most of BP's actions.  Consistent with the large investment made by Anadarko and the risks involved in the venture, the Joint Operating Agreement between Anadarko and BP required that Anadarko be provided with virtually all information concerning activities at the well, and gave Anadarko broad rights to monitor and approve any major decision undertaken by BP with respect to drilling or operating the well.  Anadarko's rights under the Joint Operating Agreement included the following:

- **Access to Detailed Information.**  Section 5.7 of the Joint Operating Agreement required BP to promptly provide Anadarko with detailed technical information regarding all operations performed in connection with the well, including copies of all applications for permits to drill (together with any amendments); detailed drilling reports via a "real time" database systems called INSITE (discussed in more detail below) and Well Space.  Such information included: "[T]he current depth, the corresponding lithological information, data on drilling fluid characteristics, information about drilling difficulties or delays (if any), mud checks, mud logs, and Hydrocarbon information, casing and cementation tallies, and estimated cumulative Costs."

Section 5.7 of the Joint Operating Agreement also required BP to provide Anadarko with detailed reports concerning "all core data and analyses;" "copies of logs and surveys" as they were generated, including all digitally recorded data; copies of all "well test results," bottomhole pressure surveys, Hydrocarbon analyses, and other similar information, including PVT analyses; all "copies of reports made to regulatory agencies;" forty-eight (48) hours' "advance notice of logging, coring, or testing operations;" "samples of cutting and sidewall cores" (if requested); all "copies of drilling prognoses;" if conventional cores are taken, access to the rig to inspect and evaluate said cores; and samples of Hydrocarbons after performing routine tests.

- **<u>Anadarko Had Approval Authority Over Key Decisions And Expenditures Concerning The Well</u>**. Section 6.2 of the Joint Operating Agreement provided that BP "<u>shall not</u> undertake an activity or operations whose Costs are Five Hundred Thousand dollars ($500,000.00) or more, unless an AFE [Authorization for Expenditure]" has been approved by Anadarko. Once Anadarko had authorized a particular operation, it became a "Participating Party" under the Joint Operating Agreement and thereby shared in the "[c]osts, risks and benefits (including rights to hydrocarbons) of an approved activity or operation." As discussed below, Anadarko expressly approved all AFE's submitted by BP requesting authorization and additional funds.

38.     The Joint Operating Agreement contemplated that AFEs and responses thereto were to be in writing (section 8.7). However, the Joint Operating Agreement also provided for communications between the co-owners to be conducted verbally – in order to ensure that costs did not mount while one party was waiting for another's written response. For example, section 8.7 expressly provides that "when a drilling rig is on location and day rate rigs charges are being charged to [the parties'] Joint Account, notices of responses thereto pertaining to operations utilizing a drilling rig <u>shall be given orally or by telephone.</u> "Receipt" of an oral or telephone notice means actual and immediate communication to the Party to be notified."

39.     Accordingly, the Joint Operating Agreement contemplated that the co-owners would be in constant communication with each other during drilling, that Anadarko (as a co-owner and participating party) would have constant, immediate and full access to all relevant details concerning activities at the well and had to approve key decisions concerning the

Macondo well.  In accordance with its contractual rights, at all relevant times Anadarko was provided with all relevant information concerning activities at the Macondo well, and approved all AFEs and other key decisions concerning operations at the well.

40.     According to testimony given by Beirne in connection with the Joint Marine Board investigation, Anadarko was kept fully apprised of all activities on the Macondo well, consist with the contractual relations the Company had negotiated.  For instance, Beirne testified that, while the Macondo well was in operation, he had "day-to-day" contact with an Anadarko representative named Nick Huch – a Project Land Advisor with Anadarko – and regularly kept Mr. Huch informed about key decisions made by BP on the well.  Beirne also testified that at no time did Anadarko ever complain that they were "not receiving access to the information that the [Joint Operating Agreement] entitled them to have."

41.     In addition, Beirne testified that during the actual drilling on the well, BP gave "five or six" Anadarko personnel access to a web-based database called "INSITE Anywhere" ("INSITE"), which provided them with constant and immediate "realtime" access to a stream of data and information concerning drilling operations at the Macondo well.  INSITE is a service provided by Halliburton, which provides real time information about wellsite drilling and operations.  Halliburton's website describes INSITE as follows:

> If you have Internet access and a Web browser, you can access well logs from anywhere in the world using the INSITE Anywhere™ service.  As data moves from your logging tools to a secure web site operated by Halliburton, your asset team can review the results in real time and make collaborative decisions on the best avenues to pursue.
>
> INSITE Anywhere service is all about making the most efficient use of your time and budget.  The system even allows you to participate in multiple wellsite operations from a single location.  Flexibility and functionality are the watchwords of the system, and displays of everything from log plots to pressure tests and samples can be configured to individual preferences.

17

42.     According to Beirne's testimony, the INSITE database ensured that Anadarko had "24/7" access to detailed technical information concerning activities at the Macondo well, including "realtime data" concerning "drilling depth, torque [and] rate of RPMs."  For example, Beirne testified regarding an email dated April 5, 2010 from John Kamm at Anadarko to Bobby Bodack ("Bodack"), BP's operations geologist at the Macondo well.  This email evidences that an Anadarko representative named Bob Quitzao was monitoring the Macondo well "from a drilling standpoint," and requested access to INSITE for Mr. Quitzao.  Beirne also testified that Anadarko was monitoring drilling on the Macondo well through direct communications with several BP employees.  For example, Beirne testified as follows:

> Q.     Did Mr. Bodack ask for Mr. Quitzao [Anadarko's representative] to be provided access to INSITE in response to Anadarko's request for Mr. Quitzao to monitor the well from a drilling standpoint?
>
> A.     Yes, ma'am.
>
> Q.     To be clear, that would be the realtime data that was coming from the rig?
>
> A.     Yes, ma'am.
>
> Q.     [...] From time to time in your experience did Anadarko request from the technical folks, Bobby Bodack in particular, information specific to the drilling of the well?
>
> A.     Yes, ma'am.
>
> Q.     And if you could turn to Tab 9 of that binder, and that would be the document bearing Bates stamp BP-HZN-MBI00173605?
>
> A.     Yes, ma'am.
>
> Q.     And if you look at the second email in that string, the one from Mr. Quitzao who was monitoring the well according to the other email, to Mr. Bodack, could you read us what Mr. Quitzao wrote to Mr. Bodack on March 24 of 2010?
>
> A.     "Good morning, Robert. I'm an Anadarko drilling engineer and taking over from your previous contact, Josh Nichols. I just started following the

18

Macondo drilling progress. It looks like operations are starting to go well. Give me an update on the following: Is the core pressure expected to come in higher than planned? Are you still planning to set the 11 and three-quarter inch liner near 17,000 feet? Are you still planning to case productive objectives with nine and seven-eighths inch casing? Thanks, Bob Quitzao."

Q.   Did Mr. Bodack respond to each of those requests?

A.   Yes, ma'am, he responded.

43.   Beirne also testified that "John Kamm, Paul Chandler, Dawn Peyton, Brian O'Neill, Rebecca Isabel and Alan O'Donnell" were individuals from Anadarko who had access to the real time INSITE data. In addition, Beirne testified as follows:

JUDGE ANDERSEN:  As far as you know, were all those people getting access to the data provided through Halliburton [*i.e.,* through INSITE] on April 20, 2010?

THE WITNESS:      Yes, Your Honor.

44.   In addition, Beirne testified that Anadarko had access to additional detailed technical information concerning the Macondo well via another online database. Beirne referred to this database as "Well Space" and testified that it was also available to Anadarko at all times during drilling at the well. Beirne testified that the Well Space database provided Anadarko with up-to-date information such as "all the daily drilling reports, [mud] logs, geologic reports, things of that nature." Beirne elaborated that the Well Space database provided Anadarko with "what was done [on the rig] in the previous 24-hour period" and a "[f]orecast of the expected operations in the next 24 hours." According to Beirne, access to the Well Space database was for "operations critical" personnel at Anadarko – and more than five or six such "operations critical" personnel from Anadarko had access to the Well Space database.

45.   According to Beirne, Anadarko personnel also had regular email communications with BP personnel regarding critical decisions made at the Macondo drilling site. Further, Beirne testified that "technical folks" from Anadarko and BP would also "directly contact" each

19

other.  Thus, as required by the Joint Operation Agreement, at all relevant times Anadarko personnel knew exactly what was happening at the Macondo well.

46.      According to an article published by the <u>Financial Times</u> dated June 29, 2010, BP, and even Anadarko itself, publicly confirmed that all key information was provided to Anadarko during drilling at the Macondo well, as described above.  The <u>Financial Times</u> reported:

> <u>Anadarko was kept abreast of what was going on each morning when BP sent it a report of what happened at the rig in the previous 24 hours, both companies said</u>. The report included information such as well test results, the technical procedures that had been undertaken and any unexpected challenges, such as a surge in gas.

> BP gave or made available to the co-owners <u>Authorisation for Expenditure (AFE) documents, supplemental AFE documents, daily operations reports, and other documents that showed the well design, changes to the well design, and identified big well control events encountered during drilling operations</u>," BP said in an e-mail in response to Financial Times' questions. "Further, <u>personnel from the co-owners engaged in periodic communications with BP personnel about well design and other issues related to the well</u>."

47.      Despite having unfettered access to all key documents relating to the Macondo oil well, Defendants failed to review or properly consider the most basic documents relating to the project.  For instance, Defendants had a contractual right to receive BP's so-called "oil spill response plan," which was woefully inadequate and facially deficient (as discussed in ¶¶ 110-121 below).  Indeed, the failures of this spill response plan have been identified by numerous Government investigations and the lack of any adequate plan to respond to the oil spill greatly exacerbated the effects of the disaster.  Also as discussed below, Defendants' failure to meaningfully review these documents or exercise any type of "check" on BP's operations on the Macondo well is inexplicable given BP's abysmal safety record, which was notorious within the oil and gas industry (as described below in ¶¶ 123-129), and should have caused the Defendants to give heightened scrutiny to BP's actions in order to protect Anadarko's investment.

## V.    DRILLING THE MACONDO OIL WELL

### A.    Overview Of The Deepwater Drilling Process And The Initial Plan For The Macondo Well

48.    Deepwater wells are drilled in sections.   The basic process involves drilling through rock at the sea floor towards oil deposits that can lie miles below the earth.   As each section of a well is drilled, the well is lined with a series of steel tubes called casing.  Each layer of casing is "cemented" into place against the well wall so that no oil or gas can leak into the space between the well wall and the outside of the casing.   After one section of casing is installed, the well is drilled deeper and then the process is repeated (*i.e.,* casing is cemented into place in the freshly drilled space and then drilling starts again).   Deepwater wells "telescope" down to smaller diameters at deeper depths.  A typical deepwater well will start at a diameter of three feet or more and telescope down to a wellhead diameter of 10 inches or less at the bottom.

49.    Wells are drilled using rotary drill bits that are lubricated and cooled with a blend of synthetic fluids referred to as "drilling mud," which is pumped through the drill pipe and flows into the well.  The drilling mud constantly circulates back to the drill rig, carrying to the surface pieces of rock and other material that has been cut by the drill bit.  This material is sieved out of the drilling mud at the rig level and then the mud is pumped back down into the well – thus the drilling mud travels in a closed loop from the rig to the drill head and back again.  The drilling mud serves several purposes.   Not only does it cool and lubricate the drill bit, but it also plays an important part in stabilizing the pressure in the well.  The weight of the drilling mud, and the downward pressure it creates, ensures that oil and gas does not leak from the bottom of the well into the well shaft and cause a fire or explosion.  Therefore, drilling crews carefully monitor the pressure being exerted by the drilling mud throughout the process.