<u>reasonable steps to protect employee health and safety. It is the goal at each Anadarko location to have and maintain a safe workplace.</u>"

200.   On November 18, 2009, Anadarko participated in the Bank of America Securities Energy Conference, at which Defendant Daniels presented.  During the presentation, Defendant Daniels praised Anadarko's project and risk management practices, telling investors:

> The project management skills that we think -- well, we're not just ourselves thinking this.  The outside consultants that do project management, benchmarking, have consistently shown that <u>Anadarko is one of the industry leaders in this and this is so important when you see that exploration success, how we translate that into value for our shareholders.  So that's critically important to us.</u>
>
> The predictable production profile is something that we build upon.  It's something that every quarter we can count on to deliver the results that we say we're going to deliver.
>
> The assets that we have ... are very, very predictable.  Again, when we put a rig on a location, we know how much it's going to cost to get what kind of a rate profile and to get what kind of reserves.

201.   Further, Defendant Daniels highlighted the Company's expertise in the Gulf of Mexico there, representing to investors that:

> [W]e think we've got one of the best deepwater positions in the industry ... we have infrastructure in the deepwater across the Gulf of Mexico and what this means is, this infrastructure we built.  That means we've got the skillset to do it again.  We know how to do it.  We brought these things online on time and on budget.  They've been performing very, very well and then we utilize them for tie-back options and really drive value creation.

202.   On December 9, 2009, Anadarko participated in the Wells Fargo Securities MLP Pipeline and E&P, Energy Services & Utility Symposiums.  Anadarko's Vice President of Investor Relations and Communications ("VP Investor Relations") presented at this conference.  During that presentation, Anadarko's VP Investor Relations touted the Company's expertise in managing major deepwater projects stating, in relevant part, that "one thing that we are very

proud of is our project management skills. <u>We have a track record of being the industry leader in on-time, on-budget delivery on these megaprojects</u>."

203.  The above statements were materially false and misleading when made because, as set forth above in ¶ 178, Anadarko was not managing its projects, including the Macondo well, in a manner that was safe or designed to ensure environmental safety. Nor did Anadarko have disciplined and rigorous risk management practices. For instance, when partnering with BP on the Macondo well, Defendants approved dangerous and high-risk operational decisions for the Macondo well, failed to properly monitor operations on the Macondo well, risked the lives of the workers on the well, endangered wildlife, the environment and commercial interests along the Gulf coast, jeopardized the Company's multi-million dollar investment in the Macondo well project and exposed the Company to billions of dollars in potential civil and environmental liability. Moreover, Anadarko completely failed to investigate, consider, or exercise any oversight over BP despite being alerted to BP's industry-wide safety record that should have made Anadarko pay particularly close to attention to BP's practices on the Macondo well.

### E.  Defendants' Materially False And Misleading Statements Made During The First Quarter Of 2010

204.  On January 31, 2010, the *Deepwater Horizon* arrived at the Macondo well to resume exploratory drilling operations on the site.

205.  On February 1, 2010, Anadarko issued a press release announcing the Company's financial results for the fourth quarter ending December 31, 2009. In the press release, Defendant Hackett stated: "2009 was a very successful year in advancing our strategy and illustrating the high quality of our portfolio."

206.  On February 2, 2010, Anadarko held an earnings conference call to discuss the Company's fourth quarter financial results with investors. Defendants Hackett and Gwin, among

other Anadarko representatives, participated on the call, which, in large part, repeated the above the statements made in the Company's February 1 press release.

207. On February 3, 2010, Anadarko participated in the Credit Suisse Group Energy Summit, at which Defendant Daniels presented. During the call, Daniels emphasized the Company's project management expertise, informing investors that:

> "[o]n the project development side, this is the second point I hope that you take away from here, is that we are very, very good at managing projects both from a time and a capital standpoint and bringing these very large megaprojects on production, on time, and on budget."

208. Defendant Daniels also highlighted to investors Anadarko's specific expertise in oil exploration in the Gulf of Mexico, and in particular noted, among other things, the Company's "demonstrated exploration success" in that region:

> Going on to the Gulf of Mexico. We have been in the deepwater Gulf of Mexico for a long time; <u>that is the only place we focus now. We feel like we are a premier operator out here. We have got demonstrated exploration success ... [t]he infrastructure we have is established and we can utilize that</u>, and it shows very clearly our operating capabilities. <u>The fact that we were able to bring those online, develop discoveries we had already had, have very efficient operations, and utilize that existing infrastructure to drive more value.</u>

209. Also during the February 3, 2010 Credit Suisse conference call, Defendant Daniels specifically touted the Company's attractiveness to investors based on the success of Anadarko's exploration program and the efficiency Company's project management skills, stating:

> So it really speaks to efficiencies, it speaks to the success of the exploration program, and the project management skills of our teams that we are able to drive our capital costs down, keep things on time and on budget, and grow our production in that kind of fashion.
>
> So, overall, it's a great time to invest in Anadarko.

210. On February 23, 2010, Anadarko filed with the SEC its Form 10-K for the fourth quarter and fiscal year ended December 31, 2009 (the "2009 10-K"). The 2009 10-K, which

74

repeated the above statements made in the Company's February 1 press release, was signed by Defendants Hackett and Gwin, among other Anadarko executives. The 2009 10-K was also certified by Defendants Hackett and Gwin.

211.   Anadarko's 2009 10-K touted the Company's active risk management practices, stating:

> "Anadarko's global business development approach transfers core skills across the globe to discover and develop world-class resources that are accretive to the Company's performance. These resources help form an optimized-global portfolio <u>where both surface and subsurface risks are actively managed</u>."

212.   Anadarko's 2009 10-K also reassured investors concerning the insurance maintained by the Company, stating:

> Our business is subject to all of the operating risks normally associated with the exploration for and production, gathering, processing and transportation of oil and gas, including hurricanes, blowouts, cratering and fire, any of which could result in damage to, or destruction of, oil and natural-gas wells or formations or production facilities and other property and injury to persons. <u>As protection against financial loss resulting from these operating hazards, we maintain insurance coverage, including certain physical damage, employer's liability, comprehensive general liability and worker's compensation insurance.</u> However, we are not fully insured against all risks in all aspects of our business, such as political risk, business-interruption risk and risk of major terrorist attacks and piracy.

213.   In addition, Anadarko's 2009 10-K stated represented to investors that Defendants had reviewed the Company's accounting principles, including its risk profile, and had properly reserved for, and insured against, foreseeable drilling related contingencies, similar to the statements regarding these matters described above in ¶¶ 186-187.

214.   Similar to the Form 10-Qs filed by the Company in prior quarters, and described above in ¶¶ 186-187, Anadarko's 2009 10-K contained certifications by Defendants Hackett and Gwin attesting to the purported accuracy and completeness of the Company's financial condition and operational information. According to the certifications, "the information contained in the

75

Report <u>fairly present, in all material respects the financial condition and results of operations on the Company.</u>"

215. On March 2, 2010, Anadarko held its 2010 Annual Investor Conference, in which Defendants Hackett and Gwin, among other Anadarko representatives, participated. During the Company's presentation, Defendant Hackett highlighted Anadarko's purportedly rigorous risk management practices, reassuring investors that "[w]e have a mindset towards exploration, prudent exploration, managed internationally <u>in a very strong risk-management perspective,</u> and we also think we've got the portfolio to be able to execute upon a very compelling plan."

216. Also on the conference call, Defendant Daniels explained in detail the Company's rigorous risk management practices:

> I want to talk a little bit about the process. I get an awful lot of questions about how we do things, how do we make decisions, how are we able to come up here and predict these kinds of resources and then deliver those. Where does the 3.5 billion barrels that we talked about in the exploration wedge, come from? [...]
>
> <u>So we go through this process internally and this is something that we do very, very rigorously.</u> I know Al talked about the magic that the exploration group does. It really is magic. It's a lot of work, <u>the guys spend an awful lot of time on risk assessment subsurface risk assessment, commercial risk assessment, so that we can make the best decisions when we invest the Company's capital.</u> The very first thing we do, is the technical team defines the opportunity sets, they define what they think the range of resources could be. <u>We have a group internally at Anadarko called the RCT, Risk Consistency Team. They use a methodology, Rowe's methodology; a lot of other companies use it but we're very rigorous about it and we get every single opportunity through that group and it's not a onetime event. It's a continuum of the process.</u>
>
> <u>Early in the process, they visit with the RCT; RCT helps focus on, what's the key risk elements in this prospect. That's where you should put your effort, that's where you should put your capital, if required, to help mitigate those risk elements.</u>
>
> <u>At the end of that, we feel like we've got a very good subsurface assessment of resource ranges and they are probabilistic resource ranges and subsurface risk assessment, based on the criterias that we have listed below which are the critical elements for hydrocarbon trapping and accumulation.</u> We then take that assessment to a team that's internal to the exploration group of engineers and

76

that's the exploration/engineering group who gets together with our facilities team, our drilling team and gets costs estimates for conceptual development plans.

217.    Defendant Daniels further explained the Company's risk management philosophy:

We also have things that don't fall into what we call, the happy land, or the upper right quadrant, that we look at as, how do we get them up there? Typically these are less mature, higher risk, type of opportunities. <u>We can get new data that can help either minimize the risk or give us a better understanding. We can take technology to the existing data and help move those things up again, through our constant process of evaluating the risk, up into the area where there would be one that we would consider for investment</u>. Or, we can monetize them; we can get somebody else to come in and take those opportunities and drill those wells and keep a piece of it.

218.    Anadarko's Senior Vice President of Worldwide Operations elaborated on Defendant Daniels' statements by highlighting to investors Anadarko's ability to monitor its projects, touting Anadarko's "increase[ing] our automation and surveillance activities that we have on our wells … [Indeed,] 95% of our gas production is up…has a surveillance component to it through automation, and that gives us a great advantage of actually going to where the problem wells are and getting them fixed, getting them back on line, and … those activities have resulted in reducing our OpEx this last year by over 20%."

219.    Anadarko's President and COO also presented at the investor conference, touting the Company's successful deepwater program to investors, stating: "I think it's extraordinary that we had the kind of success rate we had last year in deepwater exploration. We got to a point where in some ways I think we started as an organization to assume everything was going to be successful, and I think the investment community did too." According to Anadarko's President and COO, "I don't think anybody had the kind of success we had last year, and when you talk to the service companies that tell us that our 30 exploration wells and appraisal wells that we have planned for the coming year are probably, by anybody's definition, <u>the most active of any</u>

<u>company in the world you can see we're not only good at it, but -- and we have a track record to back it up, but we're also very active in it.</u>"

220.   Anadarko's President and COO attributed the Company's successful deepwater program, in large part, to Anadarko's ability to apply the skills it acquired from the Company's experience producing oil in the Gulf of Mexico. According to Anadarko's President and COO, "[t]he types of things that we've done in the past, we've taken what we learned in the Gulf of Mexico, we exported that to Brazil and West Africa, and now more recently in East Africa in Mozambique, and we're pretty excited about what that skill set's going to be able to do for us." Building on this point, Defendant Daniels remarked that:

> [W]e were very conscious about taking a skill set that we'd developed in the Gulf of Mexico which was around exploration in deep water and then into the development phase but particularly our skills in the exploration world and transporting that around the globe to where we thought there were more opportunities, less mature basins that we could apply those skill sets to.

221.   The above statements were materially false and misleading when made because, as set forth above in ¶ 178, Anadarko was not managing its projects, including the Macondo well, in a manner that was safe or designed to ensure environmental safety. Nor did Anadarko have disciplined and rigorous risk management practices. For instance, when partnering with BP on the Macondo well, Defendants approved dangerous and high-risk operational decisions for the Macondo well, failed to properly monitor operations on the Macondo well, risked the lives of the workers on the well, endangered wildlife, the environment and commercial interests along the Gulf coast, jeopardized the Company's multi-million dollar investment in the Macondo well project and exposed the Company to billions of dollars in potential civil and environmental liability. Moreover, Anadarko completely failed to investigate, consider, or exercise any oversight over BP despite being alerted to BP's industry-wide safety record that should have made Anadarko pay particularly close to attention to BP's practices on the Macondo well.

## XI. LOSS CAUSATION

222. As alleged herein, Defendants' wrongful conduct directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class. Throughout the Class Period, as set forth above, the market price of Anadarko securities was inflated by the material omissions and false and misleading statements made by the Company and Defendants Hackett, Gwin, and Daniels, which were widely disseminated to the securities markets, investment analysts and to the investing public. The false and misleading statements materially misrepresented to the investing public the Company's financial results regarding Anadarko's business, operations, risk profile and levels of insurance, and caused those securities to trade at prices in excess of their true value.

223. As a result, Lead Plaintiffs and the Class purchased Anadarko securities at artificially inflated prices. When the truth about Anadarko was revealed to the market through several partial disclosures, the price of Anadarko's securities declined in response, as the artificial inflation caused by the Defendants' material omissions and false and misleading statements was removed from the price of Anadarko's securities, thereby causing substantial damage to Lead Plaintiffs and the Class.

224. During the Class Period, Anadarko's common stock traded as high as $74.74 per share. Immediately after the explosion, Anadarko securities fell slowly over the next few weeks as the true nature of Anadarko's involvement in the well and potential liability was revealed. On April 27, 2010, on news that the spill would be difficult to contain, Anadarko's common stock fell over $3 per share from a closing price of $73.18 per share on April 26 to $70.10 per share on April 27, a statistically significant drop of 4.2%, on above average trading volume of 5,335,300 shares. On April 29, 2010, the price of Anadarko's common stock fell another $3 per share from a closing price of $70.20 per share on April 28 to $67.33 per share on April 29, a statistically

79

significant drop of 4.1%, on high trading volume of 14,134,700 shares. Finally, as a result of the partial disclosures on April 30, 2010 that cleanup efforts were ineffective and that Anadarko faced increased liability, the Company's stock continued to drop an additional $5.17 per share from the April 29 closing price of $67.33 per share to $62.16 per share on April 30, a statistically significant drop of 7.7%, on high trading volume of 21,079,100.

225. On May 5, 2010 a partial disclosure revealed the possibility that environmental recovery costs could reach $15 billion. This partial truth informed investors as to Anadarko's exposure to liability, and as a result, the price of Anadarko's common stock fell $2.57 per share from the May 4 closing price of $64.40 per share to $61.83 per share on May 5, a statistically significant drop of 4%, on high trading volume of 11,184,700 shares.

226. On May 28, 2010, another partial disclosure revealed that Congress was considering removing the liability cap for damage caused by oil spills. Removing the cap directly contrasted Hacket's earlier statement and would have increased Anadarko's potential liability. The market reacted and Anadarko's common stock fell $3.24 per share from the May 27 closing price of $55.57 per share to $52.33 per share on May 28, a statistically significant drop of 5.8%, on high trading volume of 9,825,800 shares.

227. On May 30, 2010, the first partial disclosure concerning the reckless decisions by BP and its partners in drilling the Macondo well were made. In response to these concerns, the price of Anadarko's common stock plummeted by almost $10.00 per share – a precipitous drop of approximately 20% – from the May 28 closing price of $52.33 per share to close at $42.10 per share on June 1, on extraordinarily high trading volume of over 44.8 million shares.

228. A series of partial disclosures made between June 2, 2010 and Jun 9, 2010 revealed additional truths about Anadarko and the spill. As set forth above in ¶¶ 156-162, these

additional disclosures revised the potential liability for the spill upward to $40 billion, forecast the potential environmental penalties on the parties to the Macondo well, and highlighted the errors and omission in the Macondo Spill Response Plan, a document that was available to Anadarko at the time of its investment in the Macondo well.

229. When the market finally gained a complete understanding of the magnitude of the environmental liabilities facing Anadarko and became aware of the true safety measures adopted at the rig, on June 9, 2010 the price of Anadarko's common stock had plummeted another 19% to just below $34.50 per share from their June 8 close of $42.80 per share on an extraordinarily high trading volume of over 45.72 million shares.

230. As a result of their purchases of Anadarko securities during the Class Period and the corrections removing the artificial inflation in the prices paid for those securities, Lead Plaintiffs and the Class suffered economic harm under the federal securities laws.

## XII. CLASS ACTION ALLEGATIONS

231. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Anadarko between June 12, 2009 and June 9, 2010, inclusive (the "Class") and who were injured thereby. Excluded from the Class are Defendants, members of the family of each of the Individual Defendants, executive officers and/or directors of Anadarko, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

232. Throughout the Class Period, Anadarko's common stock was actively traded on the NYSE, which is an efficient market. Numerous securities analysts published reports about

Anadarko during the Class Period, including analysts from Argus Research Company, Bernstein Research, Buckingham Research, Credit Suisse, Deutsche Bank, Fitch, HSBC, Jeffries & Co., JP Morgan, Macquarie (USA), Morgan Stanley, Oppenheimer, RBC Capital, Sadif Investment Analytics, Scotia Capital, Sun Trust, Validea, and Wells Fargo. Hundreds of thousands of Company shares were traded every day during the Class Period, and over ten million Anadarko shares were traded on numerous days.

233.   The members of the Class are so numerous that joinder of all members is impracticable. As of March 31, 2010, the Company had over 494.74 million shares of common stock issued and outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Anadarko or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

234.   Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal securities laws, and sustained damages as a result of the conduct complained of herein.

235.   Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests that are contrary to or in conflict with those of the members of the Class that Lead Plaintiffs seek to represent.

236. Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

    b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, risk profile and management of Anadarko;

    c. whether and to what extent the market prices of the Company's securities were artificially inflated during the Class Period due to the non-disclosures and/or misrepresentations complained of herein;

    d. whether Defendants acted with scienter;

    e. whether Defendants named in Lead Plaintiffs' claim pursuant Section 20(a) of the Exchange Act are controlling persons of the Company;

    f. whether reliance may be presumed pursuant to the fraud-on-the-market rule and/or the fraud-created-the-market rule;

    g. whether the members of the Class have sustained Damages as a result of the misconduct complained of herein, and if so, the proper measure thereof.

    h. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to

individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

237. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are nevertheless because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false or lacked a reasonable basis, and/or the forward-looking statement was authorized and/or approved by an executive officer of Anadarko who knew and/or recklessly disregarded that those statements were false when made.

238. Lead Plaintiffs have alleged the following based upon the investigation of Lead Plaintiffs' counsel, which included a review of SEC filings by Anadarko, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, related litigation, and media reports, and Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## XIV. PRESUMPTION OF RELIANCE

239. At all relevant times, the market for Anadarko's common stock was an efficient market for the following reasons, among others:

  a. Anadarko's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

  b. As a regulated issuer, Anadarko filed periodic public reports with the SEC and the NYSE;

  c. Anadarko regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

  d. Anadarko was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

240. As a result of the foregoing, the market for Anadarko securities promptly digested current information regarding Anadarko from all publicly available sources and reflected such information in Anadarko's stock price. Under these circumstances, all purchasers of Anadarko common stock during the Class Period suffered similar injury through their purchase of Anadarko common stock at artificially inflated prices and the presumption of reliance applies.

## XV. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT ONE

### FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

241. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

242. During the Class Period, Defendants Anadarko, Hackett, Gwin and Daniels carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Anadarko's business, operations, risk profile, foreseeable liability exposure, and the intrinsic value of Anadarko common stock; (ii) enable defendants to artificially inflate the price of Anadarko shares; (iii) enable Defendant Hackett to sell over $61 million of his privately-held Anadarko shares while in possession of material adverse non-public information; and (iv) cause Lead Plaintiffs and other members of the Class to purchase Anadarko common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, jointly and individually (and each of them) took the actions set forth herein.

243. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially inflated market prices for Anadarko's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

244. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Anadarko as specified herein.

245. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein, to falsely assure investors of Anadarko's intrinsic value, performance, and continued substantial growth. These acts included, among other things the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary to make the statements issued-about Anadarko, its business operations, and its future prospects not misleading. Defendants also engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Anadarko common stock during the Class Period.

246. The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in failing to ascertain and to disclose such facts. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly for the purpose and effect of concealing Anadarko's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations risk profile, foreseeable insurance liability, cost, expenses, and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by refraining from taking steps necessary to discover whether those statements were false or misleading.

247. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Anadarko common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices

of Anadarko's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired Anadarko common stock during the Class Period at artificially high prices and were damaged thereby.

248.   At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class did not know the misstatements were materially false and misleading. Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired Anadarko's publicly-traded securities, or, if they had acquired such publicly traded securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

249.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

250.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

### COUNT TWO

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST INDIVIDUAL DEFENDANTS

251.   Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

252. Defendants Hackett, Gwin and Daniels acted as controlling persons of Anadarko within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading. Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

253. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

254. As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's publicly-traded securities during the Class Period.

## DEMAND FOR JURY TRIAL

255.     Lead Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury in this action of all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment as follows:

A.     Determining that this action is a proper class action and certifying Lead Plaintiffs as the class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Lead Plaintiffs and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with interest thereon;

C.     Awarding rescission and/or rescissory damages in favor of Lead Plaintiffs and the other members of the Class;

D.     Awarding prejudgment interest and/or opportunity cost damages in favor of Lead Plaintiffs and the other members of the Class;

E.     Awarding Lead Plaintiffs and the Class the fees and expenses incurred in this action, including attorneys' fees and expert fees; and

F.   Granting such other and further relief as the Court may deem just and proper.

Dated: January 31, 2011                             Respectfully Submitted,

**BERNSTEIN LITOWITZ BERGER  
& GROSSMANN LLP**

/s/ John C. Browne
John C. Browne (JB-0391)
Jeremy P. Robinson
Laurence J. Hasson (LH-5834)
Brett Van Benthysen
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444

*Counsel for Lead Plaintiffs*