UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re ANADARKO PETROLEUM CORP. CLASS ACTION LITIGATION | Lead Case No. 10 Civ. 4905 (PGG) JURY TRIAL DEMANDED |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO (A) DISMISS THE CONSOLIDATED CLASS
ACTION COMPLAINTAND (B) STRIKE CERTAIN ALLEGATIONS THEREIN**

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

John C. Browne (JB-0391)
Ann M. Lipton (AL-3010)
Jeremy P. Robinson
Brett Van Benthysen
1285 Avenue of the Americas
New York, NY 10019
Telephone:      (212) 554-1400
Facsimile:      (212) 554-1444

Lead Counsel for Lead Plaintiffs

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 4

I.      Anadarko Touts its Reputation for Safety and Risk Management ..................... 4

II.     Anadarko Partnered with BP on the Macondo Well....................................... 5

        1.      Anadarko Purchased 25% Of The Macondo Well............................... 5

        2.      Anadarko Ignored the Deficient Macondo Oil Spill Response Plan ................... 6

III.    Drilling the Macondo Well ....................................................................... 7

IV.     The April 20, 2010 Explosion and Resulting Oil Spill............................... 10

V.      Post Class Period Events........................................................................ 11

ARGUMENT ........................................................................................................... 12

I.      The Complaint Alleges Claims For Violations Of Section 10(b).................. 12

        A.      Plaintiffs Allege Materially False And Misleading Statements......................... 12

                1.      False Statements Concerning Anadarko's Risk Management and
                        Commitment to Safety ....................................................... 12

                2.      False Statements Concerning Anadarko's Post-Spill Exposure .............. 18

                3.      Defendants' Statements Were Not "Puffery" .............................. 19

                4.      The Complaint Alleges Securities Fraud Not Mismanagement .............. 21

        B.      The Complaint Adequately Alleges Scienter...................................... 22

                1.      Misstatements Prior to the Gulf Spill..................................... 23

                        a.      The Importance of the Well and the Magnitude of the
                                Expenses Contribute to an Inference of Scienter........................ 23

                        b.      BP's Abysmal Safety Record Contributes to the Inference
                                of Scienter ...................................................... 24

                        c.      Defendants' Access to Detailed Information About Macondo
                                Contributes to the Inference of Scienter ........................... 25

i

d.    Defendants' Motives Contribute to an Inference of Scienter ....... 30

i.    Defendants were motivated to complete the project quickly and minimize costs................................................. 31

ii.    Hackett Was Motivated to Avoid Personal Losses Through Rapid Stock Sales................................................ 31

2.    Misstatements Made After the Gulf Spill ................................................. 33

II.    Plaintiffs' Allegations Are Confirmed By Government Complaint ................................. 34

III.    The Individual Defendants Are Liable As Control Persons ............................................. 34

CONCLUSION............................................................................................................................. 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
    512 F.3d 46 (1st Cir. 2008) ....................................................................................22

*Adams v. Kinder-Morgan, Inc.*,
    340 F.3d 1083 (10th Cir. 2003) .............................................................................24

*Aldridge v. AT Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002) ....................................................................................23

*In re Ambac Fin. Grp., Inc., Sec., Litig.*,
    693 F. Supp. 2d 241 (S.D.N.Y. 2010) ...................................................................19

*Anderson v. Abbott Labs.*,
    140 F. Supp. 2d 894 (N.D. Ill. 2001) .....................................................................15

*Atlas Air Worldwide Holdings Inc., Sec., Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004) .............................................................23, 28

*Atlas v. Accredited Home Lenders Holding Co.*,
    556 F. Supp. 2d 1142 (S.D. Cal. 2008) .................................................................20

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ..............................................................................12, 29

*Avon Prods., Inc. Sec. Litig.*,
    2009 WL 848017 (S.D.N.Y. 2009) ........................................................................32

*In re Beacon Assocs. Litig.*,
    745 F. Supp. 2d 386 (S.D.N.Y. 2010) ...................................................................34

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
    2011 WL 223540 (S.D.N.Y. 2011) ........................................................................17

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005) ...................................................................29

*In re BP Prudhoe Bay Royalty Trust Sec. Litig.*,
    2007 WL 3171435 (W.D. Wash. 2007) ................................................................28

*In re Brooks Automation, Inc. Sec. Litig.*,
    2007 WL 4754051 (D. Mass. 2007) .......................................................................28

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002)..........................................................................27, 34

*Castellano v. Young & Rubicam, Inc.*,
  257 F.3d 171 (2d Cir. 2001)...............................................................................15

*Chu v. Sabratek Corp.*,
  100 F. Supp. 2d 827 (N.D. Ill. 2000) ..................................................................24

*In re Citigroup, Inc. Sec. Litig.*,
  330 F. Supp. 2d 367 (S.D.N.Y. 2004)..................................................................22

*City of Brockton Ret. Sys. v. Shaw Grp., Inc.*,
  540 F. Supp. 2d 464 (S.D.N.Y. 2008)..............................................................22, 32

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
  423 F. Supp. 2d 348 (S.D.N.Y. 2006)..............................................................20, 21

*In re Computer Assocs. Class Action Sec. Litig.*,
  75 F. Supp. 2d 68 (E.D.N.Y. 1999) .....................................................................20

*Davidoff v. Farina*,
  2005 WL 2030501 (S.D.N.Y. 2005)....................................................................17

*De la Fuente v. DCI Telecomms., Inc.*,
  259 F. Supp. 2d 250 (S.D.N.Y. 2003)..................................................................34

*In re Donna Karan Int'l Sec. Litig.*,
  1998 WL 637547 (E.D.N.Y. 1998).......................................................................21

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)...........................................................................16, 22

*Estate of Detwiler v. Offenbecher*,
  728 F. Supp. 103 (S.D.N.Y. 1989).......................................................................22

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
  469 F. Supp. 2d 88 (S.D.N.Y. 2006)................................................................32, 33

*In re Fannie Mae 2008 Secs. Litig.*,
  742 F. Supp. 2d 382 (S.D.N.Y. 2010)..................................................................17

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
  270 F.3d 645 (8th Cir. 2001) ..............................................................................31

*In re Ford Motor Co. Sec. Litig., Class Action*,
  381 F.3d 563 (6th Cir. 2003) ..............................................................................21

iv

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
    376 F. Supp. 2d 385 (S.D.N.Y. 2005)........................................................34

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)................................................17, 29

*Glazer Capital Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) ................................................................21

*In re Globalstar Sec. Litig.*,
    2003 WL 22953163 (S.D.N.Y. 2003)......................................................19

*Hayes v. Gross*,
    982 F.2d 104 (3d Cir. 1992)....................................................................21

*Hershfang v. Citicorp*,
    767 F. Supp. 1251 (S.D.N.Y. 1991)........................................................25

*In re Initial Pub. Offering Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003)....................................................35

*Institutional Investors Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)........................................................23, 30, 33

*Iowa Pub. Employees' Ret. Sys. v. MF Global, Ltd.*,
    620 F.3d 137 (2d Cir. 2010)........................................................16, 17, 22

*Johns v. Bayer Corp.*,
    2010 WL 2573493 (S.D. Cal. 2010) ......................................................34

*In re JPMorgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005)....................................................22

*In re Keyspan Corp. Sec. Litig.*,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003) ..................................................32

*Lapin v. Goldman Sachs Grp., Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006)....................................................20

*Lasker v. New York State Elec. & Gas Corp.*,
    85 F.3d 55 (2d Cir. 1996) ......................................................................19

*Lerner v. FNB Rochester Corp.*,
    841 F. Supp. 97 (W.D.N.Y. 1993)..........................................................22

*Lipsky v. Commonwealth United Corp.*,
    551 F.2d 887 (2d Cir. 1976)....................................................................34

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011) ..........................................................................16

*In re Livent Inc. Sec. Litig.*,
    148 F. Supp. 2d 331 (S.D.N.Y. 2001) ...........................................................34

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    513 F.3d 702 (7th Cir. 2008) ....................................................................23, 31

*Malin v. XL Capital*,
    499 F. Supp. 2d 117 (D. Conn. 2007) ............................................................25

*Manavazian v. Atec Grp., Inc.*,
    160 F. Supp. 2d 468 (E.D.N.Y. 2001) ...........................................................20

*In re Marsh & McLennan Cos. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) ......................................................14, 19

*Matrixx Initiatives, Inc. v. Siracusano*,
    2011 WL 977060 (2011) ...................................................................... *passim*

*In re MidAtlantic Corp. S'holder Litig.*,
    758 F. Supp. 226 (S.D.N.Y. 2006) ................................................................20

*Nathenson v. Zonagen, Inc.*,
    267 F.3d 400 (5th Cir. 2001) .........................................................................23

*Novak v. Kasaks.*
    216 F.3d 300 (2d Cir. 2000) ................................................................. *passim*

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*,
    595 F.3d 86 (2d Cir. 2010) ...................................................................... 20-21

*In re Oxford Health Plans, Inc.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ..............................................................32, 33

*Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*,
    603 F.3d 144 (2d Cir. 2010) ..........................................................................29

*In re Pall Corp.*,
    2009 WL 3111777 (E.D.N.Y. 2009) ..............................................................23

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005) ...........................................................35

*In re Parmalat Sec. Litig.*,
    497 F. Supp. 2d 526 (S.D.N.Y. 2007) ...........................................................35

*In re Pfizer Inc. Sec. Litig.*,
    584 F. Supp. 2d 621 (S.D.N.Y. 2008)..................................................................29

*Plymouth County Ret. Ass'n v. Schroeder*,
    576 F. Supp. 2d 360 (E.D.N.Y. 2008) ...............................................................33

*In re PMA Capital Corp. Sec. Litig.*,
    2005 WL 1806503 (E.D. Pa. 2005) ...................................................................20

*Pommer v. Medtest Corp.*,
    961 F.2d 620 (7th Cir. 1992) .............................................................................16

*In re Reserve Fund Sec. & Derivative Litig.*,
    732 F. Supp. 2d 310 (S.D.N.Y. 2010)................................................................23

*In re Sadia, S.A. Sec. Litig.*,
    643 F. Supp. 2d 521 (S.D.N.Y. 2009)................................................................22

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Phillip Morris Cos., Inc.*,
    75 F.3d 801 (2d Cir. 1996).................................................................................32

*In re Sanofi-Aventis Sec. Litig.*,
    2011 WL 1196052 (S.D.N.Y. 2011)...................................................................15

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)..................................................................12, 29, 34

*Scritchfield v. Paolo*,
    274 F. Supp. 2d 163 (D.R.I. 2003).....................................................................20

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996).............................................................................35

*SEC v. Lee*,
    720 F. Supp. 2d 305 (S.D.N.Y. 2010)................................................................34

*Serabian v. Amoskeag Bank Shares, Inc.*,
    24 F.3d 357 (1st Cir. 1994)...........................................................................19, 21

*South Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009).................................................................................31

*South Ferry LP No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008)..............................................23, 24, 26, 28

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999).................................................................................32

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001)............................................................................35

*Tabor v. Bodisen Biotech, Inc.*,
    579 F. Supp. 2d 438 (S.D.N.Y. 2008).........................................................34

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008).........................................................27

*Teamsters Allied Benefit Funds v. McGraw*,
    2010 WL 882883 (S.D.N.Y. 2010)...............................................................25

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    2005 WL 2148919 (S.D.N.Y. 2005).......................................................20, 35

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
    531 F.3d 190 (2d Cir. 2008)..............................................................23, 28, 29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ............................................................................. *passim*

*In re Time Warner, Inc. Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993) .............................................................................17

*In re Union Carbide Class Action Sec. Litig.*,
    648 F. Supp. 1322 (S.D.N.Y. 1986).......................................................21, 22

*In re Van der Moolen Holding N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005)..............................................24, 25, 29

*In re Winstar Commc'ns*,
    2006 WL 473885 (S.D.N.Y. 2006)...............................................................23

*Virginia Bankshares v. Sandberg*,
    501 U.S. 1083 (1991)....................................................................................19

*Weiner v. Quaker Oats Co.*,
    129 F.3d 310 (3d Cir. 1997)..........................................................................20

*In re Xcelera.com Sec. Litig.*,
    2002 WL 745835 (D. Mass. 2002) ...............................................................34

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ........................................................................34

**STATUTES**

15 U.S.C. § 78j(b) ............................................................................... *passim*

15 U.S.C. § 78t(a) .................................................................................. 34-35

15 U.S.C. § 78u-4 .................................................................................. 12, 22

**OTHER AUTHORITIES**

17 C.F.R. §240.10b-5 .................................................................................. 12

30 C.F.R. §250.401 .................................................................................. 14

## PRELIMINARY STATEMENT

This securities class action concerns Defendants' false assurances to investors that Anadarko Petroleum Corporation ("Anadarko" or the "Company") had consistent and rigorous risk management policies, treated "safety as a top priority," and had a commitment to protecting the environment.  The truth began to be revealed on April 20, 2010, when Anadarko's reckless management of the Macondo oil well in the Gulf of Mexico resulted in an explosion and oil spill that is considered one of the worst environmental disasters in U.S. history.  After the Macondo spill began, as millions of gallons of oil spilled into the Gulf of Mexico, Defendants continued to mislead investors about Anadarko's role in the disaster and exposure to billions of dollars of liabilities.

Defendant Anadarko is an oil company headquartered in Texas that owns 25% of the Macondo well.  It partnered with BP[1] on the Macondo oil exploration activities, which resulted in the well-publicized Macondo disaster.  Plaintiffs bring this action on behalf of themselves and a class of investors who purchased Anadarko securities between June 12, 2009 and June 9, 2010 (the "Class Period") that were artificially inflated by fraudulent statements and omissions by Defendants Anadarko and the Individual Defendants: James J. Hackett ("Hackett"), Anadarko's CEO and Chair; Robert G. Gwin ("Gwin"), the Company's CFO and Senior V.P. of Finance; and Robert P. Daniels ("Daniels"), Anadarko's Senior V.P., Worldwide Exploration.

Plaintiffs allege that, prior to the disaster, Anadarko and the Individual Defendants misrepresented the consistency and rigor of the Company's risk management policies, commitment to safety, and protection of the environment.  Contrary to these representations, Defendants participated in and approved a series of increasingly reckless decisions in connection with the Macondo well.  Defendants disregarded both BP's abysmal safety record and a facially absurd oil spill response plan, which was riddled with obvious errors and later described as

---

[1] "BP" refers to BP, p.l.c. and all affiliates.  BP owned 65% of the Macondo well, with the remaining 10% owned by a company called MOEX Offshore 2007 LLC.

1

"tragically flawed" and "embarrassing" by the Congressional committee investigating the Macondo disaster. Defendants also approved dangerous shortcuts in drilling the well. These decisions – which were characterized by industry experts as "unheard of," and which Hackett himself later admitted were "reckless" and represented "gross negligence or willful misconduct" – sacrificed fundamental safety precautions to save time and money.

When making these decisions, Defendants were undeniably on notice of the dangers at Macondo: Hackett personally approved Anadarko's investment in the well and, as head of Anadarko's deepwater oil exploration activities, the well was under Daniels' specific authority. Defendants had access to detailed "real-time" data about the Macondo drilling operations – including daily reports and online databases. Defendants even explicitly approved the faulty well design that was a key contributor to the explosion, and admitted they were aware of other fateful decisions. Indeed, just as Anadarko was choosing to invest in Macondo, and later when the well was months behind schedule and millions of dollars over-budget, Hackett divested himself of 871,534 shares of Anadarko stock – including a single day sell off three weeks before the explosion of 69% of his total Anadarko holdings at that time. Hackett had sold no Anadarko stock in the two years preceding the Class Period.

Following the explosion – as millions of barrels of oil gushed into the Gulf and the attention of the world focused on Macondo – Defendants misled investors about Anadarko's role in the disaster. Daniels claimed that Defendants "were not involved" in "looking at the detail, well design or procedures" – assertions that were flatly untrue. Further, Anadarko falsely assured investors that its exposure to liability would be sufficiently covered by the Company's "net insurance coverage" of "approximately $177.5 million, less deductibles of $15 million." At the time these statements were made, Defendants knew that they faced exposure to liability and fines that vastly exceeded the $177.5 million.

In the face of these allegations, Defendants assert, among other things, that Plaintiffs have alleged only "corporate mismanagement." Defendants ignore that they explicitly and

2

repeatedly lied to investors about Anadarko's safety and environmental compliance and risk management practices, their involvement in the Macondo well, and their insurance coverage and exposure to liability.  The Complaint thus states a classic claim for securities fraud.

Equally misguided are Defendants' efforts to challenge the false and misleading statements alleged in the Complaint.  Contrary to their argument, Defendants' statements were not mere "puffery."   In fact, Defendants offered detailed descriptions of their methods for assessing risk and repeatedly touted their supposedly industry leading commitment to compliance with safety laws and regulations as well as their own stringent internal standards, calling themselves "the industry's safest" deepwater driller.  Tellingly, Defendants do not even attempt to defend Daniels's blatant post-spill lie to investors that Anadarko "…[was] not involved …at all" in "looking at the detail, well design or procedures" concerning the Macondo well.  These are exactly the sorts of statements that courts routinely find are material to investors and can form the basis of a fraud claim.

Moreover, Defendants' arguments that the Complaint fails to raise a strong inference of scienter ring hollow given that Hackett himself admitted that BP's actions, which Anadarko knowingly approved during Class Period, constituted "gross negligence or willful misconduct." Anadarko itself later admitted that the well design – a design Defendants approved – was improper for this well.  As alleged in the Complaint, Defendant Hackett had instilled a corporate culture at Anadarko that was focused on cutting costs and bringing projects in on time and under budget.   Contrary to Defendants' assurances to investors, these aggressive strategies compromised safety and placed the Company at serious risk of liability.  Finally, Defendants' claim that the Complaint fails because it does not include allegations from "confidential witnesses" is irrelevant not only because the Complaint cites to sworn testimony obtained in government investigations, but because just weeks ago, the Supreme Court unanimously sustained a complaint that included no confidential witnesses.  *See Matrixx Initiatives, Inc. v.*

*Siracusano,* 2011 WL 977060, at \*14 (2011).  In sum, Defendants' motion to dismiss and/or strike should be denied.

## STATEMENT OF FACTS

**I.     Anadarko Touts its Reputation for Safety and Risk Management**

Anadarko is a publicly-traded oil and gas exploration and production company.  ¶¶2-3, 20.  Throughout the Class Period, Anadarko repeatedly emphasized to investors that it placed a high priority on ensuring that its operations were conducted safely, with careful and detailed analysis of risks at every drilling site, and were environmentally sound.  For example, Anadarko stated that "Safety and environmental stewardship are highly valued at Anadarko and are inherent components of the culture of the company."  ¶4, 27-31, 169-177, 180, 198.  Anadarko assured investors that a "safety-first culture is a way of life at Anadarko," and the Company's "Gulf of Mexico operations team views safety as a top priority."  ¶4.  The Company further assured investors that it closely monitored its drilling projects and conducted extensive due diligence before undertaking new projects, stating, among other things that, "whenever we undertake a new project, we work to understand the environmental issues . . . [and] create a balanced plan that couples new energy development with oftentimes innovate techniques to protect the locations in which we operate."  ¶¶5, 174.  Defendants claimed that Anadarko was "positioned for continued success in the deepwater Gulf of Mexico" because it was "disciplined in its risking methodology," utilizing a "consistent [risk assessment] process.  It is rigorous and it's applied throughout the world to each of the prospects we drill."  ¶¶5, 31, 177.

Anadarko also emphasized that it complied with all environmental and safety regulations, telling investors that "Fundamental to our operating philosophy is a commitment to adhere to the stricter of two standards: our own policies and principles or an individual country's regulations," ¶174, and assuring investors of its "commitment to … protecting the environment across all our operations."  ¶193.

4

## II.   Anadarko Partnered with BP on the Macondo Well
### 1.  Anadarko Purchased 25% Of The Macondo Well

During the summer of 2009, BP approached Anadarko regarding a potential partnership on the Macondo well.  ¶¶33, 36.  At the time, BP was widely known the most reckless oil and gas company in the United States, having received 760 citations for "egregious willful" safety violations between June 2007 and February 2010 – an astonishing 97% of all egregious willful violations issued to all oil producers during that time.  ¶¶8, 124-125.  BP had also recently made headlines due to a 2005 explosion at a Texas refinery that killed 15 people and caused 200 injuries.  An OSHA investigation cited "organizational and safety deficiencies at all levels of [] BP."  BP paid over $100 million in fines to OSHA for the Texas refinery explosion, the highest in OSHA's history, surpassing the second highest fine of $21 million – which was also set by BP in 2005.  ¶¶125-127; *see also* ¶128.

Despite BP's notorious history, Hackett personally made the decision to partner with BP on the Macondo well, with an initial $24 million contribution from Anadarko.  ¶34.  Effective October 1, 2009, Anadarko and BP entered into various agreements that formalized their status as co-owners and partners and gave Anadarko significant control over the project.  ¶¶6-7, 35, 192.  These agreements included (i) a lease agreement by which Anadarko became a co-lessee of the oil well and (i) a joint operating agreement (the "JOA") that gave Anadarko the rights to participate with BP in the exploratory drilling at the Macondo well site as well as sweeping rights to supervise and approve material operational decisions on the well.  As a result of these contractual arrangements, Anadarko owned a 25% interest in the lease and BP held a 65% interest. ¶¶34-35, 192.

The sworn testimony of Michael Beirne, BP's primary contact with Anadarko concerning Macondo, establishes that Anadarko was provided with detailed information about the well as early as the summer of 2009, including the well design plan, and permit applications and other governmental filings.  ¶¶36, 37, 46, 113; *see also* Declaration of John C. Browne in Opposition

5

to Defendants' Motion to (A) Dismiss the Consolidated Complaint And (B) Strike Certain Allegations Therein ("Browne Decl."), Ex. A (Beirne Tr.) at 46:18-25; 89:11-92:11; 60:4-11. Additionally, Section 5.7 of the JOA, among others, required that Anadarko be provided with material information through "realtime" online dataflow services.  ¶¶113, 131.  Section 6.2 of the JOA also gave Anadarko broad rights to monitor and approve BP's operation of the well, including the right to approve Authorization(s) For Expenditures (AFEs) exceeding $500,000. ¶¶37-39.  Anadarko received the information it contracted for: Anadarko had 24/7 access via the INSITE and "Well Space" databases to "realtime" data concerning operations at the Macondo well, as well as "daily reports, [mud] logs, geologic reports," and 24 hours histories and forecasts of the on goings at the well.   ¶¶40-45.  Further, Beirne personally had "day-to-day" contact with an Anadarko representative named Nick Huch – a Project Land Advisor with Anadarko.  ¶40; Browne Decl., Ex. A at 6:20-7:3.  Indeed, Anadarko itself has confirmed that all key information was provided to it during drilling.  ¶46.

### 2. Anadarko Ignored the Deficient Macondo Oil Spill Response Plan

The documents provided to Anadarko included the Macondo Oil Spill Response Plan ("Spill Plan") – a plan that, in accordance with regulations, BP had filed with the MMS.  ¶13. The Spill Plan was supposed to set out the actions that would be taken by the co-owners in the event of an oil spill.  As experienced oil industry executives, Defendants knew that a response plan was required for the exploratory drilling at the Macondo well.  ¶¶110-113.  Indeed, Anadarko had specifically bargained for the right to review the Spill Plan in the JOA.[2]  *Id.*  In keeping with BP's "complacency toward serious process safety risk," ¶126 (quoting BP's internal investigation of the Texas refinery explosion), the Spill Plan was a facially inadequate, error-ridden document.  For example, under the heading "sensitive biological resources," the

---

[2] Section 5.7 of the JOA toward required BP to furnish Anadarko with "a copy of each application for a permit to drill [and all amendments thereto]" and "copies of reports made to regulatory agencies."  ¶113.

plan listed walruses, sea otters, sea lions, and seals – animals that do not live in the Gulf of Mexico.  The plan listed Professor Peter Lutz of the University of Miami as a "go-to" resource in the even of a spill – but not only had Prof. Lutz left the University of Miami twenty years earlier, he had died in 2005.  The plan also listed obviously incorrect names of marine life specialists, and relied upon defunct offices for cleanup and animal rescue.  ¶¶114-117.

Crucially, the plan massively understated the potential dangers of a spill, while overestimating the co-owners' ability to contain one.  ¶¶117-118.  The plan stated that wildlife would be unharmed, beaches would remain pristine, and massively understated the size of any spill according to internationally accepted formulae for calculating spill volume.  The Congressional Committee on Energy and Commerce (the "Congressional Energy Committee") investigating Macondo later referred to the Spill Plan as "tragically flawed" and "embarrassing." ¶¶114-120.  Nonetheless, in direct contradiction to Anadarko's claim that the "Gulf of Mexico operations team views safety as a top priority," ¶172, no one at Anadarko took steps either to amend the Spill Plan or force BP to do so.  ¶121.

## III.    Drilling the Macondo Well

Deepwater wells are drilled in sections.  For each section, the rock is drilled through, then casing is installed and cemented to secure the wellbore, *i.e.,* the hole drilled for the purpose of producing oil, before moving on to the next section.  BP's original well design plan called for Macondo to be drilled to a depth of 19,650 feet, and was to be completed within 51 days.  BP estimated the total costs to be $96.2 million.  ¶¶48-50.

From the outset, drilling at Macondo was plagued with setbacks.  First, after Hurricane Ida caused months of delay by damaging the initial drilling rig, the expensive *Deepwater Horizon* oil rig was leased by BP and Andadarko, further increasing project costs.  ¶¶51-52. Drilling resumed on or about February 6, 2010 with a scheduled completion date of March 8, 2010, but the Macondo well was still not completed as of mid-April.  ¶¶51-53.  These delays cost the Macondo well partners millions of dollars and required Anadarko to authorize additional

expenditures.   ¶¶54-56.   In the end, with total costs on the project around $150 million, the Macondo well was approximately $58 million, or 61 percent, above the cost estimate.   ¶57.

Faced with these substantial delays and rising costs, BP and Anadarko made a series of decisions that sacrificed safety and violated industry guidelines in order to reduce costs and save time, in direct contradiction to Anadarko's assurances to investors regarding its adherence to safety protocols.

<u>Anadarko Approved A Less-Safe Well Casing Design To Save Time And Money</u>.   On April 13, 2010, due to "safety concerns and well bore integrity issues," BP informed Anadarko that drilling should cease prior to reaching the well's originally-planned depth.   Anadarko approved this decision that same day.   ¶¶63, 64.   The next step was to prepare the well for production, which included placing a final well "casing" on the deepest section of the well.   The liner or tieback casing design was the safe option; the alternative "long-string" casing was more dangerous.   ¶¶65-66.   BP prepared a document known as a "Forward Plan Review," dating from mid-April 2010, that recommended <u>against</u> "long string" casing because (1) it created fewer barriers to gas leakage, thus substantially increasing the risk that gas could leak into the well and cause a "blow-out"; and (2) it was more difficult to cement into place.   Further, the Forward Plan Review noted that the use of a single string of casing would result in a violation of MMS regulations.   ¶¶66, 67.   Pursuant to Section 5.7 of the JOA, Anadarko was provided with or had access to the Forward Plan Review (¶¶37, 67) and industry executives testified before Congress that long string casing was contrary to industry norms. ¶¶74-77.   Indeed, Anadarko itself later admitted that that because Macondo was a high-pressure exploration well, the long string casing was improper.   ¶78.

Nevertheless, Anadarko and BP chose long string casing because it would save time and decrease costs.   ¶¶68-69.   On April 14, 2010, BP prepared an AFE seeking funds for the specific

purpose of funding the long string casing.  ¶69.  Fully informed, Anadarko approved the request the next day.  ¶¶70-73; Browne Decl., Ex. A at 25:1-13; 69:7-17; 105:7-112:15.

      <u>Anadarko Approved The Use of Too Few Well Casing Centralizers</u>.  Anadarko and BP next had to ensure the well casing was properly centered.  According to the American Petroleum Institute (API), if the casing is not centered, the cement job will fail.  ¶80.  To ensure proper centralization, devices called centralizers attach around the casing as it is lowered into the well.  ¶¶80-81.  As Anadarko knew, the original well design plan called for 16 centralizers.  ¶¶81-82.  But on April 1, 2010, BP learned that its supplier only had six centralizers in stock.  *Id.*  Halliburton engineers performed an analysis and warned that the well would need more than six centralizers.  *Id.*  Indeed, the Forward Plan Review showed that with only six centralizers "[c]ement simulations indicate it is <u>unlikely</u> to be a successful cement job." ¶85.  Ignoring these and other warnings, BP decided to use only six centralizers.  ¶83.  A Halliburton analysis on April 18, 2010 reported that this would likely result in a failure of the cement job and a "SEVERE gas flow problem."  ¶¶83-84.  Anadarko was expressly informed of the decision to run only six centralizers – and knew it contradicted the initial well plan design.  ¶¶86-88; Browne Decl., Ex. A at 105:7-106:1.  Indeed, Anadarko has since admitted that it knew of the decision. *Id.*

      <u>Anadarko Approved The Failure To Properly Test The Cement Job.</u>  The final step in the drilling process was to cement the casing to the well wall in order to seal off the bottom.  The first step was to circulate the drilling mud.   API's Recommended Practices state that the mud should fully circulate from bottom to top before cementing.  ¶90.  At Macondo, mud circulation could have taken as long as 12 hours.  ¶91.  However, BP circulated only a small fraction of the required mud (350 barrels instead of the full 2,760 barrels).  This was a serious departure from standard industry practice.  ¶¶89-92.  Compounding this failure, BP and Anadarko also failed to perform a "cement bond log" to test the whether the cement had bonded to the casing.  ¶93.  MMS regulations require a cement bond log or equivalent test, and the Forward Plan Review

stated that one would be necessary for a long string casing.  ¶¶66, 96.  This was particularly true given that Anadarko was well aware of at least three prior issues with cementing integrity on the well.  ¶98.  Moreover, Anadarko had contracted for the receipt of "48 hours' advance notice of logging, coring, or testing operations," as well as real-time access to "cementation tallies," and other information that would have indicated whether a cement bond log had been performed. ¶97.  Industry experts later testified that it was "unheard of" to fail to perform a cement bond log. ¶96.

## IV.  The April 20, 2010 Explosion and Resulting Oil Spill

On April 20, 2010, gas leaked through the improper cement job, caught fire, and caused an explosion that left eleven people dead and the rig critically damaged.  Two days later, the *Deepwater Horizon* sank, causing a massive oil spill.  ¶¶99-102.  Without an effective spill plan in place, the Macondo co-owners responded with an ineffectual trial and error approach.  As each attempt failed, millions of barrels of oil gushed from the damaged well.  By late June 2010, oil had contaminated the coastlines of Louisiana, Alabama, Mississippi and Florida, with devastating effects.  The well was finally capped on July 15, 2010, 84 days after the rig sank, having dumped approximately 205 million gallons of crude oil in the Gulf.  ¶¶1, 103-109.

As the disaster worsened, Anadarko's stock price plunged from $73.18 per share on April 26 to $62.16 per share on April 30.  ¶¶145-146, 224.  Faced with a rising public relations disaster, Defendants sought to prop up Anadarko's stock price with false reassurances about its potential liability.  On May 3, 2010, Defendants issued a press release stating that Anadarko "maintains insurance policies designed to provide financial protection for such events," and that "net insurance coverage will likely total approximately $177.5 million, less deductibles of $15 million."  ¶147-148.  The next day, in response to a direct question by analysts regarding Anadarko's responsibility for the faulty well design, Daniels disclaimed all responsibility, stating that "[w]hen you typically approve these as a nonoperator, you basically approve just the capital

10

spending level in the targeted zones from a geological perspective, as opposed to looking at the detail, well design or procedures. We were not involved in that at all on this well." ¶¶149-151.

These materially false and misleading representations averted widespread investor panic, causing a brief uptick in Anadarko's stock price. ¶151. However, as millions of barrels of oil continued to pour into the Gulf, Anadarko's stock continued to plunge. On May 30, 2010, Congress released internal emails from the rig that revealed the recklessness of the Macondo well co-owners. ¶¶153-154. When the market reopened on June 1, 2010, the price of Anadarko's common stock plummeted by almost $10.00 per share – or approximately 20% – from the prior day's closing price. ¶¶155-160. Finally, on June 9, 2010, the last day of the Class Period, media reports focused on the glaring errors in the Macondo Spill Response Plan, and shares of the Company fell to below $34.50 per share, from the prior day's close of $42.80 per share, an approximately 19% single day decline. ¶161.

## V.    Post Class Period Events

On December 15, 2010, the United States filed a civil lawsuit against Anadarko and others, setting out detailed allegations against Anadarko, including allegations of "willful misconduct." ¶¶130-133. Federal agencies also commenced investigations. ¶¶134-143. The Presidential Commission report concluded that the "immediate causes of the Macondo well blowout" were "identifiable mistakes by BP …that reveal[ed]… systematic failures in risk management…." ¶138. Most of the investigations remain ongoing. ¶134.[3]

---

[3] New information continues to emerge about BP and Anadarko's post-spill conduct. News reports reveal that BP may have misrepresented what was known about the oil spill flow-rate, and Anadarko, due to Section 5.7 of the JOA, would have had the same information. Browne Decl., Ex. B. Further, an article published by The Guardian on April 15, 2011 uncovered emails indicating that BP sought to influence the research being conducted by independent scientists into the consequences of the Macondo spill. Browne Decl., Ex. C. This new information buttresses Plaintiffs' allegations that Anadarko misrepresented its potential liability after the spill. Further, numerous investigations concerning the disaster are ongoing. For instance, the Joint Marine Board's final report is due on July 27, 2011.

## ARGUMENT

### I.      The Complaint Alleges Claims For Violations Of Section 10(b)

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), prohibits the making of misstatements or omissions with scienter in connection with the purchase or sale of securities. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007).   Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(1), require plaintiffs to "specify" the fraudulent statements, "identify the speaker, [] state where and when the statements were made, and [] explain why the statements were fraudulent." *Id.* at 99.   On a motion to dismiss, the court must "accept[] all factual allegations in the complaint and draw[] all reasonable inferences in the plaintiff's favor."  *Id.* at 98.  Plaintiffs are not required to plead "detailed evidentiary matter." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

#### A.      Plaintiffs Allege Materially False And Misleading Statements

Rule 10b-5 prohibits making "any untrue statement" in connection with securities, or "omit[ting] to state a material fact" necessary to avoid misleading investors.   17 C.F.R. §240.10b-5.  A complaint need only allege facts "sufficient to support a reasonable belief" that defendants' statements were false.  *Novak v. Kasaks*. 216 F.3d 300, 314 (2d Cir. 2000).

##### 1.      False Statements Concerning Anadarko's Risk Management and Commitment to Safety

During the Class Period, Anadarko repeatedly touted its commitment to safe oil production and exploration, consistent risk management, and protection of the environment.  Its website proclaimed that "we are committed to safely producing the energy we all need in a manner that protects the environment, public health and supports our communities," ¶¶29, 169, and to "sustainable operations that protect our natural resources and preserve our environment," ¶171.  The Company told investors that it would "safely leverage leading-edge technology to create pathways to new opportunities for energy development, while preserving the

12

environment," and that "surface and subsurface risks are actively managed." ¶170.[4]   The Company assured investors of its adherence to environmental and safety laws and regulations in every country in which it operated. ¶¶174, 199.  With respect to the Gulf of Mexico specifically, the Company stated that it was "[p]ositioned for continued success in the deepwater Gulf of Mexico" and employed a "risking methodology" that "incorporates a rigorous technical and commercial evaluation, risked economics for comparability and continuous high grading with commercial focus."  ¶¶5, 31, 177; *see also* ¶¶4, 172 ("Anadarko's Gulf of Mexico operations team views safety as a top priority").

These statements were false.  From the outset of the Macondo well project, it was apparent that BP was the most reckless oil and gas company operating in the U.S. and, as Anadarko has conceded, the Macondo well was an exploratory and "high pressure" well in an "unfamiliar area," requiring special care.  ¶78.  It was therefore apparent that for Anadarko to adhere to its commitment to "comply with applicable environmental, health and safety laws, regulations" (¶174), it needed to exercise vigorous oversight.  Indeed, given BP's track record, Anadarko at least needed to review the basic well-related documents, which were immediately made available to Defendants.   ¶¶36-40, 104-121.   Nonetheless, directly contrary to its assurances to investors that it conducted a detailed "and very, very rigorous[] due diligence process before investing the Company's capital (¶216; *see also* ¶¶177, 182), Anadarko entered into its joint venture in reliance on a spill plan so facially inadequate that it was later described as "tragically flawed" and "embarrassing" by the Congressional Energy Committee.  ¶114.

---

[4]  Anadarko contends that its references to risk management did not concern safety or environmental protection, but instead concerned "geological outcomes."  Def. Mem. at 12.  To the contrary, in these statements, Anadarko claimed to gauge potential profitability of a site in light of the expected costs of commercial development – costs that necessarily included safety protections, and the expected risks that would flow from those decisions.  ¶¶200, 216; *E.g.*, Saltzstein Dec. Ex. 23, at 6.  For this reason, Defendants' citations on this point, Def. Mem. at 13, all of which involved undisclosed facts that were facially unrelated to the statements alleged to be false, are irrelevant.

13

Next, undermining its supposed commitment to "managing and operating its assets in a manner that … is consistent with all environmental laws and regulations," ¶199, Anadarko approved BP's disregard of fundamental safety protocols in its operation of the well, in direct violation of U.S. law.  ¶¶66, 96, 111; 30 C.F.R. § 250.401.  Numerous industry leaders testified before Congress that the long-string casing was inappropriate for the area, ¶¶74-77, and Anadarko itself publicly declared BP's actions to "represent gross negligence or willful misconduct."  ¶122.  As a result, Anadarko's assurances to investors of its compliance with safety laws and protocols were rendered false.  *See Novak*, 216 F.3d at 311 (actions taken in violation of publicly-described policies "caused those [statements] to be materially misleading in that the disclosed policy no longer reflected actual practice"); *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 475 (S.D.N.Y. 2006) (false representations regarding business model and policies are actionable).

Anadarko further misled investors by assuring them that it maintained insurance coverage for "certain physical damage, employer's liability, comprehensive general liability and worker's compensation insurance."  ¶¶212, 213.  Though Anadarko warned that it was not fully insured against "political risk, business-interruption risk and risk of major terrorist attacks and piracy," it made no such reservations with respect to physical damage and liability, implying that it maintained sufficient coverage for these areas.  However, given the Company's utter failure to exercise oversight over a partner that it knew to have an unparalleled history of willful safety violations – not to mention its failure to ensure that an even facially appropriate spill plan was maintained – Anadarko's coverage of only $177.5 million was plainly inadequate to deal with the predictable consequences of a blowout and spill.

Defendants respond by arguing that the Company's failure to adhere to safety protocols at a single site does not render its statements false as a matter of law.  Def. Mem. at 13.  However, Anadarko assured investors not only of "general" adherence to safety protocols and

14

regulations, but "consistent" adherence at each well.  ¶¶182, 216.[5]  In the oil industry, safety and potential environmental hazards are of paramount concern to investors because even a single accident can cause catastrophic damage and ruinous legal exposure.  ¶168.  Given the potentially devastating consequences of *any* deviations from proper safety precautions, an effective policy requires that safety protocols be followed at every single site – any other interpretation would render Anadarko's assurances meaningless.  *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894 (N.D. Ill. 2001) described this principle:

> The more important a fact would be to investors, the more likely its omission will mislead them.  Consequently, materiality is more like a continuum than a simple yes or no . . .  On one extreme, some facts are so important they independently demand disclosure.  Silence on the issue itself is misleading.  On the other extreme are direct misstatements. . . .  Discussing an issue, while withholding specific facts, can mislead.

*Id.* at 903; *see In re Sanofi-Aventis Sec. Litig.*, 2011 WL 1196052, at *7 (S.D.N.Y. 2011) ("where the duty to disclose arises from a need to avoid false or misleading statements 'the inquiries as to duty and materiality coalesce'" (quoting *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)).

Here, the Company's repeated, reckless departures from safety protocols at an unfamiliar, high pressure, exploratory site posed massive risks.  Given these potential consequences, Anadarko's conduct was sufficiently significant to render misleading its repeated claims of "safety as a top priority," "environmental stewardship" and "consistent" risk management.  *Cf. Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001) (materiality "depends on

---

[5] *See also* ¶216 ("[W]e're very rigorous about it and we get every single opportunity through [the Risk Consistency Team] and <u>it's not a onetime event</u>.");  ¶193 (stressing Anadarko's "commitment to … protecting the environment across all our operations"); ¶199 ("It is the goal at each Anadarko location to have and maintain a safe workplace.").

a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity" (quotations omitted)).[6]

      Defendants next contend that their statements were not false because they did not offer "unequivocal guarantees" that Anadarko would not experience accidents.  Def. Mem. at 14.  But Plaintiffs do not allege that they were misled into thinking that drilling operations were risk free; instead, Paintiffs allege that Anadarko mischaracterized the precautions it took to manage risks.  The Second Circuit has made it clear that statements mischaracterizing policies to manage risks can form the basis of a securities fraud claim.  *See Iowa Pub. Employees' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 142-44 (2d Cir. 2010).[7]  Nowhere did the court suggest that such policies must be worded as guarantees to be actionable; instead, the court held that by characterizing a risk management system as "robust," a defendant may "invite the inference that the system will reduce the firm's risk," and will be actionable if false.  *Id.* at 144; *Pommer v. Medtest Corp.*, 961 F.2d 620, 624 (7th Cir. 1992) ("It is not enough that the other party must have recognized a risk.  Risks are ubiquitous. Disclosures assist investors in determining the magnitude of risks.").

      *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009) is not to the contrary.  There, the challenged statements referred to risk management generally, only touting a commitment to "integrity" – and in an entirely different context than those posed in the highly-risky area of deepwater drilling.  *Id.* at 205-06.  These statements were deemed "too general to cause a reasonable investor to rely upon them."  *Id.* at

---

[6] Anadarko's departures from proper risk management were even more significant in light of the fact that the well was located in the Gulf of Mexico – a critical area of development for the Company.  ¶¶27-28.  Given the Company's repeated emphasis of the importance of this segment, its failure to adhere to its stated policies regarding safety and risk management in this area were particularly likely to mislead investors.  *See Litwin v. Blackstone Group*, L.P.,  634 F.3d 706, 719-20 (2d Cir. 2011) (court must evaluate whether the "misstatement or omission relates to a segment that plays a 'significant role' in the registrant's business"; material misstatements with respect to one area of the company are not "offset" by performance in other areas).

[7] Though *MF Global* involved claims under Section 11 of the Securities Act, the Second Circuit made it clear that its analysis applied equally to Section 10(b). *See* 620 F.3d at 141 n.8.

206.  Here, Anadarko promised detailed risk management procedures and emphasized a specific commitment to safety and environmental responsibility.  Courts routinely find similar statements to be actionable.[8]  Nor were Anadarko's statements inactionable merely because, buried in its SEC filings (entirely separate documents often untethered from the document in which the false statement appeared, *e.g.*, Saltztein Dec. Exs. 16, 17), it warned of risks associated with drilling.  Def. Mem. at 14.  Warnings of <u>future</u> risks cannot insulate a defendant from liability for misstatements of <u>current</u> fact – including statements about a company's approach to reducing risk.  *See MF Global*, 620 F.3d at 143-44; *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,  2011 WL 223540, at *54 (S.D.N.Y. 2011).[9]  More importantly, Anadarko's SEC filings only warned investors that its business was "subject to all of the operating risks <u>normally associated</u> with the exploration for and production, gathering, processing and transportation of oil and gas, including hurricanes, blowouts, cratering and fire…" ¶212 (emphasis added).  But the risks to which Anadarko subjected its investors were not "normal" – they were strikingly <u>abnormal</u> due to what Anadarko itself described as "reckless decisions and actions," ¶122 – all of which Anadarko approved.  At best, Anadarko's statements conveyed the impression that the Company was taking every precaution, but that some risk remained – a far cry from the truth, which was that the Company had sacrificed risk management and safety for time and money at a dangerous and unfamiliar site.  *See Freudenberg*, 712 F. Supp. 2d at 180 ("A statement is misleading if a reasonable investor would have received a false impression from the statement");

---

[8] *See In re Fannie Mae 2008 Secs. Litig.*, 742 F. Supp. 2d 382, 405 (S.D.N.Y. 2010) ("We believe that our assessment and approach to the management of credit risk continued to contribute in the third quarter of 2006 to the maintenance of a credit book of business with strong credit characteristics."; company can "provide more liquidity … without taking risks we are not capable of managing"); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 190-91 (S.D.N.Y. 2010).

[9] *Davidoff v. Farina*, 2005 WL 2030501 (S.D.N.Y. 2005) (Def. Mem. at 14), by contrast, involved allegations that the company's *future* projections – its business plan – were false, permitting the defendants to insulate themselves with detailed warnings outlining the risks. *Id.* at *3-5, *9-10.

*Time Warner*, 9 F.3d at 268 ("A duty to disclose arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements").[10]

Finally, the Complaint alleges that Anadarko misled investors regarding its insurance coverage. ¶212. Defendants contend that such statements are only false if made recklessly or without reasonable basis. Def. Mem. at 14-15. As discussed below, Plaintiffs do allege that these statements were made recklessly, because Anadarko could not have reasonably believed that they had sufficient coverage to cover the costs of exactly the sort of deepwater blowout that Anadarko was risking, particularly without a spill plan. Moreover, Anadarko could not have helped but recognize that by singling out incidents like "terrorist attacks and piracy" as insufficiently covered, it affirmatively implied that its coverage was sufficient for blowouts.

### 2. False Statements Concerning Anadarko's Post-Spill Exposure

Following the spill, Anadarko falsely assured investors that its potential liability was limited and that it was insured for expected liabilities. Anadarko announced: "The company maintains insurance policies designed to provide financial protection for such events, …. .[T]he company estimates its net insurance coverage will likely total approximately $177.5 million, less deductibles of $15 million." ¶¶147-49. By claiming that Anadarko maintained an insurance policy "designed to provide financial protection for such events," Anadarko falsely implied that the $177.5 million would be sufficient to cover its liabilities. But by now, as oil was gushing into the Gulf three weeks after the blast with no spill plan in place, $177.5 million was facially

---

[10] Nor is it relevant that Anadarko warned investors that it had ownership interests in sites that it did not operate. Anadarko's assurances that it adhered to proper safety protocols at every location would have led investors to believe that, at minimum, it was ensuring that basic precautions were followed even at these sites, which, as events have demonstrated, exposed Andarko to significant risk. Moreover, Anadarko had the option to withdraw from the Macondo well when it became aware of BP's conduct, or to propose alternative procedures, but it chose not to do so. ¶72; *see also* Saltzstein Dec. Ex. 39, at 8.

inadequate.  Further, Daniels told that as a nonoperator, "you basically approve just the capital spending level in the targeted zones from a geological perspective, as opposed to looking at the detail, well design or procedures. We were not involved in that at all on this well…"  ¶150. Daniels blatantly misrepresented Anadarko's role – which (as Anadarko has since admitted) included both <u>authorization</u> of the long string casing well design, and detailed access to "real-time" operations at the well.  ¶¶36-47; 58-98.

### 3.   Defendants' Statements Were Not "Puffery"

Certain vague statements may be deemed "puffery" that is immaterial as a matter of law. *See Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996).  Like all materiality issues, "puffery" determinations are fact-intensive and can be made on a motion to dismiss only when the statements "are so obviously unimportant" that reasonable minds cannot differ.  *In re Globalstar Sec. Litig.*, 2003 WL 22953163, at *8 (S.D.N.Y. 2003) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000)); *see also Matrixx*,  2011 WL 977060, at *3 (complaint need only "plausibly suggest[]" materiality in accordance with Rule 8(a)).  "Soft" statements are not puffery; even "conclusory" terms like "high" or "fair," when used in a commercial context, are "reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." *Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1093 (1991).  Thus, "where a defendant affirmatively characterizes management practice as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play'" and can subject the speaker to liability.  *In re Ambac Fin. Group, Inc., Sec., Litig.,* 693 F. Supp. 2d 241, 271 (S.D.N.Y. 2010) (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992)); *see also Novak ,* 216 F.3d at  315 ( "in good shape" and "under control" are actionable if false).[11]  To

---

[11] *See also Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 364 (1st Cir. 1994) (company practice was to "address issues in a timely and conservative manner" and company "worked from their conservative assumptions"); *Marsh*, 501 F. Supp. 2d at 475 ("Marsh provides value to clients by developing the most cost-effective responses to the risks they face"; "Our brokers' knowledge of the interests of insurers for different types of risk and their relationships with

determine whether statements are inactionable puffery, they "must not be assessed in a vacuum (i.e., by plucking the statements out of their context to determine whether the words, taken per se, are sufficiently 'vague' so as to constitute puffery)…. The statements are properly interpreted only by reference to the relevant circumstances that underlie their meaning." *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 175-76 (D.R.I. 2003).

Here, Anadarko's statements concerned issues of critical importance. Anadarko repeatedly stressed its commitment to safety, offering specific descriptions of its methods for managing risk, issuing entire press releases <u>solely</u> devoted to touting its safety awards, describing its environmental protections at length on its website, and distributing an "Environmental Health & Safety Brochure" (complete with illustrations of healthy wildlife). *E.g.*, Saltzstein Dec. Exs. 16-17, 27-34. It defies credulity that Anadarko would have gone to such lengths if it did not believe its statements would influence investors.[12] Anadarko even

---

senior underwriters are an advantage for clients as well as underwriters"); *In re Computer Assocs. Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999) ("business fundamentals are strong"); *In re PMA Capital Corp. Sec. Litig.*, 2005 WL 1806503, at *2 (E.D. Pa. 2005) ("committed to a philosophy of strict underwriting discipline"); *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 239 (S.D.N.Y. 2006) ("integrity and honesty are at the heart of our business"); *In re MidAtlantic Corp. S'holder Litig.*, 758 F. Supp. 226, 232 n.2 (S.D.N.Y. 2006) (bank had "an excellent record of credit quality" and had "adher[ed] to stringent credit criteria"); *Manavazian v. Atec Group, Inc.*, 160 F. Supp. 2d 468, 473 (E.D.N.Y. 2001) ("poised for future growth"; occupied a "strategic position in the technology industry"); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 2005 WL 2148919, at *2 (S.D.N.Y. 2005) ("strict and prudent underwriting standards"); *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 359 (S.D.N.Y. 2006) (banking remained a "sound business" and a "growth proposition"; defendants had "already implemented measures to re-focus the business and reduce its risk profile").

[12] *Weiner v. Quaker Oats Co*., 129 F.3d 310, 317 (3d Cir. 1997) (by repeating a statistic "in at least three separate places" in a document, defendants "created the reasonable understanding among investors that the [statistic] was a number to which [defendants] attached considerable significance"); *Atlas v. Accredited Home Lenders Holding Co.,* 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) (materiality found because of the "frequency with which Defendants emphasized [their policies] in press releases and other public statements"); *cf. Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) (statements can "through their context and manner of presentation, [become] devices which mislead investors").

assured investors of its compliance with laws and regulations (¶¶174, 199) exactly the sort of statement that courts routinely find material and, if false, actionable.  *See Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir. 1992); *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 741-42 (9th Cir. 2008).

These facts are thus very different from *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563 (6th Cir. 2003) (Def. Mem. at 15).  Those claims concerned a handful of scattershot and vague references to safety intermixed with more general statements about "corporate citizenship" that were found to be "so vague, so lacking in specificity" as to be immaterial.  *Id.* at 570-71.  Here, Anadarko did not merely make isolated references to safety amidst general references to "ethics" and "social responsibility," but instead discussed safety and environmental protection at length in numerous formats throughout the Class Period.

### 4. The Complaint Alleges Securities Fraud Not Mismanagement

"[T]he mere fact that the conduct in question arguably constitutes mismanagement will not preclude a claim . . . if the defendant[s] made a [misleading] statement of material fact." *In re Donna Karan Int'l Sec. Litig.*, 1998 WL 637547, at *10 (E.D.N.Y. 1998); *see also Sterling Heights*, 423 F. Supp. 2d at 355.  Plaintiffs have alleged that Anadarko was "aware that 'mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement,'" exactly as Section 10(b) forbids. *Serabian*, 24 F.3d at 361 (quoting *Hayes*, 982 F.2d at 106).

In *In re Union Carbide Class Action Sec. Litig.*, 648 F. Supp. 1322 (S.D.N.Y. 1986), cited by Defendants, the plaintiffs literally identified *no* misleading statements for the vast majority of their claims.  *See id.* at 1326.  The single actual misstatement identified by plaintiffs was ruled by the court to be truthful, due to certain internal information available to the company.  *Id.* at 1328. Here, there was no such information.[13]

---

[13] Defendants' remaining cases are similarly distinguishable.  *See Estate of Detwiler v. Offenbecher*, 728 F. Supp. 103, 143 (S.D.N.Y. 1989) (claim entirely premised on omissions);

**B.      The Complaint Adequately Alleges Scienter**

Scienter for a §10(b) violation is either intentional misconduct, or recklessness, defined as "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak*, 216 F.3d at 308.   A complaint must identify facts giving rise to a "strong inference" of scienter, 15 U.S.C. §78u-4(b)(2).   An inference is "strong" if it is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).   Accordingly, "where there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the plaintiff." *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008); *see City of Brockton Ret. Sys. v. Shaw Group, Inc.*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008) (same).   The court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (emphasis in original); *see also Matrixx,* 2011 WL 977060, at *14 (same).

Significantly, according to a unanimous Supreme Court, a strong inference of scienter may be pled even when reasonable nonculpable inferences exist, and even without allegations that the defendant had an unusual motive for committing fraud. *Matrixx*, 2011 WL 977060, *14; *see also Tellabs*, 551 U.S. at 325 ("the absence of a motive allegation is not fatal.").   Moreover, contrary to Defendants' argument (Def. Mem. at 17), *Matrixx* demonstrates that scienter can be pled without confidential witnesses.   To plead scienter against a corporate entity like Anadarko, a

---

*Lerner v. FNB Rochester Corp.,* 841 F. Supp. 97, 101 (W.D.N.Y. 1993) (plaintiffs allege no facts in that case to indicate that lending was so substandard as to be fraudulent).   And to the extent that *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) is interpreted to hold that risk management policies are not actionable as a matter of law, it is flatly at odds with *MF Global*.   Indeed, the district court in *In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d 595 (S.D.N.Y. 2005), in an opinion affirmed by the Second Circuit in *ECA*, flatly rejected this aspect of *Citigroup*.   363 F. Supp. 2d at 617-18.   *See also In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 532 (S.D.N.Y. 2009) (distinguishing *Citigroup*; plaintiffs may state a claim based on defendants' mischaracterization of their policies for reducing risk).

plaintiff may plead scienter against a specific individual, like the Individual Defendants, whose scienter is then imputed to Anadarko.  Alternatively, a complaint may raise a "strong inference" that company employees "approved" false corporate documents with scienter, without identifying which specific employees were responsible.  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008).

### 1.     Misstatements Prior to the Gulf Spill

#### a.     The Importance of the Well and the Magnitude of the Expenses Contribute to an Inference of Scienter

Courts routinely infer that a company's top officers are aware of facts critical to their core business segments.  *See In re Reserve Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d 310, 322-23 (S.D.N.Y. 2010); *Atlas Air Worldwide Holdings Inc., Sec., Litig.,* 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004); *In re Pall Corp.*, 2009 WL 3111777, at *7 (E.D.N.Y. 2009); *In re Winstar Commc'ns*, 2006 WL 473885, at *7 (S.D.N.Y. 2006).[14]  In this case, Defendants repeatedly emphasized the importance of operations in the Gulf, characterizing Anadarko as the "premier deepwater [oil] producer in the Gulf of Mexico," ¶28, and calling the region "a phenomenal growth area for us," ¶27; *see also* ¶176.  Its SEC filings emphasized the significance of the Company's Gulf of Mexico operations, Saltzstein Dec. Ex. 6.  The Macondo well, in particular, had Defendants' attention:  Hackett, Anadarko's CEO and Chair – and, at the relevant time, also

---

[14] As far as Plaintiffs are aware, even after the PSLRA, every circuit to consider the matter has recognized that such inferences are appropriate. *See also South Ferry LP No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis."); *Aldridge v. AT Cross Corp.*, 284 F.3d 72, 84 (1st Cir. 2002) (scienter inferred from fact that relevant product line "was very important" to the company and a "primary driver" of growth); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 707-09 (7th Cir. 2008) ("*Tellabs II*") (misrepresentations concerning a company's "most important products" are likely to result from management's recklessness or intent); *Nathenson v. Zonagen, Inc*., 267 F.3d 400, 424-425 (5th Cir. 2001) (inferring corporate officers' scienter where fraud involved company's core product); *Dynex*, 531 F.3d at 195-96 (following *Tellabs II*); *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009) (inferring CFO's knowledge of basic company finances).

Anadarko's president – personally decided to make the initial $24 million investment in Macondo, ¶34, and thus necessarily was familiar with the terms of the deal and (critically) the identity of Anadarko's joint venturer. Given Hackett's involvement, the well and the deal terms must also have at least been vetted and monitored by Daniels, head of the division in charge of deepwater oil exploration. *Cf. Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003) (information known to the CFO is generally known to the CEO).

The expenses associated with the well further contribute to the inference that Macondo was monitored by Anadarko's highest officers, who authorized millions of dollars of expenses, on four separate occasions, to pay for the "nightmare" well. ¶¶54-57, 68-69. *See Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 840 (N.D. Ill. 2000) (knowledge inferred from their positions in the company, and "considering the amounts of money involved"). Finally, with respect to Anadarko's misleading claims it maintained sufficient insurance to cover physical damage and general liability, it is simply "absurd to suggest that management was without knowledge" of the nature and terms of its coverage. *South Ferry* 542 F.3d at 786. Particularly after the spill, all Defendants were undoubtedly intensely focused on Macondo.

### b.     BP's Abysmal Safety Record Contributes to the Inference of Scienter

Scienter may also be inferred from the presence of "red flags" "that would place a reasonable party in defendant's position on notice" of "wrongdoing." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 406 (S.D.N.Y. 2005). Here, such "red flags" existed in the identity of Anadarko's joint venturer – BP. It cannot seriously be doubted that BP's checkered history was common knowledge in the industry, and known to Anadarko executives. Any reasonable executive would have recognized the risk of serious safety hazards, and Defendants were fully aware that to ensure consistency with their public representations, they needed to diligently monitor BP's performance. Because, as described further below, reports detailing BP's track record were fully available, Defendants either had direct knowledge

24

of BP's actions, or deliberately avoided such knowledge.  *Cf. id.* at 406-07 ("red flags" existed where executives knew about, or had access to, reports of wrongdoing at a subsidiary).  The Complaint therefore pleads that "the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Novak*, 216 F.3d at 308.  Though Defendants contend that BP's reputation and history cannot, as a matter of law, constitute a "red flag," none of the cases they cite stands for that proposition, and any such rule would fly in the face of *Tellabs*'s requirement that courts consider "*all* of the facts alleged, taken collectively."  551 U.S. at 323 (emphasis in original).[15]

Defendants' further claim that because BP's regulatory violations occurred at its refineries, they had no need to be concerned about its drilling operations (Def. Mem. at 25), is absurd.  OSHA determined that BP suffered safety deficiencies "at all levels." ¶126.

### c.    Defendants' Access to Detailed Information About Macondo Contributes to the Inference of Scienter

"[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements."  *Novak*, 216 F.3d at 308.  "[A]llegations of recklessness [are also] sufficient where … defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud."  *Id.*; *see also South Ferry*, 542 F.3d at 786 (strong inference of scienter may be raised through allegations that "suggest that defendants had actual access to the disputed information").

---

[15] *Teamsters Allied Benefit Funds v. McGraw*, 2010 WL 882883, at *11 (S.D.N.Y. 2010) held that the alleged red flag– a governmental investigation – was irrelevant because it post-dated the period of the alleged misconduct.  In *Hershfang v. Citicorp*, 767 F. Supp. 1251 (S.D.N.Y. 1991), the plaintiff failed to provide *any* specifics regarding the supposed "red flags."  *Id.* at 1258.  In *Malin v. XL Capital*, 499 F. Supp. 2d 117 (D. Conn. 2007), the plaintiffs failed to show that the report at issue was available to the defendants during the relevant time period, the report itself described problems that existed prior to the class period, the company had a history of resolving problems that had appeared in similar reports, and the report only documented "immaterial" problems.  *See id.* at 142-43.

Here, a cursory review would have revealed that, as a practical matter, there was no spill plan in place for Macondo. The Spill Plan was available to Anadarko as early as the summer of 2009 (¶36) and, given BP's history of regulatory violations, a meaningful review of the plan was the most obvious, and most minimal, step Anadarko could take to ensure the truthfulness of its public statements. Yet rather than take any action to correct the plan, Anadarko allowed it to remain in effect for the entire time it was involved with the well.[16]

Once aware of the deficient Spill Plan, and given BP's history, Defendants should have been even more vigilant in their oversight. Nonetheless, Defendants not only ignored, but explicitly authorized, additional short-cuts that Hackett himself would later admit were reckless and were directly responsible for the explosion and resulting spill. ¶122. These cost-cutting measures were consistent with Hackett's strategy to bring projects in on time and at low cost – or, as Hackett phrased it, "continuing to drive down costs." ¶60; *see also* ¶61 ("we are very, very good at managing projects both from a time and a capital standpoint and bringing these very large megaprojects on production, on time, and on budget").

Defendants were fully apprised of – and approved – these measures. The Complaint details the specific reports and databases that informed Defendants of each decision and allowed them to view drilling operations in "real time." ¶¶37, 39-97, 131. Anadarko received both the Forward Plan Review and the Daily Operations Report and had access to Halliburton's simulation. ¶¶84, 85, 87. Anadarko specifically approved the long string casing (¶¶69-73), and admitted knowledge of the decision to use only 6 centralizers (¶88). Thus, the Complaint easily satisfies the requirement that it "specifically identify the reports" containing facts contradicting Defendants' public statements. *Novak*, 216 F.3d at 309; *In re Cabletron Sys., Inc.*, 311 F.3d 11,

---

[16] Defendants insist that the deficiencies in the Spill Plan are only "after-the-fact" conclusions by journalists and therefore cannot contribute to an inference of scienter. Def. 25-26 & n.12. But testimony before Congress demonstrates that it was "tragically" and obviously flawed, as would have been apparent at the time to any oil executive who bothered to review the oil spill plan.

31-32 (1st Cir. 2002) (detailed descriptions of databases support an inference of defendants' knowledge).   Indeed, Defendants themselves represented that they performed a thorough due diligence on every site (¶¶174, 182, 216), and in Anadarko's SEC filings, both Hackett and Gwin certified that Anadarko had "effective" procedures to "ensure that information required to be disclosed" by the Exchange Act was "accumulated and communicated" to them.  Saltzstein Dec. Ex. 7.  *See In re Take-Two Interactive Sec. Litig*., 551 F. Supp. 2d 247, 304-05 (S.D.N.Y. 2008) (certifications of internal controls raise an inference of scienter if there were "red flags" the signatories would have recognized).[17]

Nor could Defendants have failed to recognize the significant danger that these decisions posed, let alone their cumulative effect:  not only did industry executives agree the long string casing design was inappropriate for the region, but Anadarko itself stated that it would not use such a design on a high-pressure, exploratory well.  ¶¶74-78.  Anadarko similarly could not have missed that BP had failed to perform a cement bond log: congressional testimony confirmed that the failure to run a cement bond log was "unheard of" within the industry, ¶96, and Anadarko was aware that there had already been three previous cementing issues at the well.  ¶98.  The Presidential Commission concluded that the mistakes were "identifiable" and reflected "systematic failures in risk management."  ¶138.  And if there were any remaining doubts about whether the Defendants would have readily perceived the dangers of BP's conduct, they are resolved by Hackett's admission that BP's actions constituted "gross negligence or willful misconduct."  ¶122.  Thus, the Complaint alleges that Defendants ignored "reasonably available

---

[17] Defendants contend the Complaint fails to allege when the information regarding BP's reckless disregard of safety protocols was received. Def. Mem. at 20. To the contrary, Plaintiffs allege that Anadarko authorized the long string well casing design on April 15, 2010, and that BP's other decisions were known to Anadarko before the blowout, due to its receipt of regular reports and real-time data, including an April 18 report of the decision to use 6 centralizers. ¶¶73, 84.  Indeed, Anadarko conceded it knew about the decision to use 6 centralizers.  ¶88.  The information regarding the Spill Plan was also available to Anadarko from the beginning of the Class Period.  ¶¶112-113.

data that would have indicated that [Anadarko's] statements were materially false or misleading." *Atlas Air*, 324 F. Supp. 2d at 491; *see also In re BP Prudhoe Bay Royalty Trust Sec. Litig.*, 2007 WL 3171435, at *3 (W.D. Wash. 2007) (scienter pled where defendants were warned about inadequate maintenance at a pipeline). Indeed, the United States, after an exhaustive investigation, charged Anadarko with "gross negligence and/or willful misconduct." ¶¶130-33. *See In re Brooks Automation, Inc. Sec. Litig.*, 2007 WL 4754051, at *10 (D. Mass. 2007) (considering allegations in SEC complaint when evaluating scienter). Thus, the Complaint raises a strong inference that Defendants should have recognized that their public claims to adhere to regulations were undermined by the conduct at Macondo. ¶174.

Defendants' primary argument in response is that the Complaint fails to allege that these reports were specifically reviewed by the Individual Defendants. Def. Mem. at 20.[18] However, as *Matrixx* makes clear, a complaint may plead scienter against individual corporate officers even in the absence of allegations that they received specific reports. 2011 WL 977060, at *14 (scienter alleged against three individual defendants, even though the complaint only alleged that one had received specific reports).[19] Here, Hackett was personally involved with the well, the Individual Defendants knew BP's history, and the well required repeated authorizations of additional expenditures. This is sufficient to plead either that the Individual Defendants were aware of BP's conduct and ignored it, or that, knowing of BP's history, nevertheless recklessly

---

[18] Defendants cite a number of cases for the broad proposition that a complaint must specifically identify any reports containing information that contradicted the alleged false statements. Def. Mem. at 19-20. As described above, Plaintiffs *do* identify such reports including, among other things, Anadarko's own authorization for BP to use the long string casing design. This case is thus very unlike *Dynex*, for example, where the complaint "lack[ed] even an allegation that these [raw] data had been collected into reports." 531 F.3d at 196.

[19] Even before *Matrixx*, the Ninth Circuit recognized that, after *Tellabs*, it is inappropriate to impose a rigid requirement that all pleadings specifically allege the reports, their contents, and their receipt by the defendants. *See South Ferry*, 542 F.3d at 783-84.

failed to review the drilling operations. *See Van der Moolen*, 405 F. Supp. 2d at 406-07 (inferring that reports available to defendants were brought to the defendants' attention).[20]

Moreover, even if *arguendo* the Complaint fails to plead scienter against the Individual Defendants, it still does so against <u>Anadarko</u>. Plaintiffs may plead scienter against a corporation by raising a strong inference that <u>some</u> agent acted with scienter, even if that agent is not identified at pleading. *See Dynex*, 531 F.3d at 197. Here, the importance of the well, the need for approval of the long string casing, and the sheer obviousness of the problems, creates a strong inference that the problems were known to <u>at least some</u> executives with authority over Anadarko's statements.

Defendants also dispute Plaintiffs' allegations as a factual matter, denying that Anadarko received the Halliburton simulation regarding the consequences of using 6 centralizers. Def. Mem. at 19-20. However, Anadarko's unfettered access to drilling operations data and documents both through the JOA and the INSITE and Well Site systems give rise to the natural inference that the report was certainly made available to Anadarko. *See ATSI*, 493 F.3d at 98 (even after the PSLRA, courts must draw reasonable inferences in the plaintiffs' favor). Beirne's testimony cited by Defendants in no way contradicts this inference – Beirne states only that he

---

[20] Relying on *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144 (2d Cir. 2010) ("*PIMCO*"), Defendants contend that the Individual Defendants cannot be held liable for statements not directly attributed to them. Def. Mem. at 22 & n.10. *PIMCO* expressly limited its holding to <u>non-employees</u> of the issuer, and left undisturbed its prior holding in *Scholastic*, 252 F.3d at 75-76, that employees may be held liable when they are involved in drafting, reviewing, or disseminating the false statements. 603 F.3d at 158 n.6. Further, it is well-established in this Circuit that, at the pleading stage, it is appropriate to presume that "group-published" documents – such as SEC filings and press releases – "are the collective work of those individuals with direct involvement in the everyday business of the company" such as the Individual Defendants. *In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 637 (S.D.N.Y. 2008); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005). In any event, each defendant personally made false statements or signed false SEC filings. *See Freudenberg*, 712 F. Supp. 2d at 195 ("each defendant may be held responsible for the false and misleading statements contained in the financial statements he signed").

personally <u>was not involved</u> in communicating the Halliburton report.  Browne Decl., Ex. A, 76-77.  More importantly, the Complaint also alleges that Anadarko received the Forward Plan Review, which <u>also</u> warned of the dangers of using 6 centralizers.  ¶¶85, 86.  Indeed, given that Anadarko knew of the original well design, ¶81, admitted that it knew of the change, ¶88, and Hackett characterized the decisions made at the well and approved by Anadarko as reckless, ¶122, these allegations alone are sufficient to demonstrate that Defendants knowingly approved of BP's conduct.[21]  Similarly, Defendants' alternate interpretation of the Daily Operations Report not only draws a distinction without a difference, Def. Mem. at 21, but is irrelevant in light of Anadarko's admissions of knowledge.[22]   Finally, Defendants claim that the Forward Plan Review did not specifically use the phrase "blow out" as a consequence of a long string casing, Def. Mem. at 21; however, the Forward Plan Review warned that the long string casing was "unlikely to be a successful cement job," and would cause an "open annulus to the wellhead, with…seal assembly as only barrier," ¶66 – *i.e.*, create a situation that would allow gas to leak into the well, thus likely causing a blow-out.

### d.      Defendants' Motives Contribute to an Inference of Scienter

Contrary to Defendants' argument, Def. Mem. at 16, 18, motive allegations are part of a holistic inquiry, to be considered together with allegations that suggesting recklessness.  *Tellabs*, 551 U.S. at 325; *see also Avaya*, 564 F.3d at 277 (after *Tellabs*, it is no longer appropriate to consider motive allegations separately from recklessness).   Nowhere did the Supreme Court suggest in either *Tellabs* or *Matrixx* that allegations of recklessness must be "greater" when

---

[21] Nor are Defendants correct that the reports were generated after the statements were made.  Def. Mem. at 22.  Many of Defendants' false statements remained on their website throughout the Class Period.  ¶¶169-177.  Moreover, Defendants' reckless disregard of safety protocols began at the start of the Class Period, when Hackett and the other Defendants failed to review – or ignored – the Spill Plan even in the face of BP's egregious safety record.

[22] On its face, the document is dated April 18, 2010, not April 19, 2010, as Defendants contend.  (Def. Mem. at 21).  Saltzstein Dec. Ex. 41.  Even the Declaration of Susan L. Saltzstein describes it as dated April 18, 2010.  The April 19 date stamp may have been an artifact of printing.

motive is absent; to the contrary, *Tellabs* held that "allegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint." 551 U.S. at 325; *see also South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 112-13 (2d Cir. 2009) (considering potential motives simultaneously with allegations of recklessness).   In any event, the Complaint here has alleged motives that, considered collectively with the other allegations, raise a strong inference of scienter.

### i.   Defendants were motivated to complete the project quickly and minimize costs

Throughout the Class Period, Defendants emphasized their ability to complete projects quickly.   ¶¶60-61, 201-202, 207, 209.   The Macondo well, however, was not only behind schedule, but hemorrhaging cash.   Defendants thus had the same motives as BP to cut corners. Though this motive, standing alone, may not be enough to plead scienter, "common sense" dictates that it is an "important part of the overall picture of scienter." *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 664 (8th Cir. 2001).[23]   Nor is there anything "economically irrational" about such a motive, as Defendants suggest, Def. Mem. at 18; "The fact that a gamble … fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Tellabs II*, 513 F.3d at 710.   After all, Defendants have admitted that BP *did* take such a gamble; it is hardly implausible that Anadarko, too, chose to roll the dice.

### ii.   Hackett Was Motivated to Avoid Personal Losses Through Rapid Stock Sales

Hackett's insider trading further contributes to the inference that he had knowledge that Anadarko had abandoned its "commitment" to safety.   Prior to the explosion, Hackett divested himself of 871,534 shares of Anadarko stock, including a single day sell off three weeks before

---

[23] The Supreme Court endorsed the use of such "mundane" motives in *Matrixx*, when it held that the complaint raised an inference that the defendants had withheld material information for the ordinary, run-of-the-mill purpose of avoiding a stock price drop.  2011 WL 977060, at *14.  The Court thus made it clear that such motives must be considered collectively with other allegations.

31

the explosion of 69% of his Anadarko holdings.[24]   Notably, Hackett had not sold a single share of Anadarko's common stock in the two years preceding the Class Period.   ¶¶163-167. Collectively, these sales support an inference that that Hackett knew of the risks being taken and sought to "cash out" before those risks could materialize.[25]

Defendants argue that Hackett retained a substantial portion of his holdings, thereby weakening any inference of scienter.  Def. Mem. at 29.  But those holdings were unvested stock options that Hackett had no opportunity to sell; if such options are included in the analysis, they would always constitute an unfair "thumb on the scale" in favor of defendants.  For this reason, district courts routinely decline to consider unexercisable options.  *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 100 (S.D.N.Y. 2006).[26]

---

[24] Though Hackett was the only defendant to sell shares, the absence of insider selling on the part of other defendants does not defeat an inference of scienter.  First, as described above, the fact that the other defendants may not have had a personal motive does not, under *Tellabs* and *Matrixx*, mean that a strong inference of scienter cannot be raised against them.  Moreover, the Second Circuit has made it clear that where only a subset of defendants engaged in insider sales, those sales may create an inference of scienter against the selling defendants where – as here – the selling defendant had the ability to commit the fraud independently.  *See Stevelman v. Alias Research Inc*., 174 F.3d 79, 86 (2d Cir. 1999); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Phillip Morris Cos., Inc.*, 75 F.3d 801, 814 n.14 (2d Cir. 1996).

[25] Defendants' arguments in response are unavailing.  That Hackett's first sale was several months prior to the explosion is irrelevant; none of Defendants' cases suggest otherwise.  In *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 385 (E.D.N.Y. 2003), the sales were not made around the time of any of the alleged false statement, and there were no other allegations to support scienter.  In *Shaw Group*, 540 F. Supp. 2d at 475, the plaintiff failed to allege that the timing of the stock sales benefitted the defendants.   Finally, in *Avon Prods., Inc. Sec. Litig.,* 2009 WL 848017, at *21 (S.D.N.Y. 2009), the defendants purchased more shares than they sold during the class period.  Here, Hackett did not make any open market purchases during the Class Period.  ¶167.

[26] Moreover, absent discovery, it is impossible to determine the significance of the unvested options.  *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) ("[defendants] may have exercised options to buy at a very low price per share, in which case the shares would have been valuable to the defendants even after the stock plummeted.").

Even accepting Defendants' interpretation, however, even if Hackett's option contracts are included, he still sold a shocking 39% of his total holdings in a single day.   This extraordinary sale strongly contributes to the inference of scienter.  *EVCI*, 469 F. Supp. 2d at 100 (S.D.N.Y. 2006) ("[Defendant] sold far too much stock . . . to wriggle out from a fair inference of motive and opportunity to committed fraud."); *Oxford Health*, 187 F.R.D. at 140.

### 2.       Misstatements Made After the Gulf Spill

The inference of scienter is even stronger for statements made after the explosion, as millions of barrels of oil continued to gush into the Gulf.  At that point, there can be no serious doubt that Defendants' full attention was focused on the well, the conduct that had led to the explosion, and Anadarko's potential liability.  Defendants knew that there was no effective spill plan in place, and – given their industry experience – plainly foresaw the incredible damage the spill would cause.  Nonetheless, Anadarko falsely implied that its $177.5 million in insurance would cover its exposure, and Daniels, in response to direct questioning, falsely told investors that Anadarko was "not involved at all" in the well's design and procedures.  These assurances averted a precipitous drop in Anadarko's stock price.  ¶¶147-151.

Under such circumstances, "the most powerful evidence of scienter is the content and context of [the] statements themselves."  *Avaya*, 564 F.3d at 269.  At a time when Defendants were focused specifically on Macondo, when all of the information was unquestionably available to them, they nonetheless understated their exposure and falsely denied any substantive involvement in the fateful decisions that led to the blowout.  As the Third Circuit recognized, under such circumstances, ignorance of the truth is not exculpatory: if Defendants provide false information without confirming its accuracy, they acted recklessly.  *Id.* at 270; *see also Plymouth County Ret. Ass'n v. Schroeder*, 576 F. Supp. 2d 360, 382 (E.D.N.Y. 2008) (directors "had a duty to investigate whether [their] statements were accurate").

## II.     Plaintiffs' Allegations Are Confirmed By Government Complaint

Defendants insist that this Court must disregard allegations based on the Government Complaint against Anadarko.  Def. Mem. at 24.  In fact, "[t]here is no absolute rule barring a private plaintiff from relying on government pleadings and proceedings in order to meet the Rule 9(b) and PSLRA thresholds." *SEC v. Lee,* 720 F. Supp. 2d 305, 340 (S.D.N.Y. 2010).[27]   Given the high PSLRA pleading standards, it is common for plaintiffs to rely on newspapers and other second-hand sources in formulating their allegations; Defendants offer no reason why a complaint – if it was filed after sufficient investigation – should be any less permissible.[28]

## III.    The Individual Defendants Are Liable As Control Persons

Section 20(a) of the 1934 Act imposes liability on persons who "directly or indirectly, control[] any person liable" under §10(b), "unless the controlling person acted in good faith." 15

---

[27] *See also Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC,* 376 F. Supp. 2d 385, 395 (S.D.N.Y. 2005); *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 403 (S.D.N.Y. 2010); *De la Fuente v. DCI Telecomms., Inc.*, 259 F. Supp. 2d 250, 260 (S.D.N.Y. 2003); *In re Livent Inc. Sec. Litig.*, 148 F. Supp. 2d 331, 367 (S.D.N.Y. 2001).  Courts also permit pleading based on unproven allegations in private civil complaints.  *Johns v. Bayer Corp.*, 2010 WL 2573493, at *2 (S.D. Cal. 2010); *In re Xcelera.com Sec. Litig.*, 2002 WL 745835, at *2-3 (D. Mass. 2002).

[28] *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976), which did not involve a PSLRA complaint, struck allegations regarding an SEC complaint because the SEC complaint could not be introduced for collateral estoppel purposes under the Federal Rules of Evidence.  In so doing, the court recognized that the views of the SEC as expressed in the complaint were potentially relevant and could be introduced at trial, and observed that the plaintiff would suffer no prejudice if the allegations were removed.  *See id.* at 893-94.  Here, Plaintiffs do not cite the complaint for estoppels purposes, but to illustrate the views of the Government, which were formed after a thorough investigation.  *See Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 454 (S.D.N.Y. 2008) (*Lipsky* does not bar inclusion of such materials in a complaint as part of the "factual background" of a case).  Moreover, given the higher PSLRA pleading burdens, a rule barring such allegations would prejudice plaintiffs.  In the PSLRA context, *pleadings* need not meet evidentiary standards; for example, hearsay allegations may be considered, *see Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 997 n.4 (9th Cir. 2009), and courts may consider allegations by unnamed sources, *Novak*, 216 F.3d at 314.  As the Second Circuit has made clear, the PSLRA does not require plaintiffs to plead "detailed evidentiary matter." *Scholastic*, 252 F.3d at 72; *see also Cabletron*, 311 F.3d at 33 (securities fraud plaintiffs need not "plead evidence").

U.S.C. § 78t(a).  Liability under §20(a) is a "separate inquiry from that of primary liability." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001).  Once a plaintiff makes out a prima facie case, "the burden shifts to the defendant to show that he acted in good faith."  *SEC v. First Jersey Sec.*, *Inc.*, 101 F.3d 1450, 1473 (2d Cir. 1996).

The Individual Defendants do not dispute that they controlled Anadarko.  For the reasons above, the Complaint states a claim against Anadarko as a primary violator.  Therefore, the Complaint states a §20(a) claim against the Individual Defendants.  Although Defendants contend that the Complaint must additionally show that they culpably participated in the fraud, the burden of showing good faith remains on the defendants.  *See In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 309-10 (S.D.N.Y. 2005); *In re Parmalat Sec. Litig.*, 497 F. Supp. 2d 526, 532 n.42 (S.D.N.Y. 2007).  Even if culpable participation is required, §20(a) claims are evaluated under Rule 8(a)'s notice pleading standard, *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 2005 WL 2148919, at *7 & n.95 (S.D.N.Y. 2005), and "culpable participation" may include negligence, *In re Initial Pub. Offering Sec. Litig.,* 241 F. Supp. 2d 281, 396 n.184 (S.D.N.Y. 2003).  The Complaint more than pleads negligence under rule 8(a).

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied.  In the alternative, Plaintiffs request leave to amend.[29]

Dated:  April 18, 2011

Respectfully submitted,

  /s/ John C. Browne
John C. Browne
**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
1285 Avenue of the Americas, 38th Floor
New York, New York 10019
Telephone: 212-554-1400

---

[29] "The court should freely give [leave to amend] when justice so requires." Fed. R. Civ. P. 15(a).

Facsimile: 212-554-1444
*Lead Counsel for Lead Plaintiffs*

## CERTIFICATE OF SERVICE

I, BRETT VAN BENTHYSEN, hereby certify that on the 18th day of April, 2011, I caused to be served a true and correct copy of LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO (A) DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT AND (B) STRIKE ALLEGATIONS HEREIN, and the DECLARATION OF JOHN C. BROWNE IN OPPOSITION TO DEFENDANTS' MOTION TO (A) DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT AND (B) STRIKE ALLEGATIONS HEREIN by hand delivery and via electronic mail upon the parties listed below.

> Jay B. Kasner
> Skadden, Arps, Slate, Meagher, & Flom, LLP
> Four Times Square, 42[nd] Floor
> New York, NY 10036

Dated: April 18, 2010

_____
Brett Van Benthysen